1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

FATE THERAPEUTICS, INC.; and
WHITEHEAD INSTITUTE FOR
BIOMEDICAL RESEARCH,

Plaintiffs,

v.

SHORELINE BIOSCIENCES, INC.; and
DAN S. KAUFMAN,

Defendants.

Case No.:  22-cv-00676-H-MSB

**CLAIM CONSTRUCTION ORDER**

In the present action, Plaintiffs Fate Therapeutics, Inc. ("Fate") and Whitehead Institute for Biomedical Research ("Whitehead") assert claims for patent infringement against Defendants Shoreline Biosciences, Inc. ("Shoreline") and Dan S. Kaufman, alleging claims for infringement of U.S. Patent Nos. 8,071,369 ("the '369 Patent"), 8,932,856 ("the '856 Patent"), 8,951,797 ("the '797 Patent"), 8,940,536 ("the '536 Patent"), 9,169,490 ("the '490 Patent"), U.S. Patent No. 10,017,744 ("the '744 Patent"), and 10,457,917 ("the '917 Patent") (collectively, "the asserted patents").  (Doc. No. 162, Supp. FAC ¶¶ 157-414.)  On January 6, 2023, the parties filed their amended joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2.  (Doc. No. 113.)   On February 7, 2023, the parties each filed their opening claim

construction briefs.  (Doc. Nos. 149, 150, 151.)  On February 17, 2023, the parties each filed their responsive claim construction briefs.  (Doc. Nos. 178, 179, 180.)  On February 22, 2023, the Court issued a tentative claim construction order.  (Doc. No. 192.)

The Court held a claim construction hearing on February 27, 2023.  Jonathan D. Ball, Rose C. Prey, Giancarlo L. Scaccia, Danielle M. Zapata, and Joseph T. Ergastolo appeared for Plaintiffs.  Eric M. Acker, Drew A. Hillier, and Sarah J. Vandervalk appeared for Defendant Shoreline.  Sudip Kundu and Nicol Malick appeared for Defendant Kaufman.  After considering the parties' briefs, the parties' arguments at the hearing, and all relevant information, the Court issues the following claim construction order.

## Background

In the present action, Plaintiffs allege that Defendants infringe the asserted patents under 35 U.S.C. § 271(a) and 35 U.S.C. § 271(b) and that Defendants infringe the asserted method patents under 35 U.S.C. § 271(g).[1]  (See Doc. No. 162, Supp. FAC ¶¶ 157-414.) Specifically, Plaintiffs allege that Defendants, individually and acting in concert, make, use, sell, offer for sale, and/or import induced pluripotent stem cells ("iPSCs") that infringe one or more claims of the asserted patents.[2]  (Id. ¶ 140; see, e.g., id. ¶¶ 162 ("Defendants' use of their 'iPSC-derived cell therapy manufacturing platform' infringed at least claim 1 of the '369 Patent."), 212 ("iPSCs used by Defendants to make at least the iPSC-derived

---

[1]    The asserted method patents are the '856 Patent, the '536 Patent, the '744 Patent, and the '917 Patent.

[2]    Induced pluripotent stem cells ("iPSCs") "are pluripotent stem cells generated from somatic cells by reprogramming."  (Doc. 162, Supp. FAC ¶ 31; see Doc. No. 184, Answer to Supp. FAC ¶ 31; see also Doc. No. 151-14, Plath Decl. ¶ 59; Doc. No. 152, Snyder Decl. ¶ 43.)  "Four specific genes—cMYC, OCT3/4, SOX2 and KLF4—encoding transcription factors play a role in converting or reprogramming somatic cells into pluripotent stem cells."  (Doc. 162, Supp. FAC ¶ 32; see Doc. No. 184, Answer to Supp. FAC ¶ 32; Doc. No. 204, Answer to Supp. FAC ¶ 32; see also Doc. No. 184, Counterclaims ¶ 43 ("iPSCs are generated in culture from somatic cells through the introduction of reprogramming factors that transform a somatic cell into a pluripotent state."); Doc. No. 152, Snyder Decl. ¶¶ 41, 43.)

natural kill (NK) cell platforms are made by a process that comprises at least each step of claim 1 of the '856 Patent.").)

Plaintiff Whitehead is the owner via assignment of the patents-in-suit.  See U.S. Patent No. 8,071,369, at [73] (issued Dec. 6, 2011); U.S. Patent No. 8,932,856, at [73] (issued Jan. 13, 2015); U.S. Patent No. 8,951,797, at [73] (issued Feb. 10, 2015); U.S. Patent No. 8,940,536, at [73] (issued Jan. 27, 2015); U.S. Patent No. 9,169,490, at [73] (issued Oct. 27, 2015); U.S. Patent No. 10,017,744, at [73] (issued Jul. 10, 2018); U.S. Patent No. 10,457,917, at [73] (issued Oct. 29, 2019).  Plaintiffs allege that Fate is the exclusive licensee of the patents-in-suit.  (Doc. No. 162, Supp. FAC ¶¶ 16, 19.)

The '369 Patent is entitled "Compositions for reprogramming somatic cells" and was issued on December 6, 2011.  '369 Patent at [45], [54].  The '856 Patent is entitled "Methods for reprogramming somatic cells" and was issued on January 13, 2015.  '856 Patent at [45], [54].  The '797 Patent is entitled "Compositions for identifying reprogramming factors" and was issued on February 10, 2015.  '797 Patent at [45], [54]. The '536 Patent is entitled "Methods for making somatic cells more susceptible to reprogramming" and was issued on January 27, 2015.  '536 Patent at [45], [54].  The '490 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 27, 2015.   '490 Patent at [45], [54].   The '744 Patent is entitled "Methods for reprogramming somatic cells" and was issued on Jul. 10, 2018.  '744 Patent at [45], [54]. The '917 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 29, 2019.  '917 Patent at [45], [54].

The asserted patents are all related and all share a common specification.[3]  (See Doc. No. 149 at 5 & n.2; Doc. No. 151 at 2 & n.2 (agreeing that the asserted patents all share the same specification); see also Doc. No. 162, Supp. FAC ¶ 132).)  The shared specification states that the disclosed invention is directed to "methods for reprogramming

---

[3]     The Court will cite to the '369 Patent's specification as the "shared specification" of the asserted patents.

somatic cells to a less differentiated state." '369 Patent col. 2 ll. 24-25; see also id. at [57] ("The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells.").

Independent claim 1 of the '369 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence.

'369 Patent col. 20 ll. 40-43.

Independent claim 1 of the '856 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a pluripotent state comprising introducing at least one exogenous nucleic acid encoding Oct 4 operably linked to at least one regulatory sequence into the cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state.

'856 Patent col. 20 ll. 38-44.

Independent claim 1 of the '797 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding Oct 4, wherein the exogenously introduced nucleic acid increases Oct4 expression in the cell.

'797 Patent col. 20 ll. 40-43.

Independent claim 1 of the '536 Patent claims:

A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making the somatic cell more susceptible to reprogramming to a less differentiated state.

'536 Patent col. 20 ll. 37-44.

Independent claim 1 of the '490 Patent claims:

A somatic cell comprising an exogenous nucleic acid encoding Oct4 and an amount of Oct4 expression comparable to the amount of Oct4 expression in an embryonic stem cell.

'490 Patent col. 20 ll. 39-41.

Independent claim 1 of the '744 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a cell having a less differentiated state, comprising:

obtaining a somatic cell that comprises an exogenously introduced polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein;

wherein the exogenously introduced polynucleic acids result in making the somatic cell more susceptible to reprogramming to a less differentiated state.

'744 Patent col. 21 ll. 14-23.

Independent claim 1 of the '917 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming; and wherein the exogenous nucleic acid is transiently transfected into the somatic cell.

'917 Patent col. 21 ll. 16-24.

On May 13, 2022, Plaintiffs filed a complaint against Defendants, alleging claims for infringement of the '369 Patent, the '856 Patent, the '797 Patent, the '536 Patent, the '490 Patent, and the '917 Patent. (Doc. No. 1, Compl. ¶¶ 66-236.)  On August 12, 2022, the Court issued a scheduling order. (Doc. No. 51.)

On December 5, 2022, the parties filed their joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2. (Doc. No. 90.)  On January 3, 2023, Plaintiffs filed a first amended complaint against Defendants, adding a claim for infringement of the '744 Patent. (Doc. No. 112, FAC ¶¶ 375-414.)  On January 6, 2023, the parties filed an amended joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2. (Doc. No. 113.)  On January 10, 2023, the Court issued an amended scheduling order. (Doc. No. 115.)  On February 14, 2023, Plaintiffs filed a supplemental first amended complaint – the operative complaint. (Doc.

No. 162, Supp. FAC.)   On February 17 and 23, 2023, Defendants filed answers and counterclaims to Plaintiffs' supplemental first amended complaint.  (Doc. Nos. 184, 204.)

By the present claim construction briefs, the parties agree to the proper construction for two claim terms, and the parties request that the Court construe six disputed claim terms from the asserted patents.  (See Doc. Nos. 149, 150, 151, 178, 179, 180; see also Doc. No. 113-1, Ex. A; Doc. No. 113-7, Ex. D.)

## Discussion

## I.    Legal Standards for Claim Construction

Claim construction is an issue of law for the court to decide.  Teva Pharms. USA, Inc. v. Sandoz, Inc., 574 U.S. 318, 326 (2015); Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary."  Teva, 574 U.S. at 326.

"It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  Phillips, 415 F.3d at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a [PHOSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  Id. at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent."  O2 Micro, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'"

Phillips, 415 F.3d at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'"  Id. (quoting Innova, 381 F.3d at 1116); see Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

In determining the proper construction of a claim, a court should first look to the language of the claims.  See Allergan Sales, LLC v. Sandoz, Inc., 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("'[C]laim construction must begin with the words of the claims themselves.'"); Source Vagabond Sys. Ltd. v. Hydrapak, Inc., 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("'a claim construction analysis must begin and remain centered on the claim language itself'").  The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term.  See Phillips, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part."  Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.").  "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'"  Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014) (quoting AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d 1264, 1272 (Fed. Cir. 2011)).

But "[t]he written description part of the specification does not delimit the right to exclude.  That is the function and purpose of claims."  Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc).  Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1327 (Fed. Cir. 2012); accord Openwave Sys., Inc. v. Apple Inc., 808 F.3d 509, 514 (Fed. Cir. 2015).

In addition to the claim language and the specification, the patent's prosecution

history may be considered if it is in evidence. Phillips, 415 F.3d at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ('PTO')] and includes the prior art cited during the examination of the patent." Id. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." Id. "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. See Vitronics, 90 F.3d at 1583; Teva, 574 U.S. at 331; see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting Phillips, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. Phillips, 415 F.3d at 1319. "'[E]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.'" Genuine Enabling Tech. LLC v. Nintendo Co., 29 F.4th 1365, 1373 (Fed. Cir. 2022); see also Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." Teva, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." O2 Micro, 521 F.3d at 1362; see also Eon Corp. IP

Holdings v. Silver Spring Networks, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'").  In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies.  O2 Micro, 521 F.3d at 1360; Phillips, 415 F.3d at 1314.  But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." O2 Micro, 521 F.3d at 1361.  If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute. Id. at 1362; Eon, 815 F.3d at 1318.

## II.     Agreed Upon Claim Terms

### 1.     "primary somatic cell"

In their amended joint claim construction worksheet, the parties agree that the claim term "primary somatic cell" should be construed as "non-immortalized somatic cell." (Doc. No. 113-7, Ex. D at 37-42.)  The parties' joint proposed construction for this claim term is well supported by the shared specification.  See '369 Patent col. 5 ll. 63-66 ("The somatic cells in the invention may be primary cells or immortalized cells.  Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal . . . .").  As such, the Court construes the claim term "primary somatic cell" as "non-immortalized somatic cell."  See Phillips, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee . . . .  In such cases, the inventor's lexicography governs."); Edwards Lifesciences LLC v. Cook Inc., 582 F.3d 1322, 1329 (Fed. Cir. 2009) (explaining that a patentee acts as his own lexicographer when the patentee "'clearly set[s] forth a definition of the disputed claim term in either the specification or prosecution history'"); see, e.g., Biogen MA Inc. v. EMD Serano, Inc., 976 F.3d 1326, 1336 (Fed. Cir. 2020).

/ / /

/ / /

2.   "candidate agent of interest with respect to its potential to reprogram a somatic cell"

In their amended joint claim construction worksheet, the parties agree that the claim term "candidate agent of interest with respect to its potential to reprogram a somatic cell" should be construed as "a candidate agent of interest with respect to its potential to reprogram a somatic cell, including naturally arising, recombinant, synthetic, designed, chemically modified, or isolated compounds, including organic compounds, biomolecules, peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids, oligonucleotides, oligopeptides, bacterial extracts, fungal extracts, plant extracts, animal extracts, chromatin remodeling proteins, and pluripotency proteins." (Doc. No. 113-7, Ex. D at 16-24.)  The parties' joint proposed construction for this claim term is well supported by the shared specification.  See '369 Patent col. 11 ll. 51-67, col. 12 ll. 1-8.  As such, the Court construes the claim term "candidate agent of interest with respect to its potential to reprogram a somatic cell" as "a candidate agent of interest with respect to its potential to reprogram a somatic cell, including naturally arising, recombinant, synthetic, designed, chemically modified, or isolated compounds, including organic compounds, biomolecules, peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids, oligonucleotides, oligopeptides, bacterial extracts, fungal extracts, plant extracts, animal extracts, chromatin remodeling proteins, and pluripotency proteins."

## III.   Disputed Claim Terms

### A.   "less differentiated state"

Plaintiffs propose that the claim term "less differentiated state" be construed as "a state in which the differentiation status of the cell has moved along a continuum of differentiation states toward a pluripotent state." (Doc. No. 151 at 16.)  Defendants propose that the claim term be construed as "a state where the cell has the potential to differentiate into more types of cells compared to its prior state." (Doc. No. 149 at 21.)  Here, the parties dispute whether the term "less differentiated state" requires that the state being one where the cell has the potential to differentiate into more types of cells compared to its prior state

(e.g., from unipotent to multipotent or from multipotent to pluripotent) or whether the state is simply one where the differentiation status of the cell has moved along a continuum toward a pluripotent state.

The Court begins its analysis of the parties' dispute by reviewing the intrinsic record. The shared specification sets forth the meaning of the term "less differentiated state" within the context of the claimed invention.  The specification explains:

> Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end.  Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated.  Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell.  In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state.  For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differentiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state.  In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state.  The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

'369 Patent col. 7 ll. 55-67, col. 8 ll. 1-8.  Here, the specification describes the differentiation status of cells as a "continuous spectrum," and that "reprogramming" encompasses "any movement" of the differentiation status of a cell along that spectrum. Id.  By using the phrase "continuous spectrum," the specification describes "differentiation status" as being a connected, unbroken range of states.[4]  And, by describing the claim term

---

[4]    The Court notes that the common meaning of the word "continuous" is "connected, unbroken."  OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/40280?redirectedFrom=continuous#eid (defining "continuous" as "[c]haracterized by continuity; extending in space without interruption of substance; having no interstices or breaks; having its parts in immediate connection; connected, unbroken"); see also MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/continuous

"less differentiated state" as being related to any movement along that continuum of differentiation status, Plaintiffs' proposed construction aligns with the specification's description of the terms differentiation status and less differentiated state.  As such, Plaintiffs' proposed construction is well supported by the specification.  See Phillips, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee . . . .  In such cases, the inventor's lexicography governs."); Edwards Lifesciences, 582 F.3d at 1329 (explaining that a patentee acts as his own lexicographer when the patentee "'clearly set[s] forth a definition of the disputed claim term in either the specification or prosecution history'"); see, e.g., Biogen, 976 F.3d at 1336.

Defendants argue that this same passage in the shared specification supports their proposed construction. (Doc. No. 149 at 21-22; Doc. No. 178 at 10.)  The Court disagrees. By requiring that the "less differentiated state" be a state where the cell has the potential to differentiate into more types of cells compared to its prior state (e.g., unipotent to multipotent), Defendants fails to adhere to the specification's description of the differentiation status of cells as being a "continuous spectrum" of states.  Moreover, to support their proposed construction, Defendants only rely on examples and preferred embodiments described in the specification.  (See Doc. No. 149 at 22; Doc. No. 178 at 10.) "[C]laims should not be limited 'to preferred embodiments or specific examples in the specification.'"  VLSI Tech. LLC v. Intel Corp., 53 F.4th 646, 652 (Fed. Cir. 2022) (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1328 (Fed. Cir. 2002)); see also Dealertrack, 674 F.3d at 1327 ("It is improper to read limitations from a preferred

---

(defining "continuous" as "marked by uninterrupted extension in space, time, or sequence").  And the common meaning of the word "spectrum" is "a range of different positions."  CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/spectrum (defining "spectrum" as "a range of different positions, opinions, etc. between two extreme points"); OXFORD ENGLISH DICTIONARY, (defining "spectrum" as "[t]he entire range or extent of something, arranged by degree, quality, etc."); see also MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/spectrum (defining "spectrum" as "a continuous sequence or range").

22-cv-00676-H-MSB

embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").  Here, there is no clear indication in the specification that the claims should be limited to those specific examples.  To the contrary, the specification describes the differentiation status of cells as a "continuous spectrum." '369 Patent col. 7 ll. 55.  As such, the shared specification does not support Defendants' proposed construction.

Turning to the prosecution history, the prosecution history also supports Plaintiffs' proposed construction for the claim term "less differentiated state."  During prosecution of the '856 Patent, the examiner stated: "according to the specification, the breadth of the claims encompass reprogramming to a partially less differentiated state, such as a multipotent cell, a full differentiated state, such as [a] pluripotent cell, and anywhere in between."  (Doc. No. 113-2, Ex. B-11 at 7; see also Doc. No. 113-5, Ex. B-31 at 10 ("Applicant refers to the teachings of the specification which teaches that the invention encompasses any shift along the continuous spectrum of differentiation status as long as it is in the direction of less differentiated . . . .").)  See 3M Innovative Properties Co. v. Tredegar Corp., 725 F.3d 1315, 1332 (Fed. Cir. 2013) (explaining that an examiner's statement during prosecution of the patent can be "representative of how one of skill in the art would understand the term").  As such, Plaintiffs' proposed construction for this claim term is well supported by the intrinsic record, including both the specification and the prosecution history.[5]

_____

[5]     The Court rejects Defendants' contention that the prosecution history supports their proposed construction.  (See Doc. No. 149 at 23.)  To support their assertion, Defendants rely on the following statement from the examiner: "[T]he breadth of 'reprogramming' without specifying a particular differentiation status encompasses transdifferentiation, reprogramming the[sic] a less differentiated state, including unipotent, multipotent, pluripotent, and totipotent."  (Doc. No. 113-2, Ex. B-13 at 3.)  This language is insufficient to support Defendants' proposed construction.  Here, the examiner uses open-ended language in explaining that "a less differentiated state" includes unipotent, multipotent, pluripotent, and totipotent states.  The examiner does not state that it only includes those four specific states.

In sum, the Court adopts Plaintiffs' proposed construction for this claim term, and the Court rejects Defendants' proposed construction. The Court construes the claim term "less differentiated state" as "a state in which the differentiation status of the cell has moved along a continuum of differentiation states toward a pluripotent state."

B.    "reprogramming to a [pluripotent/less differentiated] state"

Plaintiffs contend that the claim term "reprogramming to a [pluripotent/less differentiated] state" need not be construed, and, instead, the term should be given its plain and ordinary meaning. (Doc. No. 151 at 18.) Defendants propose that the claim term be construed as "directly reprogramming to a [pluripotent/less differentiated] state." (Doc. No. 149 at 10.)

Here, the parties dispute whether the asserted claims at issue are limited to "direct reprogramming." Defendants contend that the "reprogramming" claimed in the asserted claims is "direct" reprogramming (i.e., reprogramming without the use of embryos, oocytes and/or nuclear transfer technology),[6] and Plaintiffs dispute Defendants' contention.[7] (See

---

[6]    The Court notes that Defendants' interpretation of the meaning of the phrase "directly reprogramming" is consistent with how the shared specification defines "reprogramming . . . directly." See, e.g., '369 Patent col. 3 ll. 65-67 ("It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology."); see also Phillips, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee . . . ."). (See also Doc. No. 113-5, Ex. B-31 at 5 (examiner stating "the art at the time was not developed to the point of demonstrating any methods of direct reprogramming with pluripotency factors, let alone, solely the use of Oct4").) As such, the Court rejects Plaintiffs' assertion that Defendants' use of the phrase "directly reprogramming" would inject unnecessary ambiguity into the claims. (See Doc. No. 151 at 18-19.) Nevertheless, even though the specification supports Defendants' interpretation of the meaning of the phrase "directly reprogramming," that does not resolve the current claim construction issue as to whether the asserted claims should be limited to direct reprogramming.

[7]    In their responsive claim construction briefs, Plaintiffs clarify that they do not argue that the asserted claims encompass somatic cell nuclear transfer ("SCNT"); rather, Plaintiffs disagree that the word "directly" should be read into the claim language. (Doc. No. 179 at 9 & n.7.)

14

Doc. No. 149 at 10-13; Doc. No. 151 at 18-19; Doc. No. 179 at 9.)

The Court begins its analysis of the parties' dispute by reviewing the claim language. The claim language at issue merely uses the term "reprogramming." It does not contain the words "direct" or "directly." For example, independent claim 1 of the '856 Patent claims: "A method of making a somatic cell more susceptible to reprogramming to a pluripotent state . . . . wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state." '856 Patent col. 20 ll. 38-44; see also, e.g., '917 Patent col. 21 ll. 16-23 ("A method of making a somatic cell more susceptible to reprogramming to a less differentiated state . . . wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming . . . ."). As such, the claim language does not support Defendants' proposed construction.

Defendants contend that the claim language supports their proposed construction because the claim language states that a "somatic cell" or a "primary somatic cell" is what is being made more susceptible to reprogramming, and the claim language does not recite making a somatic cell nucleus inserted into an egg more susceptible to reprogramming. (Doc. No. 149 at 12; see also Doc. No. 18 at 3-4.) The Court rejects this argument. Defendants' argument is based on their assumption that the patentees would not use the terms "somatic cell" or "primary somatic cell"[8] when referring to a method involving reprogramming via nuclear transfer technology, such as SCNT, and, instead, the patentees would use a term like "somatic cell nucleus inserted into an egg." Defendants' assumption is not supported by a review of the intrinsic record. The parties agree that the sole working example in the specification, Example 1, is "a SCNT experiment." (Doc. No. 149 at 6; Doc. No. 151 at 6.) When describing the result of that SCNT experiment, the specification states: "This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming." '369 Patent col. 19 ll.

---

[8]    The Court construes the claim term "primary somatic cell" as "non-immortalized somatic cell" based on the parties' joint proposed construction. (Doc. No. 113-7 at 37-42.)

32-34.    Here, the specification uses the term "somatic cells" when referring to reprogramming via nuclear transfer technology, specifically SCNT.[9]   In addition, in explaining the process of SCNT, the specification explains that SCNT involves a normal egg with its nucleus removed (i.e., an "enucleated egg") and a "donor diploid somatic cell." *Id.* at col. 1 ll. 48-50.  (See also Doc. No. 152, Snyder Decl. ¶ 35 (explaining SCNT); Doc. No. 151-14, Plath Decl. ¶ 62 (explaining nuclear transfer/nuclear cloning).)  Further, during the prosecution of the asserted patents, the examiner also used the term "somatic cell[s]" when referring to reprogramming via nuclear transfer.  (See Doc. No. 113-5, Ex. B-31 at 5 ("At the time of the invention, the sole means of reprogramming a somatic cell known in the art was via nuclear transfer or somatic cell fusion with an ES cell." (citation omitted)), 8 ("This demonstrates, as consist[ent] with the prior art, that nuclear transfer itself reprograms somatic cells.").)   As such, Defendants' assumption is erroneous and not supported by the intrinsic record.

Indeed, a review of the shared specification demonstrates that Defendants' proposed construction should be rejected.  Defendants contend that "direct reprogramming" means reprogramming without the use of embryos, oocytes, and/or nuclear transfer technology.  (See Doc. No. 149 at 10-13.)  As Defendants acknowledge, the only working example provided in the specification, Example 1, is an SCNT experiment.  See '369 Patent col. 18 ll. 54-56, col. 19 ll. 22-34, Table 1 (describing "Nuclear Transfer Experiment").  (See Doc. No 149 at 6.)  Because Defendants' proposed construction would limit the claims at issue to "direct reprogramming" (thereby, excluding use of nuclear transfer technology, including SCNT), Defendants' proposed construction would exclude the preferred embodiment described in Example 1 from the scope of the claims.  "'A claim construction

---

[9]    Indeed, in describing the SCNT "nuclear transfer experiment," the shared specification explains that "[n]uclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene."  '369 Patent col. 19 ll. 23-25.  The specification expressly lists "fibroblasts" as one of the types of "[m]ammalian somatic cells useful in the present invention."  Id. col. 6 ll. 6-15.

1  that excludes a preferred embodiment is rarely, if ever correct and would require highly
2  persuasive evidentiary support.'" <u>Kaufman v. Microsoft Corp.</u>, 34 F.4th 1360, 1372 (Fed.
3  Cir. 2022) (quoting <u>Epos Technologies Ltd. v. Pegasus Technologies Ltd.</u>, 766 F.3d 1338,
4  1347 (Fed. Cir. 2014)); <u>see</u> <u>Duncan Parking Techs., Inc. v. IPS Grp., Inc.</u>, 914 F.3d 1347,
5  1364 (Fed. Cir. 2019) ("[A] claim construction that excludes the preferred embodiment is
6  highly disfavored."); <u>Immunex Corp. v. Sanofi-Aventis U.S. LLC</u>, 977 F.3d 1212, 1220
7  (Fed. Cir. 2020) ("'[T]here is a strong presumption against a claim construction that
8  excludes a disclosed embodiment.'" (quoting <u>Nobel Biocare Servs. AG v. Instradent USA,</u>
9  <u>Inc.</u>, 903 F.3d 1365, 1381 (Fed. Cir. 2018)).  Indeed, Defendants' proposed construction
10 excludes not only a preferred embodiment; it excludes the only working preferred
11 embodiment described in the shared specification.  As such, the specification strongly
12 supports rejecting Defendants' proposal requiring that the claims be limited to direct
13 reprogramming.

14      Defendants contend that the shared specification supports their proposed
15 construction.  (Doc. No. 149 at 10-12; Doc. No. 178 at 2-3.)  The Court disagrees.  In an
16 attempt to support their proposed construction, Defendants rely on the following passage
17 in the specification:

> Generating pluripotent or multipotent cells by somatic cell
> reprogramming using the methods of the present invention has at least two
> advantages. . . . . Second, the methods of the present invention allow one to
> generate pluripotent without using embryos, oocytes and/or nuclear transfer
> technology.

22 '369 Patent col. 4 ll. 21-32.  The Court acknowledges that the Federal Circuit has explained
23 in many cases that:  "When a patentee 'describes the features of the 'present invention' as
24 a whole,' he implicitly alerts the reader that 'this description limits the scope of the
25 invention.'" <u>Luminara Worldwide, LLC v. Liown Elecs. Co.</u>, 814 F.3d 1343, 1353 (Fed.
26 Cir. 2016) (quoting <u>Regents of Univ. of Minnesota v. AGA Med. Corp.</u>, 717 F.3d 929, 936
27 (Fed. Cir. 2013)); <u>accord</u> <u>Pacing Techs., LLC v. Garmin Int'l, Inc.</u>, 778 F.3d 1021, 1025
28 (Fed. Cir. 2015); <u>Verizon Servs. Corp. v. Vonage Holdings Corp.</u>, 503 F.3d 1295, 1308

(Fed. Cir. 2007); see Techtronic Indus. Co. v. Int'l Trade Comm'n, 944 F.3d 901, 907 (Fed. Cir. 2019).  But there are two problems with Defendants' reliance on this passage in the specification.  First, the passage uses permissive language in explaining that the methods of the present invention "allow" for one to generate pluripotent cells by somatic cell reprogramming without using embryos, oocytes and/or nuclear transfer technology.  The language at issue does not require that the claimed reprogramming must be done without the use of embryos, oocytes and/or nuclear transfer technology.

Further, the passage at issue does not appear to be even applicable to the claims at issue.  Although the passage at issue is describing "the present invention," it is describing the present invention within the context of "methods" for "[g]enerating pluripotent or multipotent cells by somatic cell reprogramming."  '369 Patent col. 4 ll. 21-22.  The claims at issue are not directed to methods for reprogramming a somatic cell.  As both parties concede, the patentees attempted to obtain claims directed to "reprogramming a somatic cell," but those claims were rejected by the examiner for lack of enablement.  (See Doc. No. 149 at 7-8; Doc. No. 151 at 6; see, e.g., Doc. No. 113-5, Ex. B-31 at 2-16; Doc. No. 113-3, Ex. B-23; Doc. No. 113-4, Ex. B-28.)  In contrast, the claims at issue merely encompass "making a somatic cell more susceptible to reprogramming."[10]  '856 Patent col. 20 ll. 38-39; accord '536 Patent col. 20 ll. 37-44; '744 Patent col. 21 ll. 14-23; '917 Patent col. 21 ll. 16-24.  (See also Doc. No. 113-5, Ex. B-32.)

Defendants also attempt to support their proposed construction by relying on the shared specification's discussion of the prior art in the "Background of the Invention"

---

[10]   For this same reason, the Court rejects Defendants' reliance on the prosecution history to support their proposed construction.  (See Doc. No. 149 at 12-13.)  At most, the cited prosecution history shows that the patentees attempted to obtain claims directed to methods for reprogramming a primary somatic cell.  (See Doc. No. 113-5, Ex. B-31 at 3-5.)  But this is of no consequence because those claims were rejected by the examiner for lack of enablement, (see id. at 2-16), and the claims currently before the Court are different claims with a different scope.  (See id. at 5 ("the specification . . . actually teaches an invention of a total different scope").)

section.  In the "Background of the Invention" section, the shared specification explains that four prior art methods exist for obtaining pluripotent stem cells (also referred to in the specification as "ES cells").  See '369 Patent col. 1 ll. 39-67, col. 2 ll. 1-3.  One of the four methods is "somatic cell nuclear transfer (SCNT)."  Id. at col. 1 ll. 46-48.  The specification then goes on to explain with respect to these four prior art methods:

> [A]ll presently available methods depend on controversial sources—embryos (either created naturally or via cloning), fetal tissue and via the mixing of materials of multiple species.  The controversy surrounding the sources for such cells, according to many leading scientists and public and private organizations including the NIH, has greatly compromised and slowed the study of such cells and their application.
>
> There is thus a great demand for alternative methods of generating pluripotent cells.

Id. at col. 2 ll. 4-13.  In the "Detailed Description of the Invention" section, the specification reiterates this point and explains:

> Presently, human ES cells or ES-like cells can only be generated from controversial sources.  It would be useful to reprogram somatic cells directly into pluripotent cells.  Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology.  It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

Id. at col. 3 ll. 60-67.

The Federal Circuit has explained that a patentee may disavow claim scope "when the specification distinguishes or disparages prior art."  See Poly-Am., L.P. v. API Indus., Inc., 839 F.3d 1131, 1136 (Fed. Cir. 2016); Techtronic, 944 F.3d at 906; Openwave, 808 F.3d at 513–17.  "To find disavowal of claim scope through disparagement of a particular feature," a court should ask "whether 'the specification goes well beyond expressing the patentee's preference . . . [such that] its repeated derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal.'"  Openwave, 808 F.3d at 513.  In the cited passages, the shared specification disparages the prior art methods for obtaining pluripotent stem cells, including SCNT and nuclear transfer technology, and the specification explains, therefore, that it would be useful to directly reprogram somatic cells

into pluripotent stem cells without the use of nuclear transfer technology. Nevertheless, the Court finds this language insufficient to constitute a disclaimer that would support Defendants' proposed construction because, as previously explained, the claims at issue are not directed to methods of reprogramming a somatic cell, and the only working example provided in the specification utilizes SCNT.[11] In sum, the shared specification does not support Defendants' proposed construction.

Finally, to support their proposed construction, Defendants rely on extrinsic evidence. (See Doc. No. 149 at 13.) The cited extrinsic evidence is not persuasive. At most, the extrinsic evidence demonstrates that there is a difference between directly reprogramming somatic cells into pluripotent cells and SCNT. (See Doc. No. 152-3, Snyder Decl. Ex. 18 at 409.) But this is of no consequence because the claimed "reprogramming" in the claims at issue is not limited to direct reprogramming.

In the sum, the Court rejects Defendants' proposed construction. The Court gives the claim term "reprogramming to a [pluripotent/less differentiated] state state" its plain and ordinary meaning, and the Court declines to construe the claim term.

C.   "makes the cell more susceptible to reprogramming"

Plaintiffs propose that the claim term "makes the cell more susceptible to reprogramming" be construed as "improves the efficiency of reprogramming the cell." (Doc. No. 151 at 10.) Defendants argue that the claim term "makes the cell more

---

[11]   The Court notes that if the claims at issue were directed to methods of reprogramming somatic cells, then the specification's discussion of the methods of "the present invention" combined with its disparagement of the prior art would likely constitute disclaimers of claim scope. But it is clear from a review of the intrinsic record, particularly the prosecution history, that the method claims at issue are of a different scope and are not directed to methods of reprogramming somatic cells. (See, e.g., Doc. No. 113-5, Ex. B-31 at 5 ("[T]he specification fails to enable a method of reprogramming a cell to a less differentiated state by introduction of Oct4 because the specification fails to provide specific guidance to such embodiments and actually teaches an invention of a total different scope.").) As such, the purported disclaimers identified in the specification are inapplicable to the claims at issue.

susceptible to reprogramming" renders independent claim 1 of the '856 Patent and independent claim 1 of the '917 Patent invalid for indefiniteness. (Doc. No. 149 at 14.)  In the alternative, Defendants propose that the claim term be construed as "primes the cell for subsequent reprogramming." (Id.)

The Court finds it appropriate to first address the parties' competing proposed constructions for this claim term prior to addressing Defendants' indefiniteness arguments. By presenting the Court with competing proposed constructions, it is clear that the parties dispute the proper scope of this claim term.  To analyze indefiniteness, the Court must determine whether the claim "language, when read in light of the specification and the prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1369–70 (Fed. Cir. 2014) (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014)); see Infinity Computer Prod., Inc. v. Oki Data Americas, Inc., 987 F.3d 1053, 1059 (Fed. Cir. 2021) ("'[W]e look to the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed.'" (quoting Teva Pharms. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335, 1341 (Fed. Cir. 2015))).  As such, in order to properly analyze Defendants' indefiniteness challenge, the Court must first assess the proper scope of the claim term at issue and thereby, in turn, the scope of the invention claimed.

With respect to this claim term, the parties dispute whether the claim term "makes the cell more susceptible to reprogramming" means improving the efficiency of reprogramming the cell or whether it is means priming the cell for subsequent reprogramming.  The Court begin its review of the parties' dispute by analyzing the claim language.  Here, the claim language does not resolve the parties' dispute.  The claim language at issue simply states that the claimed method "makes the cell more susceptible to reprogramming to a pluripotent state" or a less differentiated state.  '865 Patent col. 20 ll. 38-44; '917 Patent col. 21 ll. 16-17.  The claim language says nothing about efficiency or priming.  For example, independent claim 1 of the '856 Patent claims:

> A method of making a somatic cell more susceptible to reprogramming to a pluripotent state comprising introducing at least one exogenous nucleic acid encoding Oct 4 operably linked to at least one regulatory sequence into the cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state.

'856 Patent col. 20 ll. 38-44.  As such, the claim language does not resolve the parties' dispute.

Turning to the specification, Plaintiffs contend that the shared specification supports their proposed construction because the specification equates making a cell "more susceptible" to reprogramming with improving the "efficiency" of reprogramming.  (Doc. No. 151 at 10; Doc. No. 179 at 1-2.)  The shared specification contains the term "more susceptible to reprogramming" only twice – once in the title of Example 1 and once in the body of Example 1.  (See Doc. No. 151 at 11 (stating that Example 1 in the specification "is the only place the term appears in the Specification" (emphasis removed)).)  The title of the sole working example contained in the shared specification is "Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment."  '369 Patent col. 18 ll. 54-56.  The working example provides in the section titled "C. Nuclear Transfer Experiment:"

> Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene.  Dox induction was for 24 hours prior to nuclear transfer.  Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002).  As shown in Table 1, on average, blastocyst formation and ES cell derivation (as measured as a fraction of eggs with pronucleus formation) is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts.  This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

'369 Patent col. 19 ll. 23-34; accord id. at col. 19 ll. 64-66.

Plaintiffs argue that this passage in the specification supports their proposed construction because it "unequivocally equates" making a cell "more susceptible" to reprogramming with improving the "efficiency" of reprogramming.  (Doc. No. 151 at 10-

11; Doc. No. 179 at 1.)  Although the Court agrees with Plaintiffs that in this passage, the specification equates making a cell "more susceptible" to reprogramming with improving "efficiency," Plaintiffs fail to properly acknowledge the type of "efficiency" that is being discussed in this passage.  This passage only discusses "efficiency" within the context of nuclear transfer reprogramming.  See '369 Patent col. 18 ll. 54-56, col. 19 ll. 22-34.  (See Doc. No. 151 at 6 (conceding that Example 1 is "a SCNT experiment"); see also Doc. No. 151-14, Plath Decl. ¶ 87 ("in the context of somatic cell nuclear transfer").)  Further, the specific type of efficiency referenced in the specification is "blastocyst formation and ES cell derivation" efficiency.  See '369 Patent col. 19 ll. 29-30, col. 19 ll. 64-66.  (See also Doc. No. 151-14, Plath Decl. ¶¶ 52 ("As shown in Table 1, blastocyst formation and embryonic (ES) cell derivation are more efficient from Oct4 induced fibroblasts than from uninduced fibroblast . . . ."), 66 ("A POSA would further look to the data in Table 1, and see that the experiments show, higher blastocyst formation and embryonic stem cell derivation efficiency (or more efficient reprogramming) . . . ."), 62 (explaining that "measures of successful reprogramming by somatic cell nuclear transfer include: (i) the proportion of enucleated oocytes (eggs) carrying the transferred somatic cell nucleus that develop to the blastocyst stage, [and] (ii) the proportion of transferred oocytes giving rise to an ES cell line").)  Plaintiffs' proposed construction is flawed because it fails to properly describe the type of "efficiency" referred to in the shared specification.[12]

Plaintiffs make a similar error in relying on the prosecution history.  Plaintiffs contend that the prosecution history demonstrates that the examiner understood that the specification equates making a cell "more susceptible" to reprogramming with improving

---

[12]      Plaintiffs contend that when the shared specification is referring to efficiency it is using the term more broadly to refer to any enhancement to the reprogramming process. The Court disagrees.  In the passages identified by Plaintiffs, the only efficiency described by the specification is "blastocyst formation and ES cell derivation" efficiency.  '369 Patent col. 19 ll. 29-31, col. 19 ll. 65-66.  Plaintiffs have failed to identify any passage in the specification describing any other type of efficiency.

the "efficiency" of reprogramming.  (Doc. No. 179 at 1-2 (citing Doc. No. 151-36, Ex. V at 4); Doc. No. 151 at 11 (citing Doc. No. 113-5, Ex. B-31 at 3-4).)  But Plaintiffs again fail to properly acknowledge the type of "efficiency" that is being described.  In the relevant prosecution history, the examiner states that the specification "teaches that on average blastocyst formation and ES cell derivation is more efficient when Oct4 induced fibroblasts are used as compared to un-induced fibroblasts."  (Doc. No. 113-5, Ex. B-31 at 3.)  The examiner then goes on to describe this efficiency as being "nuclear transfer cloning efficiency."  The examiner states: "the experiments described in the specification . . . solely demonstrate[] that addition of Oct4 expression enhances nuclear transfer cloning efficiency and nuclear transfer's reprogramming process."  (Id. at 8 ("[T]hey demonstrate that cloning efficiency is increased by induced expression of Oct4 in the donor fibroblast cells.  Cloning efficiency is determined with nuclear transfer units."); see also Doc. No. 151-14, Plath Decl. ¶ 62 (referring to "nuclear transfer" as "nuclear cloning").)  The examiner further states:

> Applicant is over-extrapolating the findings of the nuclear transfer experiment.  It is acknowledged that the nuclear transfer experiments with nuclei from manipulated fibroblasts are intended to assess reprogramming and that the measured parameter of reprogramming is clone efficiency.  The measurement of cloning efficiency is informative in regards to reprogramming in that it elucidates the ability of the nuclear transfer unit comprising a somatic nuclei to gain pluripotency.  It is not informative into all the factors of nuclear transfer that induce reprogramming to the pluripotent state because these factors are not being tested separately but at a whole in this type of experimental model. . . .  Given that reprogramming is going to occur in the nuclear transfer experiments regardless of exogenous Oct4 expression, the nuclear transfer experimental model is only informative to the impact of Oct4 exogenous expression on the degree of cloning efficiency or the degree of reprogramming completeness or effectiveness upon the number of reprogrammed fibroblast nuclei, not the ability of Oct4 alone to reprogram a fibroblast nuclei as Applicants suggest.

(Doc. No. 113-5, Ex. B-31 at 12-13.)[13]  As such, similar to the Court's review of the specification, the Court agrees with Plaintiffs that the prosecution history demonstrates that making a cell "more susceptible" to reprogramming corresponds with improving "efficiency," but Plaintiffs fail to properly consider the type of "efficiency" that is being discussed.  Consistent with the specification, the only type of efficiency discussed in the prosecution history is "cloning efficiency" – "blastocyst formation and ES cell derivation"

---

[13]       In their briefing, Plaintiffs cite this same passage and contend that the examiner acknowledged that the SCNT experiment in the specification was "intended to assess reprogramming" and the results were "informative" with respect to "'direct' reprogramming (as Defendants use the term)."  (Doc. No. 179 at 7 ("During prosecution, the examiner also acknowledged that the SCNT experiment was 'intended to assess reprogramming' and that the results are 'informative in regards to reprogramming.'"), 9 n.7 ("[T]he Examiner recognized that the SCNT experiment was 'informative' with respect to 'direct' reprogramming (as Defendants use the term) . . . .").)  The Court does not find Plaintiffs' selective quotations of isolated statements from the examiner persuasive as Plaintiffs again fail to provide important surrounding context to those statements.  As shown above, the examiner does state that the nuclear transfer experiments in the shared specification "are intended to assess reprogramming," but the examiner then goes on to state that "the measured parameter of reprogramming is cloning efficiency" (i.e., nuclear transfer cloning efficiency).  (Doc. No. 113-5, Ex. B-31 at 12-13 ("[t]he measurement of cloning efficiency is informative in regards to reprogramming"); see also id. at 8 ("the experiments described in the specification . . . solely demonstrate[] that addition of Oct4 expression enhances nuclear transfer cloning efficiency").)  Further, it is clear from a review of the office action at issue that when the examiner is referring to "reprogramming," the examiner is referring to "reprogramming" broadly – including both direct reprogramming (as defined by Defendants and the shared specification) and nuclear transfer reprogramming – and not just to direct reprogramming.  (See, e.g., id. at 5 ("At the time of the invention, the sole means of reprogramming a somatic cell known in the art was via nuclear transfer or somatic cell fusion with an ES cell." (citation omitted)), 8 ("This demonstrates, as consist[ent] with the prior art, that nuclear transfer itself reprograms somatic cells. . . . [A]ny reprogramming abilities of Oct4 are confounded by the known effect of nuclear transfer reprogramming.  The art and the applicant's own experiments demonstrate that reprogramming is occurring by the process of nuclear transfer."), 13 ("reprogramming is going to occur in the nuclear transfer experiments regardless of exogenous Oct4 expression"); see also id. at 5-6 (explaining that at the time of the invention, direct reprogramming had not yet been developed).)

efficiency.[14]

In sum, a review of the intrinsic record shows that it does not fully support Plaintiffs' proposed construction for this claim term. Although the Court agrees with Plaintiffs that the specification and the prosecution history equate the term making a cell "more susceptible" to reprogramming with improving "efficiency," they only do so with respect to a certain type of efficiency. Plaintiffs' proposed construction is improper because it fails to accurately characterize the described "efficiency." As such, the Court will include a modified version of Plaintiffs' proposed construction in the Court's construction for this claim term construing the term in part as improves "cloning efficiency."

Turning to Defendants' proposed construction, Defendants argue that this same prosecution history related to the prosecution of the '536 Patent supports their proposed construction. (Doc. No 149 at 18-20; Doc. No. 178 at 7-9.) "Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.'" Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1359 (Fed. Cir. 2017) (quoting Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323 (Fed. Cir. 2003)). "[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" Id. at 1360 (quoting Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

"'Prosecution disclaimer can arise from both claim amendments and arguments.'" Traxcell Techs., LLC v. Nokia Sols. & Networks Oy, 15 F.4th 1136, 1141 (Fed. Cir. 2021) (quoting SpeedTrack, Inc. v. Amazon.com, 998 F.3d 1373, 1379 (Fed. Cir. 2021)); see Aylus, 856 F.3d at 1359 ("Such disclaimer can occur through amendment or argument."). Prosecution disclaimer "attaches if a patentee 'has unequivocally disavowed a certain meaning to obtain [a] patent' in a way that is 'clear and unmistakable.'" Traxcell, 15 F.4th

---

[14]   Plaintiffs have failed to identify any passage in the prosecution history – or anywhere else in the intrinsic record – describing any other type of efficiency.

at 1141 (quoting Omega, 334 F.3d at 1323); see also Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply to an ambiguous disavowal."). "While disavowal must be clear and unequivocal, it need not be explicit." Poly-Am., 839 F.3d at 1136; see Techtronic, 944 F.3d at 907 ("A disavowal must be clear, but it need not be explicit."). "'The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art.'" Genuine Enabling Tech., 29 F.4th at 1374.

During the prosecution of the '536 Patent, the patentees attempted to obtain method claims encompassing "a method of reprogramming a primary somatic cell to a less differentiated state." (Doc. No. 152-4, Snyder Decl. Ex. 27 at 508-09.) In an office action dated April 11, 2014, the examiner rejected these claims under 35 U.S.C. § 112 ¶ 1 for failure to comply with the enablement requirement. (Doc. No. 113-5 Ex. B-31 at 1-16; see also Doc. No. 113-3, Ex. B-23; Doc. No. 113-4, Ex. B-28.) In providing the basis for these enablement rejections, the examiner explained:

> The specification provides specific guidance to the production of a transgenic mouse comprising in its genome an inducible exogenous Oct4 gene. The specification provides specific guidance to the isolation of fibroblasts from said transgenic mouse and inducing Oct4 expression in said fibroblasts by treatment with deoxycycline. The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and then transferred into enucleated oocytes to produce nuclear transfer units. The specification teaches that the nuclear transfer units were cultured to the blastocyst stage and ES cell were derived from the nuclear transfer units. The specification further teaches that on average blastocyst formation and ES cell derivation is more efficient when Oct4 induced fibroblasts are used as compared to un-induced fibroblasts. The specification thus concludes that inducing Oct4 expression in somatic cells makes these cells more susceptible to reprogramming.
>
> While the specification provides specific guidance to a means of priming somatic cells for reprogramming, the specification fails to provide any guidance to a method that predictably reprograms primary somatic cells to a less differentiated state by solely introducing a nucleic acid encoding Oct4 to said somatic cell or by solely introducing an Oct4 protein into said somatic

cell. The specification fails to assess the differentiation status of the somatic cells after induction of Oct4 but before reprogramming the somatic cell by nuclear transfer. As such, the specification has provided no evidence that alone the exogenous Oct4 in the cell is reprogramming the somatic cell to a less differentiated state. The specification further fails to provide any teaching to the narrower embodiments of the claims encompassing introduction of Oct4 into an adult stem cell, such as hematopoietic stem cells, neural stem cells, or mesenchymal stem cells. As such, the specification fails to demonstrate that introduction of Oct4 into such adult stem cells or any cells will predictably result in a less differentiated state as the claims require.

Thus, the specification fails to enable the instant claims because the invention disclosed by the specification is not commensurate in scope with the method of the claims. . . .

The specification provides specific guidance to a method of priming a somatic cell for reprogramming by introducing Oct4 activity into said somatic cell. This cannot properly be interpreted as commensurate in scope with a method of reprogramming a somatic cell by solely introducing Oct4 because the specification fails to teach that Oct4 alone reprograms a cell. As such, the specification fails to enable a method of reprogramming a cell to a less differentiated state by introduction of Oct4 because the specification fails to provide specific guidance to such embodiments and actually teaches an invention of a total different scope.

(Id. at 3-5 (emphasis in original) (citations omitted); see also id. at 7 ("[T]he specification describes a method of priming a somatic cell for reprogramming by solely introducing Oct4.").) Here, in analyzing enablement, the examiner explained the scope of the invention disclosed in the shared specification and explained why that scope did not encompass a method of reprogramming a somatic cell to a less differentiated state by introduction of Oct4 alone.

In response to the examiner's enablement rejections, the patentees amended the claims at issue to now claim a method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state. (Doc. No. 113-5, Ex. B-32; see also Doc. No. 151 at 6.) For example, the patentees amended claim 1 as follows:

1.    (Currently amended) A method of making reprogramming a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein

> operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making ~~reprogramming~~ the somatic cell <u>more susceptible to reprogramming</u> to a less differentiated state.

(Doc. No. 113-5, Ex. B-32 at 2 (underlining and strike outs in original).)  In providing these amendments, the patentees did not dispute the examiner's characterizations of the scope of the invention disclosed in the specification.  Rather, the patentees stated with respect to enablement:

> Applicants submit that the presently claimed subject matter is enabled by the as-filed specification, as acknowledged by the Office in the Actions mailed August 20, 2013, and April 11, 2014.  *See* Office Action mailed April 11, 2014, last sentence of second paragraph of page 3, paragraph bridging pages 3-4, paragraph bridging pages 4-5, and first full paragraph of page 7.

> Accordingly, this basis for rejection is now moot and properly withdraw.

(*Id.* at 5.)  The examiner allowed the claims as amended.  (<u>See</u> Doc. No. 113-5, Ex. B-33.)

The Federal Circuit has found this sequence of events sufficient to constitute prosecution disclaimer.  <u>See, e.g.</u>, <u>Biogen Idec, Inc. v. GlaxoSmithKline LLC</u>, 713 F.3d 1090, 1096 (Fed. Cir. 2013); <u>Ancora Techs., Inc. v. Apple, Inc.</u>, 744 F.3d 732, 739 (Fed. Cir. 2014); <u>SandBox Logistics LLC v. Proppant Express Invs. LLC</u>, 813 F. App'x 548, 554 (Fed. Cir. 2020).  For example, in <u>Biogen</u>, during the prosecution of the asserted patent, the examiner rejected all of the pending claims for lack of enablement as they encompassed "'any and all anti-CD20 antibodies.'"  713 F.3d at 1095–96.  In providing these rejections, the examiner explained that the specification was enabling for "Rituxan®, rituximab, and 2B8–MX–DTPA," but it was not enabling for other anti-CD20 antibodies.  <u>See id.</u> at 1096. In response to these rejections, rather than challenging the examiner's understanding of the crucial terms, the applicants argued that the specification was enabling for anti-CD20 antibodies with similar affinity and specificity as Rituxan®.  <u>Id.</u>  The Federal Circuit explained: "While the applicants may not have repeated the examiner's language *verbatim et literatim*, it is clear that they were limiting their invention to what the examiner believed they enabled: antibodies that have a similar specificity and affinity for the specific epitope

to which Rituxan® binds." <u>Id.</u>  The Federal Circuit held that this constituted a clear and unmistakable prosecution disclaimer. <u>See id.</u>  The Federal Circuit explained:

> While disavowing statements must be "so clear as to show reasonable clarity and deliberateness," this requirement does not require the applicant to parrot back language used by the examiner when clearly and deliberately responding to a particular grounds for rejection.  If an applicant chooses, she can challenge an examiner's characterization in order to avoid any chance for disclaimer, but the applicants in this case did not directly challenge the examiner's characterization.

<u>Id.</u> (quoting <u>Omega</u>, 334 F.3d at 1325); <u>see also, e.g.</u>, <u>SandBox</u>, 813 F. App'x at 554 (finding prosecution disclaimer supported construing the term "bottom" as "bottom wall" where examiner considered a "bottom wall" to be essential based on the disclosures in the specification, applicants amended the claims to include "a bottom," and applicants failed to challenge the examiner's understanding of the claims); <u>Oy v. Verizon Servs. Corp.</u>, No. CV 12-715-CJB, 2014 WL 7385615, at *12 (D. Del. Dec. 23, 2014).

The circumstances in this case are analogous to <u>Biogen</u> and <u>Sandbox</u>.  Here, the examiner rejected the claims for lack of enablement and explained to the patentees what the examiner considered to be the proper scope of the invention disclosed in the specification, including the examiner's view that the specification provides specific guidance to a method of "priming" a somatic cell for reprogramming by introducing Oct4. (<u>See</u> Doc. No. 113-5, Ex. B-31 at 3, 4, 7.)  In response to the examiners' rejections, the patentees amended the claims and did not dispute the examiner's characterizations of the disclosures contained in the specification.  Indeed, to support enablement of the amended claims, the patentees expressly and specifically cited to every instance where the examiner characterized the specification as disclosing a method of "priming" a somatic cell for reprogramming.  (<u>Compare</u> Doc. No. 113-5, Ex. B-32 at 5 (citing April 11, 2014 office action at "paragraph bridging pages 3-4, paragraph bridging pages 4-5, and first full paragraph of page 7") <u>with</u> Doc. No. 113-5, Ex. B-31 at 3, 4, 7.)  As such, under <u>Biogen</u> and <u>SandBox</u>, this constitutes prosecution disclaimer, and, as a result, the claims at issue are limited to a method of "priming" a somatic cell for reprogramming.  <u>See SandBox</u>, 813

F. App'x at 554 ("SandBox's failure to challenge the Examiner's understanding amounts to a disclaimer."); <u>Biogen</u>, 713 F.3d at 1095–96 ("If an applicant chooses, she can challenge an examiner's characterization in order to avoid any chance for disclaimer, but the applicants in this case did not directly challenge the examiner's characterization."); <u>see also TorPharm, Inc. v. Ranbaxy Pharm., Inc.</u>, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ("[I]n ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest.  Such acquiescence may be found where the patentee narrows his or her claims by amendment[.]" (internal citation omitted)).

Plaintiffs argue that Defendants' proposed construction is improper because it construes the word "priming" used by the examiner as a two-step process in which the Oct4 is introduced as an antecedent step.  (Doc. No. 151 at 12-13; Doc. No. 179 at 2-3.)  Plaintiffs argue that the relevant portions of the prosecution history do not suggest that the examiner was contemplating that "priming" entails some sort of pre-conditioning step; Plaintiffs argue, to the contrary, that the examiner recognized that Example 1 in the specification shows that Oct4 was present as an "additive factor."  (Id. (citing Doc. 113-5, Ex. B-31 at 3-4, 16).)  The Court rejects this argument as Plaintiffs again fail to read the examiner's statements within their proper context.  As Plaintiffs acknowledge, when the examiner discusses the "addition of exogenous Oct4 as an additive factor to reprogramming," the examiner is discussing it within the context of Example 1 in the specification – the SCNT experiment – which Plaintiffs acknowledge is only place in the specification where the term at issue appears.  (See id. at 11-12.)  With respect to that experiment, the specification explains: "Dox induction was for 24 hours prior to nuclear transfer."  '369 Patent col. 19 ll. 25.  (See also Doc. No. 113-3, Ex. B-23 at 3 ("The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were first treated with DOX to induce Oct4 expression and then use[d] in nuclear transfer."); Doc. No. 113-2, Ex. B-11 at 4; ("The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and then

transferred into enucleated oocytes to produce [] nuclear transfer units."); Doc. No. 113-5, Ex. B-31 at 3 (same).) Thus, the specification, consistent with the examiner's description, describes it as a two-step process.[15]   As such, Defendants' alternative proposed construction is well supported by the intrinsic record – specifically the specification and the prosecution disclaimer in the prosecution history, and, as such, the Court adopts the proposed construction.[16]

---

[15]   At the claim construction hearing, Plaintiffs challenged the Court's citation to this passage in the shared specification as support for the notion that "priming" entails introducing Oct4 as an antecedent step prior to the subsequent step of reprogramming. The Court notes that in presenting this challenge and explaining the experiment described in Example 1 of the specification, Plaintiffs stated at the hearing:  "A POSA understands that it was to make sure over that 24-hour period that the expression of the transgene has enough time to generate Oct4 so that in this subsequent step Oct4 was being put together with the oocyte.").  Feb. 27, 2023 Hearing; see also id. ("they wanted to make sure that that cell had Oct4 in it at the time that they combined it with the oocyte").  As such, Plaintiffs' own description of the experiment described it as a two-step process where the experimenters made sure that Oct4 was present in the somatic cell prior to the subsequent step of combining it with the oocyte (i.e., prior to nuclear transfer reprogramming).  Indeed, Plaintiffs even used the phrase "subsequent step" in their explanation.  Id.

[16]   Plaintiffs also argue that Defendants' proposed construction should be rejected in light of the shared specification's discussion of "embodiments in which multiple pluripotency genes are introduced into a somatic cell 'as part of a cDNA expression library.'"  (Doc. No. 179 at 3 (citing '369 Patent col. 9 ll. 40-48).)  The Court does not find Plaintiffs' reliance on this passage in the specification persuasive.  This passage is from a section of the specification describing "Method for Reprogramming Somatic Cells."  '369 Patent col. 7 ll. 34.  As Plaintiffs acknowledge, the claims at issue are not directed to methods for reprogramming a somatic cell.  (See Doc. No. 151 at 6; see also Doc. No. 113-5, Ex. B-31 at 5 ("[T]he specification . . . actually teaches an invention of a total different scope.").)

In addition, Plaintiffs criticize Shoreline's expert Dr. Snyder for attempting to analogize the examiner's use of the word "priming" to priming a pump or priming a wall for painting.  (Doc. No. 179 at 2; Doc. No. 151 at 11-12.)  The Court makes clear that it adopts Defendants' proposed construction for this claim term because it is well supported by the intrinsic record – the shared specification and the prosecution history including the prosecution disclaimer.  In adopting Defendants' proposed construction, the Court does not

In sum, the Court adopts a modified version of Plaintiffs' proposed construction for this claim term, and the Court adopts Defendants' alternative proposed construction for this claim term.  The Court construes the claim term "makes the cell more susceptible to reprogramming" as "primes the cell to improve the cloning efficiency of the subsequent reprogramming."  Further, in their briefing, the parties agree that the claim terms "making the somatic cell more susceptible to reprogramming" and "make the cell more susceptible to reprogramming" should be construed consistent with the Court's construction for the term "makes the cell more susceptible to reprogramming."  (See Doc. No. 149 at 14; Doc. No. 151 at 10 n.7.)  As such, the Court also construes the claim term "making the somatic cell more susceptible to reprogramming" as "priming the somatic cell to improve the cloning efficiency of the subsequent reprogramming," and the Court construes the claim term "makes the cell more susceptible to reprogramming" as "prime the cell to improve the cloning efficiency of the subsequent reprogramming."

Turning to Defendants' indefiniteness challenge, Defendants argue that the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" renders the asserted claims at issue invalid for indefiniteness.  (Doc. No. 149 at 14-18.)  "Definiteness is a statutory requirement for patentability." Niazi, 30 F.4th at 1346.  Under 35 U.S.C. § 112(b), a patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention." 35 U.S.C. § 112(b).

"A claim fails to satisfy this statutory requirement and is thus invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" Interval Licensing, 766 F.3d at 1369–70 (quoting Nautilus, 572 U.S. at 901); see Infinity Computer, 987 F.3d at 1059.  This "reasonable certainty" standard

---

rely on any of Dr. Snyder's opinions or testimony.  As such, Plaintiffs' challenges to Dr. Snyder's testimony are moot.

"reflects a 'delicate balance' between 'the inherent limitations of language' and providing 'clear notice of what is claimed.'" <u>Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n</u>, 936 F.3d 1353, 1359 (Fed. Cir. 2019). "Th[e] standard 'mandates clarity, while recognizing that absolute precision is unattainable.'" <u>Nevro Corp. v. Bos. Sci. Corp.</u>, 955 F.3d 35, 39 (Fed. Cir. 2020) (quoting <u>Nautilus</u>, 572 U.S. at 910); <u>see also</u> <u>BASF Corp. v. Johnson Matthey Inc.</u>, 875 F.3d 1360, 1365 (Fed. Cir. 2017) ("'Reasonable certainty' does not require 'absolute or mathematical precision.'").

"General principles of claim construction apply to indefiniteness allegations." <u>HZNP Medicines LLC v. Actavis Lab'ys UT, Inc.</u>, 940 F.3d 680, 688 (Fed. Cir. 2019). The party asserting indefiniteness bears "the burden of proving indefiniteness by clear and convincing evidence." <u>BASF</u>, 875 F.3d at 1365 (citing <u>Biosig Instruments, Inc. v. Nautilus, Inc.</u>, 783 F.3d 1374, 1377 (Fed. Cir. 2015)); <u>see also</u> <u>Microsoft Corp. v. i4i Ltd. P'ship</u>, 564 U.S. 91, 95 (2011) (holding that 35 U.S.C. § 282 "requires an invalidity defense to be proved by clear and convincing evidence").

Defendants first argue that the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" is indefinite because the specification fails to adequately explain to a POSITA how to assess whether a somatic cell has been made "more susceptible to reprogramming" without using oocytes or nuclear transfer technology (as contemplated by the inventors). (Doc. No. 149 at 14-16; Doc. No. 178 at 4-5.) This argument is based on Defendants' contention that the claims at issue do not encompass the use of nuclear transfer technology. The Court has rejected this argument. <u>See</u> <u>supra</u>. As such, the Court rejects Defendants' indefiniteness challenge to the extent it is based on Defendant's rejected contention that the use of nuclear transfer technology is outside the scope of the asserted claims at issue.

Defendants argue that the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" is indefinite because Plaintiffs' proposed construction defining the term as improving the efficiency of reprogramming is itself indefinite and ambiguous. (Doc. No. 149 at 15-16.) The Court has rejected Plaintiffs' proposed

construction for this claim term.  See supra.  As such, the Court rejects Defendants' indefiniteness challenge to the extent it is based on the Court's adoption of Plaintiffs' proposed construction.  Further, the Court rejects Defendants' contention that the word "efficiency" is ambiguous in the context of the asserted patents.  The shared specification and the prosecution history explain that the "efficiency" at issue is "blastocyst formation and ES cell derivation" efficiency – cloning efficiency.  See '369 Patent col. 19 ll. 29-30, col. 19 ll. 64-66.  (See also Doc. No. 113-2, Ex. B-11 at 4 ("The specification further teaches that on average blastocyst formation and ES cell derivation is more efficient when Oct4 induced fibroblasts are used as compared to un-induced fibroblasts."); Doc. No. 113-5, Ex. B-31 at 3 (same), 8 ("The difference seen was a degree of clone production efficiency, with exogenous Oct4 increasing the number of clones produced").)  Defendants fail to adequately explain how a POSITA would be confused by this explanation provided in the intrinsic record.

Finally, Defendants' indefiniteness argument is flawed because it does not account for the Court's construction of this claim term, construing the term as "[primes / priming / prime] the [somatic] cell to improve the cloning efficiency of the subsequent reprogramming."  Because an indefiniteness challenge must account for the scope of the invention claimed, Defendants' indefiniteness challenge must account for the Court's construction of this claim term.  See Nautilus, 572 U.S. at 901; Interval Licensing, 766 F.3d at 1369–70; Infinity Computer, 987 F.3d at 1059.  In sum, Defendants have failed to demonstrate that the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" is indefinite at this stage in the proceedings.[17]

---

[17]     In the parties' joint claim construction hearing statement, Defendant Shoreline states that it "reserves the right to argue that [the] Asserted Claims are invalid under 35 U.S.C. § 112(b) . . . based upon information learned through the course of fact discovery and/or developed through expert discovery."  (Doc. No. 90 at 5-6 n.1.)  The Court acknowledges that in rejecting Defendants' indefiniteness challenge in this claim construction order, the Court is not entering a judgment against Defendants on their indefiniteness counterclaims or defenses.  See DNA Genotek Inc. v. Spectrum Sols. L.L.C., No. 321CV00516RSHDDL,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D.    "Oct4" / "Oct 4"

Plaintiffs contend that the claim term "Oct4"/"Oct 4" need not be construed, and, instead, the term should be given its plain and ordinary meaning.  (Doc. No. 151 at 19.) Defendants propose that the term be construed as "Oct4 from any species."  (Doc. No. 149 at 23.)  In their responsive claim construction brief, Plaintiffs refer to a "compromise construction" that they proposed, requesting that the term be construed as "Oct4, from any suitable species."  (Doc. No. 179 at 10 n.8.)

To support their proposed construction, Defendants contend that the asserted claims are not limited to mammalian somatic cells.  (Doc. No. 149 at 23-24.)  But Defendants' contention is directly contradicted by the shared specification.  The specification states: "The somatic cells in the present invention are mammalian cells, such as, for example, human cells or mouse cells."  '369 Patent col. 6 ll. 1-2; see also id. at col. 6 ll. 7-8 ("Mammalian somatic cells useful in the present invention include . . . .").  By using the phrase "the present invention" in this passage, the specification makes clear that the invention claimed in the asserted patents is limited to mammalian somatic cells.  See Luminara, 814 F.3d at 1353 ("When a patentee 'describes the features of the "present invention" as a whole,' he implicitly alerts the reader that 'this description limits the scope of the invention.'" (quoting Regents of Univ. of Minnesota, 717 F.3d at 936)); Pacing, 778 F.3d at 1025; see also Poly-Am., 839 F.3d at 1136 ("[A]n inventor may disavow claims lacking a particular feature when the specification describes "the present invention" as having that feature."); Techtronic, 944 F.3d at 907 ("It is axiomatic that, where the

---

2022 WL 17331255, at *10 n.7 (S.D. Cal. Nov. 29, 2022).  Nevertheless, the Federal Circuit has explained that "[g]eneral principles of claim construction apply to indefiniteness allegations."  HZNP Medicines, 940 F.3d at 688.  And the Federal Circuit has also held that a "district court's claim construction" is "law of the case for purposes of the trial."  Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1371 n.2 (Fed. Cir. 2007).  As such, any future indefiniteness challenge in this case must adhere to the holdings in this claim construction order.  See id.; see also Exergen, 575 F.3d at 1321 ("No party may contradict the court's construction . . . .").

specification 'describes "the present invention" as having [a] feature,' that representation may disavow contrary embodiments.")

Defendants note that independent claim 10 of the '917 Patent recites, among other things, "a somatic cell," and that dependent claim 14 depends from claim 10 and further recites "wherein the somatic cell is a mammalian cell."  (Doc. No. 149 at 24.)  '917 Patent col. 22 ll. 6, 26-27.  In light of this claim language, Defendants argue that, under the doctrine of claim differentiation, the asserted claims should not be limited to mammalian somatic cells because the "somatic cell" in independent claim 10 must be broader than just mammalian cells.  (Doc. No. 149 at 24; Doc. No. 178 at 10.)  The Court disagrees.  "The doctrine of claim differentiation is 'based on the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'"  Starhome GmbH v. AT & T Mobility LLC, 743 F.3d 849, 857 (Fed. Cir. 2014) (quoting Karlin Tech. Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971–72 (Fed. Cir. 1999)); see also World Class Tech. Corp. v. Ormco Corp., 769 F.3d 1120, 1125 (Fed. Cir. 2014) ("The doctrine of claim differentiation creates a presumption that distinct claims, particularly an independent claim and its dependent claim, have different scopes.").  The Federal Circuit has explained that the doctrine of claim differentiation "is 'not a hard and fast rule.'"  Littelfuse, Inc. v. Mersen USA EP Corp., 29 F.4th 1376, 1380 (Fed. Cir. 2022) (quoting Seachange Int'l, Inc. v. C–COR, Inc., 413 F.3d 1361, 1369 (Fed. Cir. 2005)).  "Indeed, any presumption created by the doctrine of claim differentiation will be overcome by a contrary construction dictated by the written description or prosecution history."  Id. (internal quotation marks omitted) (quoting Retractable Techs., Inc. v. Becton, Dickinson, and Co., 653 F.3d 1296, 1305 (Fed. Cir. 2011)); see Howmedica Osteonics Corp. v. Zimmer, Inc., 822 F.3d 1312, 1323 (Fed. Cir. 2016)  Here, the clear language in the specification limiting the claimed invention to mammalian somatic cells is sufficient to rebut any presumption created by the doctrine of claim differentiation.  See id.; see also Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1302 (Fed. Cir. 1999) ("[T]he doctrine of claim differentiation does not serve to broaden claims beyond their meaning in

light of the specification and does not override clear statements of scope in the specification and the prosecution history." (citation omitted).)

To support their proposed construction, Defendants also rely on extrinsic evidence, specifically a declaration from Shoreline's expert. (See Doc. No. 149 at 23 (citing Doc. No. 152, Snyder Decl. ¶¶ 102-06).) But "[e]xtrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" Summit 6, 802 F.3d at 1290 (quoting Phillips, 415 F.3d at 1324); see also Seabed Geosolutions, 8 F.4th at 1287 ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). As such, Defendants cannot use expert testimony to contradict the clear statements in the specification limiting the asserted claims to mammalian somatic cells. See id.; see also Genuine Enabling Tech., 29 F.4th at 1373 ("[E]xpert testimony may not be used to diverge significantly from the intrinsic record.").

In sum, the Court rejects Defendants' proposed construction for the term "Oct4"/"Oct 4," and the Court adopts Plaintiffs' alternative proposed construction for the claim term. As such, the Court construes the claim term "Oct4"/"Oct 4" as "Oct4 from any suitable species."

E.   "candidate agent of interest"

Plaintiffs propose the claim term "candidate agent of interest" from claim 8 of the '797 Patent be construed as "an exogenous nucleic acid encoding Nanog and/or Sox-2 protein." (Doc. No. 151 at 22.) Defendants propose that the claim term "candidate agent of interest" from claim 8 of the '797 Patent be construed as "a candidate agent including naturally arising, recombinant, synthetic, designed, chemically modified, or isolated compounds, including organic compounds, biomolecules, peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids, oligonucleotides, oligopeptides, bacterial extracts, fungal extracts, plant extracts, animal extracts, chromatin remodeling proteins, and pluripotency proteins." (Doc. No. 149 at 24.)

Although Plaintiffs initially disputed Defendants' proposed construction for this claim term, Plaintiffs state in their responsive claim construction brief that they agree to

adopt Defendants' proposed construction.  (Doc. No. 179 at 1 n.1; see also Doc. No. 113-7, Ex. D at 16-24.)  As such, the Court construes the term "candidate agent of interest" in claim 8 of the '797 Patent as "a candidate agent including naturally arising, recombinant, synthetic, designed, chemically modified, or isolated compounds, including organic compounds, biomolecules, peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids, oligonucleotides, oligopeptides, bacterial extracts, fungal extracts, plant extracts, animal extracts, chromatin remodeling proteins, and pluripotency proteins."

F.   "somatic cell"

Plaintiffs propose that the claim term "somatic cell" be construed as "any mammalian cell of meso, endo, ectodermal lineage, whether native or engineered, including cells such as adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, other muscle cells, hematopoietic stem cells, neural stem cells, mesenchymal stem cells, and engineered somatic cells, but excluding pluripotent and germ cells."  (Doc. No. 151 at 20-21.)  Defendants propose that the claim term be construed as "any of the body cells except the reproductive (germ) cells."  (Doc. No. 149 at 25.)

Although Plaintiffs initially disputed Defendants' proposed construction for the claim term "somatic cell," Plaintiffs state in their claim construction briefing that they agree to adopt Defendants' proposed construction.[18]  (Doc. No. 151 at 21; Doc. No. 179 at 1 n.1; see also Doc. No. 151-14, Plath Decl. ¶ 34 ("Somatic cells make up all the organs and tissues in the body of a human being, except for the germ cells (sperm, oocytes) which

---

[18]   In their briefing, Plaintiffs explain that they initially disputed Defendants' proposed construction based on a potential ambiguity as to the meaning of "body cells," but that this potential ambiguity was clarified during a deposition of Shoreline's expert.  (Doc. No. 151 at 21.)

are involved in reproduction.").)  As such, the Court construes the claim term "somatic cell" as "any of the body cells except the reproductive (germ) cells."

### Conclusion

For the above reasons, the Court hereby adopts the constructions set forth above.[19]

**IT IS SO ORDERED.**

DATED: February 28, 2023

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[19]     The Court notes that on February 17, 2023, Plaintiffs filed a motion to strike certain clarifications identified in the errata to the deposition of Shoreline's technical expert, Dr. Snyder.  (Doc. No. 177.)  The Court's claim construction order does not cite to or rely on any testimony from Dr. Snyder's deposition.  As such, the analysis in this claim construction order is not implicated by the pending motion to strike.