# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FATE THERAPEUTICS, INC.; and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, <br><br>                Plaintiffs, <br><br> v. <br><br> SHORELINE BIOSCIENCES, INC.; and DAN S. KAUFMAN, <br><br>                Defendants. | Case No.: 22-cv-00676-H-MSB <br><br> **ORDER DENYING PLAINTIFFS' MOTIONS FOR RECONSIDERATION** <br><br> [Doc. Nos. 228, 231, 232.] |

On March 28, 2023, Plaintiffs Fate Therapeutics, Inc. ("Fate") and Whitehead Institute for Biomedical Research ("Whitehead") filed three motions for reconsideration of orders that the Court entered on February 28, 2023. (Doc. Nos. 228, 231, 232.) On March 29, 2023, the Court took the motions under submission. (Doc. No. 233.) On April 11, 2023, Defendants Shoreline Biosciences, Inc. ("Shoreline") and Dan S. Kaufman filed their responses in opposition to Plaintiffs' motions for reconsideration. (Doc. Nos. 241, 242, 243, 244, 245, 246, 247.) On April 18, 2023, Plaintiffs filed their replies. (Doc. Nos. 250, 251, 252.) For the reasons below, the Court denies Plaintiffs' motions for reconsideration.

/ / /

/ / /

## **Background**

In the present action, Plaintiffs assert claims for patent infringement under 35 U.S.C. §§ 271(a), (b), and (g) against Defendants Shoreline and Dan S. Kaufman, alleging claims for infringement of U.S. Patent Nos. 8,071,369 ("the '369 Patent"), 8,932,856 ("the '856 Patent"), 8,951,797 ("the '797 Patent"), 8,940,536 ("the '536 Patent"), 9,169,490 ("the '490 Patent"), 10,457,917 ("the '917 Patent"), and 10,017,744 ("the '744 Patent") (collectively, "the asserted patents").   (Doc. No. 162, Supp. FAC ¶¶ 157-414.) Specifically, Plaintiffs allege that Defendants, individually and acting in concert, make, use, sell, offer for sale, and/or import induced pluripotent stem cells ("iPSCs") that infringe one or more claims of the asserted patents.[1]   (Id. ¶ 140; see, e.g., id. ¶¶ 162 ("Defendants' use of their 'iPSC-derived cell therapy manufacturing platform' infringe[] at least claim 1 of the '369 Patent."), 212 ("iPSCs used by Defendants to make at least the iPSC-derived natural kill (NK) cell platforms are made by a process that comprises at least each step of claim 1 of the '856 Patent.").)

Plaintiff Whitehead is the owner via assignment of the asserted patents.  See U.S. Patent No. 8,071,369, at [73] (issued Dec. 6, 2011); U.S. Patent No. 8,932,856, at [73] (issued Jan. 13, 2015); U.S. Patent No. 8,951,797, at [73] (issued Feb. 10, 2015); U.S. Patent No. 8,940,536, at [73] (issued Jan. 27, 2015); U.S. Patent No. 9,169,490, at [73] (issued Oct. 27, 2015); U.S. Patent No. 10,017,744, at [73] (issued Jul. 10, 2018); U.S. Patent No. 10,457,917, at [73] (issued Oct. 29, 2019).  Plaintiffs allege that Fate is the

---

[1]    Induced pluripotent stem cells ("iPSCs") "are pluripotent stem cells generated from somatic cells by reprogramming." (Doc. 162, Supp. FAC ¶ 31; see Doc. No. 184, Answer to Supp. FAC ¶ 31; see also Doc. No. 151-14, Plath Decl. ¶ 59; Doc. No. 152, Snyder Decl. ¶ 43.)  "Four specific genes—cMYC, OCT3/4, SOX2 and KLF4—encoding transcription factors play a role in converting or reprogramming somatic cells into pluripotent stem cells." (Doc. 162, Supp. FAC ¶ 32; see Doc. No. 184, Answer to Supp. FAC ¶ 32; Doc. No. 204, Answer to Supp. FAC ¶ 32; see also Doc. No. 184, Counterclaims ¶ 43 ("iPSCs are generated in culture from somatic cells through the introduction of reprogramming factors that transform a somatic cell into a pluripotent state."); Doc. No. 152, Snyder Decl. ¶¶ 41, 43.)

exclusive licensee of the asserted patents.  (Doc. No. 162, Supp. FAC ¶¶ 16, 19.)

The '369 Patent is entitled "Compositions for reprogramming somatic cells" and was issued on December 6, 2011.  '369 Patent at [45], [54].  The '856 Patent is entitled "Methods for reprogramming somatic cells" and was issued on January 13, 2015.  '856 Patent at [45], [54].   The '797 Patent is entitled "Compositions for identifying reprogramming factors" and was issued on February 10, 2015.  '797 Patent at [45], [54].  The '536 Patent is entitled "Methods for making somatic cells more susceptible to reprogramming" and was issued on January 27, 2015.  '536 Patent at [45], [54].  The '490 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 27, 2015.   '490 Patent at [45], [54].   The '744 Patent is entitled "Methods for reprogramming somatic cells" and was issued on Jul. 10, 2018.  '744 Patent at [45], [54].  The '917 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 29, 2019.  '917 Patent at [45], [54].

The asserted patents are all related and all share a common specification.[2]  (See Doc. No. 149 at 5 & n.2; Doc. No. 151 at 2 & n.2 (agreeing that the asserted patents all share the same specification); see also Doc. No. 162, Supp. FAC ¶ 132.)  The shared specification states that the disclosed invention is directed to "methods for reprogramming somatic cells to a less differentiated state."  '369 Patent col. 2 ll. 24-25; see also id. at [57] ("The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells.").

Independent claim 1 of the '369 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence.

'369 Patent col. 20 ll. 40-43.

Independent claim 1 of the '856 Patent claims:

---

[2]     The Court will cite to the '369 Patent's specification as the "shared specification" of the asserted patents.

A method of making a somatic cell more susceptible to reprogramming to a pluripotent state comprising introducing at least one exogenous nucleic acid encoding Oct 4 operably linked to at least one regulatory sequence into the cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state.

'856 Patent col. 20 ll. 38-44.

Independent claim 1 of the '797 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding Oct 4, wherein the exogenously introduced nucleic acid increases Oct4 expression in the cell.

'797 Patent col. 20 ll. 40-43.

Independent claim 1 of the '536 Patent claims:

A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making the somatic cell more susceptible to reprogramming to a less differentiated state.

'536 Patent col. 20 ll. 37-44.

Independent claim 1 of the '490 Patent claims:

A somatic cell comprising an exogenous nucleic acid encoding Oct4 and an amount of Oct4 expression comparable to the amount of Oct4 expression in an embryonic stem cell.

'490 Patent col. 20 ll. 39-41.

Independent claim 1 of the '744 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a cell having a less differentiated state, comprising:

obtaining a somatic cell that comprises an exogenously introduced polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein;

wherein the exogenously introduced polynucleic acids result in making the somatic cell more susceptible to reprogramming to a less differentiated state.

4

'744 Patent col. 21 ll. 14-23.

Independent claim 1 of the '917 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming; and wherein the exogenous nucleic acid is transiently transfected into the somatic cell.

'917 Patent col. 21 ll. 16-24.

On May 13, 2022, Plaintiffs filed a complaint against Defendants, alleging claims for infringement of the '369 Patent, the '856 Patent, the '797 Patent, the '536 Patent, the '490 Patent, and the '917 Patent.  (Doc. No. 1, Compl. ¶¶ 66-236.)  On August 12, 2022, the Court issued a scheduling order.  (Doc. No. 51.)  On January 3, 2023, Plaintiffs filed a first amended complaint against Defendants, adding a claim for infringement of the '744 Patent.  (Doc. No. 112, FAC ¶¶ 375-414.)  On January 10, 2023, the Court issued an amended scheduling order.  (Doc. No. 115.)

On February 14, 2023, Plaintiffs filed a supplemental first amended complaint – the operative complaint.  (Doc. No. 162, Supp. FAC.)  On February 17 and 23, 2023, Defendants filed answers and counterclaims to Plaintiffs' supplemental first amended complaint.  (Doc. Nos. 184, 199.)

On February 28, 2023, (1) the Court issued a claim construction order construing agreed up and disputed claim terms from the asserted patents; (2) the Court issued an order denying Plaintiffs' motion to compel without prejudice; and (3) the Court denied as moot Defendants' motion to strike certain clarifications identified in the errata to the deposition of Defendant Shoreline Biosciences, Inc.'s expert Dr. Evan Snyder.  (Doc. Nos. 208, 209, 210.)  On March 27, 2023, the Court denied Shoreline's motion for partial summary judgment.  (Doc. No. 226.)  On March 30, 2023, the Court denied Defendants' partial motion to dismiss Plaintiffs' supplemental first amended complaint.  (Doc. No. 234.)

By the present motion, Plaintiff moves for reconsideration of the Court's three

February 28, 2023 orders.  (Doc. Nos. 228-1, 231-1, 232-1.)  Specifically, Plaintiffs move for reconsideration of: (1) the Court's construction of the claim term "makes the cell more susceptible to reprogramming" contained in the Court's February 28, 2023 claim construction order (Doc. No. 232-1 at 1, 4, 12); (2) the Court's February 28, 2023 order denying Plaintiffs' motion to compel certain damages-related discovery without prejudice (Doc. No. 228-1 at 4-5, 18); and (3) the Court's February 28, 2023 order denying Plaintiffs' motion to strike as moot.  (Doc. No. 231-1 at 1, 4.)

## Discussion

## I.    Legal Standards Governing a Motion for Reconsideration

A motion for reconsideration in a patent case is governed by the law of the regional circuit, here, the Ninth Circuit.  See Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC, 597 F.3d 1374, 1379 (Fed. Cir. 2010).  Under Ninth Circuit law, a district court has inherent jurisdiction to modify, alter, or revoke a prior order.  United States v. Martin, 226 F.3d 1042, 1049 (9th Cir. 2000).  "Reconsideration [of a prior order] is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."  School Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993); accord Smith v. Clark Cnty. Sch. Dist., 727 F.3d 950, 955 (9th Cir. 2013).

Reconsideration of a prior order is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources."  Carroll v. Nakatani, 342 F.3d 934, 945 (9th Cir. 2003); accord Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 858–59 (9th Cir. 2022); see also Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 880 (9th Cir. 2009) ("'[A] motion for reconsideration should not be granted, absent highly unusual circumstances . . . .'");  Raiser v. San Diego Cnty., No. 19-CV-00751-GPC, 2021 WL 4751199, at *1 (S.D. Cal. Oct. 12, 2021) ("Motions for reconsideration are disfavored and should only be granted in narrow instances.").  A motion for reconsideration may not be used to relitigate old matters, or to raise arguments or present evidence for the first time that reasonably could have been raised earlier in the

litigation.  <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 486 n.5 (2008); <u>see</u> <u>Berman</u>, 30 F.4th at 859 ("Reconsideration motions may not be used to raise new arguments or introduce new evidence if, with reasonable diligence, the arguments and evidence could have been presented during consideration of the original ruling." (citing <u>Kona Enterprises, Inc. v. Estate of Bishop</u>, 229 F.3d 877, 890 (9th Cir. 2000)); <u>Williams v. Cnty. of San Diego</u>, 542 F. Supp. 3d 1070, 1071 (S.D. Cal. 2021) ("A motion for reconsideration is not a vehicle to reargue the motion or to present evidence which should have been raised before."). "'A motion to reconsider is not another opportunity for the losing party to make its strongest case, reassert arguments, or revamp previously unmeritorious arguments.'" <u>Raiser</u>, 2021 WL 4751199, at *1; <u>see also</u> <u>Kilbourne v. Coca-Cola Co.</u>, No. 14CV984-MMA (BGS), 2015 WL 10943610, at *2 (S.D. Cal. Sept. 11, 2015) ("'[M]otions for reconsideration are not the proper vehicles for rehashing old arguments and are not intended to give an unhappy litigant one additional chance to sway the judge.'").  "A party seeking reconsideration must show more than a disagreement with the Court's decision." <u>United States v. Westlands Water Dist.</u>, 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001); <u>accord</u> <u>Williams</u>, 542 F. Supp. 3d at 1071.

## II.   Plaintiffs' Motion for Reconsideration of the Court's February 28, 2023 Claim Construction Order

Plaintiffs move for reconsideration of the Court's February 28, 2023 claim construction order.  (Doc. No. 232-1.)  Specifically, Plaintiffs request that the Court reconsider its construction of the claim term "makes the cell more susceptible to reprogramming."  (<u>Id.</u> at 1, 4, 12.)  In response, Defendants argue that Plaintiffs' motion should be denied because Plaintiffs improperly seek to relitigate claim construction and Plaintiffs' arguments also fail on the merits in view of the intrinsic record.  (Doc. No. 241 at 1, 3-14.)

### A.   Legal Standards for Claim Construction

Claim construction is an issue of law for the court to decide.  <u>Teva Pharms. USA, Inc. v. Sandoz, Inc.</u>, 574 U.S. 318, 326 (2015); <u>Markman v. Westview Instruments, Inc.</u>,

517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary."  <u>Teva</u>, 574 U.S. at 326.

"It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  <u>O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.</u>, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  <u>Phillips</u>, 415 F.3d at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  <u>Id.</u> at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent."  <u>O2 Micro</u>, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'"  <u>Phillips</u>, 415 F.3d at 1314 (quoting <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'"  <u>Id.</u> (quoting <u>Innova</u>, 381 F.3d at 1116); <u>see</u> <u>Ericsson, Inc. v. D-Link Sys., Inc.</u>, 773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

In determining the proper construction of a claim, a court should first look to the language of the claims.  <u>See</u> <u>Allergan Sales, LLC v. Sandoz, Inc.</u>, 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("'[C]laim construction must begin with the words of the claims themselves.'"); <u>Source Vagabond Sys. Ltd. v. Hydrapak, Inc.</u>, 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("'a claim construction analysis must begin and remain centered on the claim

language itself'").  The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term.  See Phillips, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.").  "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014) (quoting AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d 1264, 1272 (Fed. Cir. 2011)).

But "[t]he written description part of the specification does not delimit the right to exclude.  That is the function and purpose of claims." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc).  Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1327 (Fed. Cir. 2012); accord Openwave Sys., Inc. v. Apple Inc., 808 F.3d 509, 514 (Fed. Cir. 2015).

In addition to the claim language and the specification, the patent's prosecution history may be considered if it is in evidence.  Phillips, 415 F.3d at 1317.  The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ('PTO')] and includes the prior art cited during the examination of the patent." Id.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." Id.  "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.  In addition, a court should also consult the prosecution history "so that the court can exclude any interpretation that was disclaimed during prosecution." Sorensen v. Int'l Trade Comm'n, 427 F.3d 1375, 1378 (Fed. Cir.

2005) (citing <u>Phillips</u>, 415 F.3d at 1317).

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes.  <u>See</u> <u>Vitronics</u>, 90 F.3d at 1583; <u>Teva</u>, 574 U.S. at 331; <u>see also</u> <u>Seabed Geosolutions (US) Inc. v. Magseis FF LLC</u>, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence.").  However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'"  <u>Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.</u>, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting <u>Phillips</u>, 415 F.3d at 1317).  A court must evaluate all extrinsic evidence in light of the intrinsic evidence.  <u>Phillips</u>, 415 F.3d at 1319.  "'[E]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.'"  <u>Genuine Enabling Tech. LLC v. Nintendo Co.</u>, 29 F.4th 1365, 1373 (Fed. Cir. 2022); <u>see also</u> <u>Summit 6, LLC v. Samsung Elecs. Co.</u>, 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'").  In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence."  <u>Teva</u>, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."  <u>O2 Micro</u>, 521 F.3d at 1362; <u>see also</u> <u>Eon Corp. IP Holdings v. Silver Spring Networks</u>, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'").  In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies.  <u>O2 Micro</u>, 521 F.3d at 1360; <u>Phillips</u>, 415 F.3d at 1314.  But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary'

meaning does not resolve the parties' dispute." <u>O2 Micro</u>, 521 F.3d at 1361.  If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute.  <u>Id.</u> at 1362; <u>Eon</u>, 815 F.3d at 1318.

B.  <u>Analysis</u>

Plaintiffs request that the Court reconsider its construction of the claim term "makes the cell more susceptible to reprogramming."  (Doc. No. 232-1 at 1, 4, 12.)  In the Court's February 28, 2023 claim construction order, the Court construed the claim term "makes the cell more susceptible to reprogramming" as "primes the cell to improve the cloning efficiency of the subsequent reprogramming."  (Doc. No. 208 at 33.)  Plaintiffs argue that the Court should reconsider its construction of this claim term because the Court's construction is clearly erroneous and/or manifestly unjust.  (Doc. No. 232-1 at 5.)

Plaintiffs' motion is an attempt to reargue and relitigate the proper construction of the claim term "makes the cell more susceptible to reprogramming."  Plaintiffs' motion does not identify any new arguments or new evidence that could not have previously been presented to the Court during the claim construction phase of this case.  Rather, in the motion, Plaintiffs simply disagree with the Court's construction of the claim term "makes the cell more susceptible to reprogramming," and Plaintiffs attempt to re-argue the proper construction of that claim term based on revised and new arguments that could have been presented earlier.  This is improper, and this alone provides a sufficient basis to deny Plaintiffs' motion for reconsideration.  <u>See</u> <u>Exxon Shipping</u>, 554 U.S. at 486 n.5; <u>Berman</u>, 30 F.4th at 859; <u>Williams</u>, 542 F. Supp. 3d at 1071; <u>Westlands Water Dist.</u>, 134 F. Supp. 2d at 1131; <u>Raiser</u>, 2021 WL 4751199, at *1.

Plaintiffs' attempt to relitigate claim construction is particularly improper here as Plaintiffs were given a full and fair opportunity to litigate the proper construction of the term "makes the cell more susceptible to reprogramming" during the claim construction phase of the case.  Claim construction in this case was performed pursuant to the Court's Patent Local Rules which provide for: the exchange of preliminary claim constructions and responsive claim constructions; the identification of extrinsic evidence; the filing of a joint

claim construction statement, chart, and worksheet; claim construction discovery; and the filing of opening and responsive claim construction briefs.  See S.D. Cal. Pat. L.R. 4.1-4.4. Further, although not required to do so, on February 22, 2023, the Court issued a 39-page tentative claim construction order – a full five days before the claim construction hearing in this case.  (Doc. No. 192.)  The Court's tentative claim construction order contained not only all of the Court's tentative claim constructions; the tentative order also contained full analyses in support of those tentative constructions and any potential alternative constructions that the Court was considering.  (See id.)  The Court's tentative claim construction order contained 14 pages of analysis regarding the proper construction of the claim term "makes the cell more susceptible for reprogramming."  (See id. at 20-34.)  The Court then held a claim construction hearing on February 27, 2023, providing the parties a full opportunity to argue before the Court their claim construction positions in light of the Court's analyses and tentative constructions.  (Doc. No. 205.)  At the hearing, the Court permitted the parties to use voluminous slide decks as part of their arguments to the Court, and the Court considered all the arguments and materials presented in those slides.[3]  And the only term argued at the hearing was the term "makes the cell more susceptible to reprogramming."  After considering all of the parties' arguments in their briefing and at the hearing and after considering the relevant portions of the record, the Court issued its February 28, 2023 claim construction order.  Under these circumstances, it is improper for Plaintiffs to seek a re-do and attempt to relitigate claim construction through this motion for reconsideration.

Plaintiffs note that the Federal Circuit has held that district courts may engage in rolling claim construction.  (Doc. No. 232-1 at 4-5.)  The Federal Circuit has recognized that "'district courts may engage in a rolling claim construction, in which the court revisits

---

[3]     The Court acknowledges that at the February 27, 2023 hearing, Plaintiffs' slides only addressed the pending motion for summary judgment.  But that was due to Plaintiffs' own choice to not prepare and present slides in support their claim construction arguments.

and alters its interpretation of the claim terms as its understanding of the technology evolves.'" <u>Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.</u>, 599 F.3d 1308, 1316 (Fed. Cir. 2010); <u>accord</u> <u>Conoco, Inc. v. Energy & Env't Int'l, L.C.</u>, 460 F.3d 1349, 1359 (Fed. Cir. 2006).  In addition, the Federal Circuit has explained that "a district court may (and sometimes must) revisit, alter, or supplement its claim constructions . . . to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact." <u>In re Papst Licensing Digit. Camera Pat. Litig.</u>, 778 F.3d 1255, 1261 (Fed. Cir. 2015) (citing <u>O2 Micro</u>, 521 F.3d at 1359; <u>Pfizer, Inc. v. Teva Pharm., USA, Inc.</u>, 429 F.3d 1364, 1377 (Fed. Cir. 2005)).  But this is not a situation where the Court's understanding of the relevant technology or the scope of the parties' dispute has evolved in light of subsequent arguments or evidence presented by the parties at summary judgment or at trial.  This is a situation where one side, Plaintiffs, simply disagrees with the Court's claim construction order and seeks to reargue claim construction.  This is not a proper basis for a motion for reconsideration.  <u>See</u> <u>Exxon Shipping</u>, 554 U.S. at 486 n.5; <u>Berman</u>, 30 F.4th at 859; <u>Williams</u>, 542 F. Supp. 3d at 1071; <u>Westlands Water Dist.</u>, 134 F. Supp. 2d at 1131; <u>Raiser</u>, 2021 WL 4751199, at *1.  As such, the Court denies Plaintiffs' motion for reconsideration on the grounds that it is an improper attempt to relitigate claim construction.  <u>See</u> <u>id.</u>; <u>see, e.g.</u>, <u>Regents of Univ. of California v. Affymetrix, Inc.</u>, No. 17-CV-01394-H-NLS, 2018 WL 5617866, at *2 (S.D. Cal. Oct. 30, 2018) (denying motion for reconsideration of claim construction order where the motion was an improper attempt to reargue and relitigate claim construction).

Moreover, even if the Court were to consider the substantive arguments in the motion for reconsideration, Plaintiffs have not identified any error in the Court's construction of the claim term "makes the cell more susceptible to reprogramming," let alone clear error.  Plaintiffs contend that the Court erred in finding a prosecution disclaimer.  (Doc. No. 232-1 at 5-9; Doc. No. 250 at 1-3.)  In construing the relevant claim term, the Court engaged in a detailed analysis of the prosecution history, found a prosecution disclaimer, and held that, as a result of that disclaimer, "the claims at issue are

limited to a method of 'priming' a somatic cell for reprogramming." (Doc. No. 208 at 30.) In reaching this holding, the Court primarily relied on the Federal Circuit's decisions in Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090 (Fed. Cir. 2013), and SandBox Logistics LLC v. Proppant Express Invs. LLC, 813 F. App'x 548 (Fed. Cir. 2020).[4] Plaintiffs have not identified any error in the Court's finding of a prosecution disclaimer.

Plaintiffs argue that the Court's finding of prosecution disclaimer was erroneous because "the Court incorrectly focused on what the Applicant did ***not*** say in response to an enablement rejection instead of what Applicant did say." (Doc. No. 232-1 at 6-7 (emphasis in original).)  Plaintiffs note that it is the applicant, not the examiner, who disclaims claim scope. (Id. at 7 (citing Innova/Pure Water, 381 F.3d at 1124; 3M Innovative Properties Co. v. Tredegar Corp., 725 F.3d 1315, 1332 (Fed. Cir. 2013)).) See Arendi S.A.R.L. v. Google LLC, 882 F.3d 1132, 1135 (Fed. Cir. 2018) ("[I]t is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims.'" (quoting Sorensen, 427 F.3d at 1379))).  Plaintiffs' argument fails as it is based on a mischaracterization of the Court's analysis.  In finding a prosecution disclaimer, the Court not only relied on the examiner's enablement rejection; the examiner's statements in support of that rejection; and the applicant's amendments to the claims at issue in response to that rejection, the Court also relied on the applicant's express and affirmative citation to every instance in the April 11, 2014 office action where the examiner characterized the specification as disclosing a method of "priming" a somatic cell for reprogramming in an effort to support enablement of the amended claims.  (See Doc. No. 208 at 27-31; compare Doc. No. 113-5, Ex. B-32 at 5 (citing April 11, 2014 office action at "paragraph bridging pages 3-4, paragraph bridging pages 4-5, and first full paragraph of page 7") with Doc. No. 113-5, Ex. B-31 at 3, 4, 7).)  As such, the Court's finding of prosecution disclaimer focused

---

[4]    The Court also relied on the Federal Circuit's decisions in Ancora Techs., Inc. v. Apple, Inc., 744 F.3d 732, 739 (Fed. Cir. 2014), and TorPharm, Inc. v. Ranbaxy Pharm., Inc., 336 F.3d 1322, 1330 (Fed. Cir. 2003), and the district court decision in Oy v. Verizon Servs. Corp., No. CV 12-715-CJB, 2014 WL 7385615, at *12 (D. Del. Dec. 23, 2014).

on and relied on what applicant affirmatively said to the PTO through its citations.

Further, in <u>Biogen</u>, the Federal Circuit explained: "While disavowing statements must be 'so clear as to show reasonable clarity and deliberateness,' this requirement does not require the applicant to parrot back language used by the examiner when clearly and deliberately responding to a particular ground[] for rejection.  If an applicant chooses, she can challenge an examiner's characterization in order to avoid any chance for disclaimer, but the applicants in this case did not directly challenge the examiner's characterization." 713 F.3d at 1096 (quoting <u>Omega Eng'g, Inc, v. Raytek Corp.</u>, 334 F.3d 1314, 1325 (Fed. Cir. 2003), and citing <u>TorPharm</u>, 336 F.3d at 1330); <u>see also</u> <u>TorPharm</u>, 336 F.3d at 1330 ("Whether the patentee chooses to dispute the examiner's view of matters is relevant to claim interpretation, for there a court may need to ascertain exactly what subject matter was actually examined and allowed by the PTO. . . . Accordingly, in ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest.  Such acquiescence may be found where the patentee narrows his or her claims by amendment or lets stand an examiner's restrictive interpretation of a claim." (citing <u>Elkay Mfg. Co. v. Ebco Mfg. Co.</u>, 192 F.3d 973, 978–79 (Fed. Cir. 1999))); <u>SandBox</u>, 813 F. App'x at 554 ("SandBox's failure to challenge the Examiner's understanding amounts to a disclaimer."). Plaintiffs do not identify any passage in the intrinsic record where the applicant directly challenged the examiner's characterization of the specification as disclosing a method of "priming" a somatic cell for reprogramming.  Rather, the prosecution history contains affirmative citations by the applicant to that characterization by the examiner to support the patentability of the claims at issue.[5]

---

[5]   In reaching its holding in <u>Biogen</u>, the Federal Circuit expressly addressed the principle that it is applicant, not the examiner, who must disclaim claim scope, and the Federal Circuit explained:

> We are mindful that "it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the

Plaintiffs assert that the applicant "did not simply 'cite[] to every instance where the examiner characterized the specification as disclosing a method of 'priming' a somatic cell for reprogramming' to thereby equate 'priming' with 'making a cell more susceptible to reprogramming.'"  (Doc. No. 232-1 at 7 (quoting Doc. No. 208 at 30).)  Plaintiffs note that the applicant also cited to the examiner's acknowledgement "that the specification 'concludes that inducing Oct4 expression in somatic cells makes these cells more susceptible to reprogramming.'"  (Id. (comparing Doc. No. 113-5, Ex. B-32 at 5 with Doc. No. 113-5, Ex. B-31 at 3).)  Plaintiffs contend that, in light of this, a plausible reading of the prosecution history is "that 'priming' is an example of making a cell more susceptible to reprogramming and that the claims may encompass, but are not limited to, 'priming.'"  (Id. at 7; see Doc. No. 250 at 2.)  The Court does not find this argument persuasive.  If the

---

claims."  Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1124 (Fed. Cir. 2004).  This case, however, differs markedly from those frequently raising this admonition.  Those cases typically involve an applicant standing silent when confronted by statements made by the examiner during prosecution, most often in the examiner's Statement of Reasons for Allowance.  See, e.g., Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1345–47 (Fed. Cir. 2005); ACCO Brands, Inc. v. Micro Sec. Devices, Inc., 346 F.3d 1075, 1079 (Fed. Cir. 2003).  This case deals not only with applicants letting stand an examiner's narrow characterization of a claim term, but also their adoption of that characterization to overcome the examiner's enablement rejection.  Thus, the acquiescence cases are inapposite.  See TorPharm, 336 F.3d at 1330 ("[T]he public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest.").

Biogen, 713 F.3d at 1097 n.6.  As in Biogen, "[t]his case deals not only with applicants letting stand an examiner's narrow characterization of a claim term, but also their [affirmative] adoption of that characterization to overcome the examiner's enablement rejection."  Id.  As such, Plaintiffs' reliance on Innova/Pure Water and 3M is misplaced.  In addition, 3M is also easily distinguishable from the present case because in 3M the accused infringer did not even assert that there was a prosecution disclaimer.  See 725 F.3d at 1332 ("[Defendant] neither argues nor provides evidence of a disclaimer in the original prosecution or the reexamination.").

applicant was not equating "priming" with "making a cell more susceptible to reprogramming," then there would have been no need to cite to all three passages in the office action discussing "priming" to support the patentability of the amended claims. The applicant would have only needed to cite to the single passage where the examiner discusses the specification's conclusion that inducing Oct4 expression makes cells more susceptible to reprogramming. But that is not what happened. The applicant cited to all three of the examiner's statements characterizing the disclosed invention as a method of "priming," and the public and the Court are entitled to rely on those affirmative representations by the applicant regarding the scope of its invention. See DNA Genotek Inc. v. Spectrum Sols. L.L.C., No. 321CV00516RSHDDL, 2022 WL 17331255, at *21 (S.D. Cal. Nov. 29, 2022) ("The Federal Circuit has explained that the public and the Court are 'entitled to take the patentee at his word' regarding the scope of its invention." (quoting Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1350 (Fed. Cir. 2004); Honeywell Int'l, Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006)); see also Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1360 (Fed. Cir. 2017) (explaining that claims should not be "'construed one way in order to obtain their allowance and in a different way against accused infringers'"). "While the applicants may not have repeated the examiner's language *verbatim et literatim*, it is clear that they were limiting their invention to what the examiner believed they enabled," Biogen, 713 F.3d at 1096, which here is a method of "priming" a somatic cell for reprogramming. (See Doc. No. 113-5, Ex. B-31 at 3-4, 7.)

Plaintiffs note that when the applicant amended the claims, the applicant explicitly chose not to include "priming" in the claim language, and, instead, the claims were amended to recite different language. (Doc. No. 232-1 at 7; Doc. No. 250 at 3.) This argument is not persuasive as it fails to meaningfully distinguish the present case from the Federal Circuit's decision in SandBox. In SandBox, the applicant explicitly amended the claims to recite a "bottom," and the applicant did not use the word "wall" in the amended claim language. See 813 F. App'x at 554. Nevertheless, in light of the relevant prosecution history, the Federal Circuit found a prosecution disclaimer and affirmed the district court's

construction of the term "bottom" as "bottom wall."  See id. at 554–55; see also Traxcell Techs., LLC v. Nokia Sols. & Networks Oy, 15 F.4th 1136, 1141 (Fed. Cir. 2021) ("'Prosecution disclaimer can arise from both claim amendments and arguments.'").

Plaintiffs also assert: "[T]he Court erred in importing an order of steps requirement ('subsequent reprogramming') based on disclaimer because the examiner's rejection and comments did not relate in any way to when Oct-4 is introduced to the cell in relation to when reprogramming occurs." (Doc. No. 232-1 at 8.)  Plaintiffs assert that "[t]here can be can be no clear and unmistakable disclaimer because the examiner never rejected the claims or made any comments related to the order of steps, nor did the applicant amend claims or make any argument to overcome such a rejection."  (Id. (citing Grober v. Mako Prods., Inc., 686 F.3d 1335, 1342 (Fed. Cir. 2012)); see Doc. No. 250 at 3-4.)  The Court rejects this argument as it is not based on an accurate characterization of the intrinsic record. Specifically, it is inaccurate to state that the examiner and the applicant never made any comments related to the order of steps.  In the April 11, 2014 office action, the examiner characterized the specification as disclosing a method of "priming [a] somatic cell[] for reprogramming" three times, and when the applicant amended the claims, the applicant affirmatively cited to all three of those passages discussing "priming."  (See Doc. No. 113-5, Ex. B-31 at 3, 4, 7; Doc. No. 113-5, Ex. B-32 at 5.)  The common meaning of the verb "priming" is "[t]o make ready, prepare."  THE AMERICAN HERITAGE COLLEGE DICTIONARY at 1086 (3d ed. 1997); see also OXFORD LEARNER'S DICTIONARIES, https://www.oxfordlearnersdictionaries.com/us/   definition/american_english/prime_3 (defining the verb "prime" as "prime something to make something ready for use or action"), DICTIONARY.COM, https://www.dictionary. com/browse/prime (defining verb "prime" as "to prepare or make ready for a particular purpose or operation"); MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/prime (defining the verb "prime" as "to supply with an essential prerequisite (such as a hormone, nucleic acid,

or antigen) for chemical or biological activity").[6]  Thus, that the examiner was describing a two-step process where you have an initial preparation step and then a subsequent "reprogramming" step is inherent in the examiner's use of the verb "priming" in the passages at issue.[7, 8]  And, again, the applicant expressly cited to all of those passages to support the patentability of the amended claims.

Plaintiffs continue to argue that the examiner merely found that the example in the specification showed that Oct-4 achieved an "additive" effect for reprogramming when other factors were also "present" in the oocyte; rather than some two-step process.  (Doc. No. 232-1 at 8 (citing Doc. No. 151-6, Ex. 5 at 16); Doc. No. 250 at 2; see also Doc. No.

---

[6]  The common meaning of the noun "prerequisite" is "something that is" "[r]equired or necessary as a prior condition."  THE AMERICAN HERITAGE COLLEGE DICTIONARY at 1081; see also OXFORD LEARNER'S DICTIONARIES https://www.oxfordlearnersdictionaries. com/us/definition/english/prerequisite_2 (defining the noun "prerequisite" as "something that must exist or happen before something else can happen or be done").

[7]  Claim construction discovery in this case is closed and has been since January 24, 2023.  (See Doc. No. 115 at 3.)  Plaintiffs have been on notice of Defendants' contention that the term at issue means "primes the cell for subsequent reprogramming" since at least December 5, 2022 when the parties filed their joint claim construction chart.  (See Doc. No. 90-1 at 22.)  Yet Plaintiffs chose to not provide the Court with any definitions of the verb "prime" or "priming" during claim construction.

[8]  Plaintiffs assert that "the most plausible reading of the prosecution history is that the Examiner was equating 'prim[ing]' with enhancing efficiency of reprogramming."  (Doc. No. 232-1 at 9.)  The correct, clear, and unambiguous reading of the prosecution history is that when the examiner uses the word "priming," she is referring to the two-step process described in the working example of the specification – the working example in the specification that both Plaintiffs' counsel and Plaintiffs' expert describe as an SCNT experiment involving a two-step process.  (See Doc. No. 218 at 12, 30; Doc. No. 232-3, Plath Decl. ¶¶ 8-9.)  In the April 11, 2014 office action, in the entire paragraph immediately preceding the first time the examiner uses the verb "priming," the examiner describes "the specific guidance" that the specification provides and entirely focuses on the working example of the specification and describes it as a two-step process.  (See Doc. No. 113-5, Ex. B-31 at 3 ("The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and *then* transferred into enucleated oocytes to produce[] nuclear transfer units." (emphasis added)).)

151 at 12-13; Doc. No. 179 at 2-3.)   The Court rejected this argument in the claim construction order, (see Doc. No. 208 at 31-32), and the Court again rejects this argument here.  By making this argument, Plaintiffs essentially request that the Court solely focus on the examiner's single statement regarding "Oct4 as an additive factor to reprogramming" and ignore the examiner's other multiple statements characterizing the specification as disclosing a method of "priming" a cell for reprogramming.  The Court declines to focus on that single statement out of context.  In evaluating prosecution disclaimer, the Court must read the examiner's statements in the "context" of "the full prosecution history." Biogen, 713 F.3d at 1096; see also CardSoft, (assignment for the Benefit of Creditors), LLC v. VeriFone, Inc., 807 F.3d 1346, 1350 (Fed. Cir. 2015) (explaining that claim terms are read "'in the context of the entire patent,' including the specification and the prosecution history" (quoting Phillips, 415 F.3d at 1313)).  Thus, the Court must consider all relevant statements in the prosecution history, and, importantly, it is not as if these statements are inconsistent with each other.  These statements are easily combined to reflect the examiner's understanding that the specification discloses a method of "priming" a somatic cell for reprogramming where the initial Oct-4 "priming" (i.e., the preparation/conditioning) step provides an "additive factor" to the subsequent reprogramming step.[9]

---

[9]      The Court also notes that these statements when combined with others also reflect that the "additive factor" that the examiner is referring to is "enhanc[ing] nuclear transfer cloning efficiency and nuclear transfer's reprogramming process."  (Doc. No. 113-5, Ex. B-31 at 8 ("[T]he experiments described in the specification . . . solely demonstrate[] that addition of Oct4 expression enhances nuclear transfer cloning efficiency and nuclear transfer's reprogramming process."), 13 ("[T]he nuclear transfer experimental model is only informative to the impact of Oct4 exogenous expression on the degree of cloning efficiency or the degree reprogramming completeness or effectiveness upon the number of reprogrammed fibroblast nuclei."); see also Doc. No. 151-10, Ex. 9 at pp. 160 ("improving the efficiency of somatic cloning"), 178 ("improve cloning efficiency")).  In their motion for reconsideration, Plaintiffs assert that the Court's claim construction analysis improperly relies on "isolated statements" from the prosecution history.  (Doc. No. 232-1 at 1, 6.)  As shown by the above, it is the Court's analysis that seeks to interpret the claims within the "context" of "the full prosecution history."  See Biogen, 713 F.3d at 1096.  And it is

Plaintiffs also assert: "The Court . . . found support for the order of steps in the somatic cell nuclear transfer ('SCNT') experiment in the patent Example even though the record was devoid of evidence that a person of ordinary skill in the art ('POSA') would understand the Example in the same manner." (Doc. No. 232-1 at 1; see also id. at 9-11.) First, Plaintiffs are wrong, and the record was not devoid of evidence regarding how a POSITA would understand the SCNT experiment in the specification. The intrinsic record contains a September 19, 2011 office action, where the examiner explained: "The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were *first* treated with DOX to induce Oct4 expression *and then* use[d] in nuclear transfer." (Doc. No. 113-3, Ex. B-23 at 3 (emphasis added).) The intrinsic record also contains an August 20, 2013 office action and an April 11, 2014 office action, where in both the examiner explained: "The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and *then* transferred into enucleated oocytes to produce[] nuclear transfer units." (Doc. No. 113-2, Ex. B-11 at 4 (emphasis added); Doc. No. 113-5, Ex. B-31 at 3.) The Court relied on these statements and expressly cited to them in the Court's claim construction order. (See Doc. No. 208 at 31-32.) Statements by an examiner during the prosecution of a patent are evidence of how a POSITA would understand the invention.[10]

---

Plaintiffs who attempt rely on "isolated statements" from the prosecution history while entirely ignoring many others.

[10] The prosecution history also contains statements from the inventors of the asserted patents describing the SCNT experiment as a two-step process, where the somatic donor nucleus is conditioned/modified (i.e., primed) "prior to" nuclear transfer. (See Doc. No. 151-10, Ex. 9 at pp. 160 ("[P]rimary somatic cells . . were . . . treated with Dox for 48 hours *prior to* nuclear transfer to transiently induce ectopic expression of Oct4." (emphasis added)), 168 (explaining that Oct-4 inducible mice were generated "[t]o modify the somatic donor nucleus *prior to* nuclear transfer in an effort facilitate epigenetic reprogramming and cloning efficiency" (emphasis added)), 169 ("The Oct4 inducible mouse strain will be used in an attempt to 'condition' a somatic donor nucleus so as to facilitate nuclear reprogramming and increase nuclear cloning efficiency.").) In so doing, the inventors also specifically explained that the duration of the DOX treatment has a material effect on

See 3M, 725 F.3d at 1332 (explaining that statements by an examiner during prosecution of a patent can be "representative of how one of skill in the art would understand the term"); Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1347 (Fed. Cir. 2005) ("Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."); Nitride Semiconductors Co. v. Lite-On Tech. Corp., No. W-21-CV-00183-ADA, 2022 WL 17347782, at *8 (W.D. Tex. Nov. 30, 2022) ("Examiner's prosecution statements are evidence of how the POSITA would understand this term.").

Second, the Court's construction of this claim term was also based on Plaintiffs' own explanation at the hearing of how a POSITA would understand the SCNT experiment. (See Doc. No. 108 at 32 n.15.) At the February 27, 2023 hearing, Plaintiffs explained the SCNT experiment in the specification as a two-step process where the experimenters first made sure that the "cell had Oct4 in it," and the experimenters then combined that cell with the oocyte in a "subsequent step" to perform the nuclear transfer and reprogram the cell. (See Doc. No. 218 at 30 ("A POSA understands that it was to make sure over that 24-hour period that the expression of the trans gene had enough time to generate Oct4 so that in this subsequent step, Oct4 was being put together with the oocyte."), 12 ("they wanted to make sure that that cell had Oct4 in it at the time that they combined it with the -- the oocyte"); see also id. at 3-4 (explaining that SCNT reprogramming happens when the somatic cell is

---

"[o]ptimal gene activation levels." (See id. at pp. 173 ("Activation of the target gene will be accomplished by treating the animals or explanted fibroblasts with DOX . . . . Optimal gene activation levels will be achieved by altering *time* and treatment concentration of the drug." (emphasis added)), 178 ("[I]mportant parameters of this procedure such as concentration of DOX and *duration* of treatment have not yet been optimized." (emphasis added)).) The Federal Circuit has explained: "although inventor testimony cannot change the scope of the claims from their meaning at the time of invention, '[a]n inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims.'" Bradium Techs. LLC v. Iancu, 923 F.3d 1032, 1044 (Fed. Cir. 2019) (quoting Voice Techs. Grp., Inc. v. VMC Sys., Inc., 164 F.3d 605, 615 (Fed. Cir. 1999)).

fused with an egg cell that has had its genetic material removed, subsequently forming "a clone blastocyst").)   Further, even if the Court were to consider the declaration from Plaintiffs' expert submitted along with their motion for reconsideration, the declaration is consistent with that explanation and also describes it as a two-step process.[11]   (See Doc. No. 232-3, Plath Decl. ¶ 8 ("The expression was induced *prior to* fusion with the oocyte to ensure that Oct-4 was present at the time the nucleus was fused with the oocyte . . . ." (emphasis added)), ¶ 9 ("[I]t was necessary in that particular experiment to induce Oct-4 for several hours *prior to* the fusion because the expression of Oct-4 from the transgene is not immediate." (emphasis added)).)

Plaintiffs further assert: "It was also clear error to include the limitation 'improve cloning efficiency' in this construction because the specification is unambiguously directed to improving the efficiency of ES cell generation generally and makes no mention of 'cloning efficiency.'" (Doc. No. 232-1 at 1; see id. at 11; Doc. No. 250 at 4-6.) In response, Defendants argue: "Plaintiffs asked for inclusion of 'efficiency' during claim construction, but, as the Court made clear, ignored what type of 'efficiency' the specification disclosed. Having requested 'efficiency' as part of [its proposed] construction, Plaintiffs should not now be heard to object that the Court clarified their own proposed added limitation." (Doc. No. 241 at 12 (citation omitted).)  The Court agrees with Defendants.

At claim construction, Plaintiffs directed the Court to statements in the specification

---

[11]     The Court also notes that Plaintiffs' counsel's and Plaintiffs' expert's explanation of the SCNT experiment in the specification is also consistent with the common meaning of the verb "prime." Both Plaintiffs' counsel and Plaintiffs' expert describe the SCNT experiment as a process where the cell was primed (i.e., prepared/conditioned) by inducing Oct4 expression "prior to" the "subsequent step" of nuclear transfer/fusion (i.e., nuclear transfer reprogramming). (Doc. No. 218 at 30; Doc. No. 232-3, Plath Decl. ¶¶ 8, 9.)  And that is consistent with how the examiner and the inventors described the SCNT experiment. (See Doc. No. 113-3, Ex. B-23 at 3 ("The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were *first* treated with DOX to induce Oct4 expression *and then* use[d] in nuclear transfer." (emphasis added)); Doc. No. 113-5, Ex. B-31 at 3; Doc. No. 151-10, Ex. 9 at pp. 160-61, 168-69, 173, 178.)

and the prosecution history discussing "efficiency," and Plaintiffs asserted that the claim term "makes the cell more susceptible to reprogramming" should be interpreted based on those passages.  (See Doc. No. 151 at 10-11; Doc. No. 179 at 1-2.)  As explained in the claim construction order, Plaintiffs failed to read those statements in their proper context.  (See Doc. No. 208 at 22-26.)  And Plaintiffs continue to fail to read those statements in their proper context.

Contrary to Plaintiffs' assertions, those passages do not discuss improving the efficiency of ES cell generation generally.  Rather, every statement in the specification and the prosecution history regarding efficiency identified by Plaintiffs describes either "blastocyst formation and ES cell derivation" efficiency, "nuclear transfer cloning efficiency," or "cloning efficiency."  See '369 Patent col. 19 ll. 29-30, col. 19 ll. 64-66. (See Doc. No. 113-5, Ex. B-31 at 3-4, 8, 12-13; see also Doc. No. 208 at 22-26; Doc. No. 151-14, Plath Decl. ¶ 52 (Plaintiffs' expert testifying: "As shown in Table 1, blastocyst formation and embryonic (ES) cell derivation are more efficient from Oct4 induced fibroblasts than from uninduced fibroblast . . . .").)  In addition, the prosecution history contains a declaration under 37 C.F.R. § 1.131 from the inventors of the asserted patents, Drs. Jaenisch and Hochedlinger.  (Doc. No. 151-10, Ex. 9.)  Applicant submitted this § 1.131 declaration to the PTO in an effort to support enablement of the method claims at issue in the examiner's April 11, 2014 office action.[12]  (See Doc. No. 113-4, Ex. B-29 at 5-7.)  In the declaration, the inventors describe the SCNT experiment referenced in the specification as being related to "improving the efficiency of somatic cloning" and "to assess reprogramming by cloning efficiency."  (Doc. No. 151-10, Ex. 9 at p. 160; see also id. at pp. 165 ("improve cloning efficiency"), 168 ("improve cloning efficiency"), 169

---

[12]     Plaintiffs note that the declaration was provided in response to an enablement rejection, not a prior art rejection.  (Doc. No. 250 at 4.)  Regardless of whether it was in response to an enablement rejection or a prior art rejection, the declaration at issue was submitted to the PTO in an effort to demonstrate the patentability of the claims at issue. (See Doc. No. 113-4, Ex. B-29 at 5-7.)

22-cv-00676-H-MSB

("increase nuclear cloning efficiency"), 171 ("Development of clones is inefficient"), 171 ("the efficiency of somatic cloning might be substantially improved"), 171 ("improve the efficiency of nuclear cloning"), 175 ("[c]loning efficiency will be tested"), 178 ("improve nuclear cloning efficiency"), 178 ("improve cloning efficiency"), 178 ("increase overall cloning efficiency").)  See Phillips, 415 F.3d at 1317 ("[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent."); see, e.g., Bradium, 923 F.3d at 1044 (affirming claim construction that was "consistent with the testimony of the inventor").

At the claim construction hearing, Plaintiffs conceded that the words "blastocyst" and "cloning" "are unique to SCNT."[13]  (Doc. No. 218 at 18 ("[T]he problem that we have with the Court's tentative constructions is that they read into the claim -- some of them seem to recognize this concept of improved efficiency, but they read into the claims words . . . that are unique to SCNT, things like blastocyst or cloning . . . ."); see also id. at 17 (explaining that "blastocyst formation" is "specific to the particular technique . . . SCNT").)  And, as the Court explained to Plaintiffs in the claim construction order, context matters.  See Phillips, 415 F.3d at 1313; CardSoft, 807 F.3d at 1350; Biogen, 713 F.3d at 1096.  That the efficiency at issue was consistently described in the intrinsic record within the specific context of SCNT is important because both the specification of the asserted patents and Plaintiffs' own presentation at the February 27, 2023 hearing make clear that SCNT is very

---

[13]    Consistent with Plaintiffs' representation at the hearing that "cloning" is unique to SCNT, the examiner used the phrases "nuclear transfer cloning efficiency" and "cloning efficiency" interchangeably.  (Compare Doc. No. 113-5, Ex. B-31 at 8 ("cloning efficiency is increased") with id. at 8 ("enhances nuclear transfer cloning efficiency").)  In addition, the inventors of the asserted patents used the phrases "nuclear cloning efficiency" and "cloning efficiency" interchangeably.  (Compare Doc. No. 151-10, Ex. 9 at p. 168 ("improve cloning efficiency"); with id. at p. 169 ("increase nuclear cloning efficiency"); compare id. at p. 178 ("improve nuclear cloning efficiency") with id. at p. 178 ("improve cloning efficiency").)

different than direct reprogramming.[14]  See '369 Patent col. 1 ll. 46-55, col. 2 ll. 4-13, col. 3 ll. 60-67, col. 4 ll. 30-32.  (See Doc. No. 218 at 3-6 (explaining the differences between SCNT and direct reprogramming and asserting that "[d]irect reprogramming is a different technique").)[15]

Plaintiffs argue that the Court erred in including "cloning efficiency" in its claim construction because it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.  (Doc. No. 232-1 at 11; Doc. No. 250 at 5.)  The Federal Circuit has held in many cases that "'it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication

---

[14]    The Court notes that Plaintiffs have not identified any passage in the intrinsic record where "efficiency" is discussed in the context of direct reprogramming.

[15]    For example, Plaintiffs described SCNT as "an old technique for reprogramming" that is an "incredibly difficult challenging technical technique that can only be done by a handful of labs in the world."  (Doc. No. 218 at 3.)  Plaintiffs then described the technique of SCNT as taking "a somatic cell" and either: (1) taking the nucleus out of that somatic cell and "put[ting] it into an egg cell" that has had its "genetic material removed;" or (2) taking "the entire somatic cell" and "fus[ing] it together with an egg cell" that has had its genetic material removed.  (Id.)  Either method then "creates, in effect, a fertilized egg cell." (Id. at 4.)  See also '369 Patent col. 1 ll. 46-55, col. 2 ll. 4-11(describing the technique of SCNT and referring to it as a method that "depend[s] on controversial sources" such as "embryos (either created naturally or via cloning)").

Plaintiffs contrasted that technique with "[d]irect reprogramming" which according to Plaintiffs has "much more commercial appeal and universal applicability."  (Doc. No. 218 at 4.)  Plaintiffs described the technique of direct reprogramming as including the following steps: taking somatic cells and inserting DNA that encodes certain proteins "collectively called the Yamanaka factors;" then allowing the cells "to express the[] transcription factors in [a] first step;" then transferring the cells into "a priming medium;" and then "transfer[ring] them to the reprogramming step where the mediums change."  (Id. at 5.)  See also '369 Patent col. 3 ll. 60-67 (describing "directly" reprogramming as reprogramming that does not use "oocytes and nuclear transfer technology" and does not use "controversial sources").

in the intrinsic record that the patentee intended the claims to be so limited.'" <u>Dealertrack</u>, 674 F.3d at 1327; <u>accord</u> <u>Openwave</u>, 808 F.3d at 514.  But the Court again notes that it was Plaintiffs that asserted that the claim term "makes the cell more susceptible to reprogramming" should be interpreted based on passages in the specification and the prosecution history discussing "efficiency." (<u>See</u> Doc. No. 151 at 10-11; Doc. No. 179 at 1-2.)  The claims at issue do not contain the phrase "improve the efficiency."  <u>See</u> '865 Patent col. 20 ll. 38-44; '917 Patent col. 21 ll. 16-17.  As such, by proposing their construction for this claim term, Plaintiffs sought to read in an "improve the efficiency" limitation from the specification and prosecution history into the claims, meaning that Plaintiffs recognized that this was an appropriate situation to read in material from the specification and prosecution history into the claims.  However, Plaintiffs did not receive the precise "efficiency" limitation that they wanted when the Court construed the claim term because the intrinsic record did not provide support for such a broad limitation. Rather, the intrinsic record only supported the inclusion of an "efficiency" limitation related to "blastocyst formation and ES cell derivation" efficiency, "nuclear transfer cloning efficiency," and "cloning efficiency," which are all specific to SCNT.[16]  As such, narrowing Plaintiffs' proposed construction to only encompass "cloning efficiency" was necessary to tether the claims to what the intrinsic record indicates the inventors actually invented.[17]  <u>See</u> <u>Medicines Co. v. Mylan, Inc.</u>, 853 F.3d 1296, 1309 (Fed. Cir. 2017)

---

[16]  That the Court lists these out as three efficiencies should not be taken to imply that they are indeed three different types of efficiencies.  Indeed, as noted elsewhere, both the examiner and the inventors used the phrases "nuclear [transfer] cloning efficiency" and "cloning efficiency" interchangeably.  (<u>See, e.g.</u>, Doc. No. 113-5, Ex. B-31 at 8; Doc. No. 151-10, Ex. 9 at p. 168-69, 178.)

[17]  In their motion for reconsideration, Plaintiffs take issue with the fact that the specific phrase "cloning efficiency" is not expressly contained in the specification.  (<u>See</u> Doc. No. 232-1 at 11; Doc. No. 250 at 4-5.)  As explained above and in the February 28, 2023 claim construction order, the phrase "cloning efficiency" is contained throughout the relevant prosecution history.  Further, in the Court's tentative claim construction order, the Court also proposed construing the claim term "as improves higher blastocyst formation and

("[C]onstruing 'efficiently mixing' to incorporate the efficient mixing conditions of Example 5 is necessary to 'tether the claims to what the specification[] indicate[s] the inventor actually invented.'" (quoting <u>Retractable Techs., Inc. v. Becton, Dickinson & Co.</u>, 653 F.3d 1296, 1305 (Fed. Cir. 2011))).  As such, Plaintiffs have failed to demonstrate any error in the Court's inclusion of the phrase "improve cloning efficiency" in its construction for the term "makes the cell more susceptible to reprogramming."

In sum, Plaintiffs' motion for reconsideration is improper and fails to present any basis for the Court to alter its construction of the claim term "makes the cell more susceptible to reprogramming."   Plaintiffs' disagreement with the Court's claim construction is not a basis for a motion for reconsideration.  <u>See</u> <u>Williams</u>, 542 F. Supp. 3d at 1071; <u>Westlands Water Dist.</u>, 134 F. Supp. 2d at 1131; <u>Raiser</u>, 2021 WL 4751199, at *1; <u>Kilbourne</u>, 2015 WL 10943610, at *2; <u>Regents of Univ. of Cal.</u>, 2018 WL 5617866, at *2. As such, the Court denies Plaintiffs' motions for reconsideration of the Court's February 28, 2023 claim construction order.

## III.   Plaintiffs' Motion for Reconsideration of the Court's February 28, 2023 Discovery Order

Plaintiffs move for reconsideration of the Court's February 28, 2023 order denying their motion to compel without prejudice.  (Doc. No. 228-1 at 4-5, 18.)  Specifically, Plaintiffs request that the Court reconsider its denial of Plaintiffs' requests for certain damages-related discovery.  (<u>Id.</u> at 4, 11-18.)  In response, Defendants argue that Plaintiffs' motion should be denied because the Court correctly denied Plaintiffs' overbroad discovery requests in an attempt to support a baseless damages model.  (Doc. No. 242 at 1, 2-5.)

---

embryonic stem cell derivation efficiency."  (Doc. No. 192 at 25 n.13.)  This alternative proposed construction was derived directly from the specification's discussion of "blastocyst formation and ES cell derivation" efficiency.  '369 Patent col. 19 ll. 29-30, col. 19 ll. 64-66.  But at the February 27, 2023 claim construction hearing, Plaintiffs did not express a preference for that proposed construction over the one the Court adopted and included in its construction for the claim term "makes the cell more susceptible to reprogramming."

1      Federal Rule of Civil Procedure 26(b)(1) provides:

2      Unless otherwise limited by court order, the scope of discovery is as follows:
3      Parties may obtain discovery regarding any nonprivileged matter that is
      relevant to any party's claim or defense and proportional to the needs of the
4      case, considering the importance of the issues at stake in the action, the
      amount in controversy, the parties' relative access to relevant information, the
5      parties' resources, the importance of the discovery in resolving the issues, and
      whether the burden or expense of the proposed discovery outweighs its likely
6      benefit.  Information within this scope of discovery need not be admissible in
      evidence to be discoverable.
7

8 Fed. R. Civ. P. 26(b)(1).  "'The 2015 amendments to Rule 26(b)(1) emphasize the need to

9 impose reasonable limits on discovery through increased reliance on the common-sense

10 concept of proportionality.'"  Thai v. Cnty. of Los Angeles, No. 15CV583-WQH (NLS),

11 2022 WL 2873214, at *1 (S.D. Cal. July 21, 2022) (quoting Roberts v. Clark Cty. Sch.

12 Dist., 312 F.R.D. 594, 603 (D. Nev. 2016)).  "The fundamental principle of amended Rule

13 26(b)(1) is 'that lawyers must size and shape their discovery requests to the requisites of a

14 case.'  Both discovery and Rule 26 are intended to provide parties with 'efficient access to

15 what is needed to prove a claim or defense, but eliminate unnecessary or wasteful

16 discovery.'"  Id. (quoting Roberts, 312 F.R.D. at 603); accord Lin v. Suavei, Inc., No. 3:20-

17 CV-862-L-AHG, 2021 WL 6077621, at *1 (S.D. Cal. Dec. 23, 2021).  "District courts have

18 broad discretion in determining relevancy for discovery purposes."  Surfvivor Media, Inc.

19 v. Survivor Prods., 406 F.3d 625, 635 (9th Cir. 2005); see also Laub v. U.S. Dep't of

20 Interior, 342 F.3d 1080, 1093 (9th Cir. 2003) ("A district court is vested with broad

21 discretion to permit or deny discovery.").

22      "'The party seeking to compel discovery has the burden of establishing that its

23 request satisfies the relevancy requirements of Rule 26(b)(1).  Thereafter, the party

24 opposing discovery has the burden of showing that the discovery should be prohibited, and

25 the burden of clarifying, explaining or supporting its objections.'"  Williams v. Cnty. of

26 San Diego, No. 17CV00815MMAJLB, 2019 WL 2330227, at *3 (S.D. Cal. May 31, 2019)

27 (quoting Bryant v. Ochoa, No. 07cv200 JM (PCL), 2009 WL 1390794, at *1 (S.D. Cal.

28 May 14, 2009)); accord Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer,

285 F.R.D. 481, 485 (N.D. Cal. 2012).

Plaintiffs argue that the Court erred in holding that its damages-related discovery requests were too broad.  (Doc. No. 228-1 at 4.)  Plaintiffs argue that the Court's holding was "clearly erroneous and/or manifestly unjust because it was not informed by Plaintiffs' damages contentions or any explanation by Plaintiffs as to how the requested information is relevant to the issues in the case."  (Id. at 4, 11-12; see Doc. No. 252 at 1.)  But in making this argument, Plaintiffs fail to consider that at the time the Court ruled on Plaintiffs' motion to compel, the Court had Plaintiffs' current infringement contentions (the January 4, 2023 infringement contentions), Plaintiffs' presentation and arguments at the February 27, 2023 hearing, and the Court's February 28, 2023 claim construction order.  In light of these filings, Plaintiffs' damages-related discovery request was too broad, and Plaintiffs failed to make a sufficient showing of relevance.

The importance of the Court's claim construction order on the discovery issues in this case was explained in the Court's February 28, 2023 discovery order.  (Doc. No. 209.) The Court explained:

> Once a district court has construed the relevant claim terms, and unless altered by that district court, those claim constructions are law of the case for purposes of trial.  See Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1321 (Fed. Cir. 2009); Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1371 n.2 (Fed. Cir. 2007).  No party may contradict the court's claim constructions.  Exergen, 575 F.3d at 1321.  As such, Plaintiffs' discovery requests in this case must be commensurate in scope with the scope of the asserted claims as construed by the Court.  See, e.g., CellCast Techs., LLC v. United States, 152 Fed. Cl. 414, 432 (2021) ("A claim construction order heavily impacts, if not determines, the scope of the parties' discovery."); In re Papst Licensing GmbH & Co. KG Litig., 273 F.R.D. 339, 345 (D.D.C. 2011) ("'Limitations on the scope of discovery may be appropriate where the court already has construed the patent claims.  Regardless of the timing of the claim construction, however, the parties should be prohibited from offering alternative constructions throughout the litigation and thereby expanding the scope of discovery.'"); Intervet, Inc. v. Merial Ltd., 252 F.R.D. 47, 50 (D.D.C. 2008).

(Id. at 2.)  Plaintiffs' motion for reconsideration does not challenge this portion of the

Court's February 28, 2023 order.  (See generally Doc. No. 228-1; Doc. No. 252.)

The Court's claim construction order impacted the scope of the damages-related discovery that Plaintiffs were requesting.  Plaintiffs explain that the requested damages-related discovery is based on Plaintiffs' damages contention that it is entitled to a reasonable royalty in the form of a lump-sum payment "'reflecting the value to Shoreline of using iPSCs at the time of first (or each) infringement.'"  (Doc. No. 228-1 at 6 (quoting Doc. No. 238, Ex. 2 at p. 12)); see also Doc. No. 238, Ex. 3 at pp. 28-29, Doc. No. 163.)  Plaintiffs further contend: "In other words, because Shoreline can only exist based on its infringement of the Asserted Patents, a reasonable royalty to compensate Fate Therapeutics would be equal to some or all the financing Shoreline has or will receive as a result of Defendants' unauthorized exploitation of the Asserted Patents."  (Doc. No. 238, Ex. 2 at 10.)

"Upon a finding of infringement, [a] patentee is entitled to 'damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.'"  AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1329–30 (Fed. Cir. 2015) (quoting 35 U.S.C. § 284).  "The most common method for determining a reasonable royalty is the hypothetical negotiation approach, which 'attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.'"  VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quoting Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009)); see Apple Inc. v. Wi-LAN Inc., 25 F.4th 960, 971 (Fed. Cir. 2022).

A reasonable royalty may be either a lump-sum payment or a running royalty payment.  See VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1326 (Fed. Cir. 2014); Pelican Int'l, Inc. v. Hobie Cat Co., No. 320CV02390RSHMSB, 2023 WL 2130379, at *21 (S.D. Cal. Feb. 10, 2023); DataQuill Ltd. v. High Tech Computer Corp., 887 F. Supp. 2d 999, 1020 (S.D. Cal. 2011).  "A lump-sum license is an up-front payment in full for the invention that involves uncertainty about 'whether the technology is commercially

successful or even used.'" <u>DataQuill</u>, 887 F. Supp. 2d at 1020 (quoting <u>Lucent</u>, 580 F.3d at 1326).

"A reasonable royalty analysis requires that 'the trial court . . . carefully tie proof of damages to the claimed invention's footprint in the market place.'" <u>Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC</u>, 879 F.3d 1332, 1350 (Fed. Cir. 2018) (quoting <u>ResQNet.com, Inc. v. Lansa, Inc.</u>, 594 F.3d 860, 869 (Fed. Cir. 2010)); <u>accord</u> <u>VirnetX</u>, 767 F.3d at 1327; <u>LaserDynamics, Inc. v. Quanta Computer, Inc.</u>, 694 F.3d 51, 67 (Fed. Cir. 2012); <u>see also</u> <u>AstraZeneca</u>, 782 F.3d at 1344 ("[T]he royalty due for patent infringement should be the value of what was taken—the value of the use of the patented technology."). "[D]amages must be based on the scope of infringement." <u>Apple Inc. v. Motorola, Inc.</u>, 757 F.3d 1286, 1321 (Fed. Cir. 2014); <u>see</u> <u>Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.</u>, 909 F.3d 398, 411 (Fed. Cir. 2018) ("A reasonable royalty 'cannot include activities that do not constitute patent infringement, as patent damages are limited to those "adequate to compensate for the infringement."'" (quoting <u>AstraZeneca</u>, 782 F.3d 1343)); <u>see also</u> <u>LaserDynamics</u>, 694 F.3d at 67 ("A damages theory must be based on 'sound economic and factual predicates.'").

As such, any damages-related discovery in this case must be commensurate with the scope of the claimed invention as construed by the Court and the scope of the asserted infringement.  At the time the Court ruled on the Plaintiffs' motion to compel, the Court had received and reviewed Plaintiffs' January 4, 2023 infringement contentions, but those contentions did not incorporate or align with the Court's claim constructions.  (<u>See</u> Doc. No. 197.)  Nor could they since the contentions were generated prior to the Court issuing its claim construction order on February 28, 2023.  (<u>See</u> Doc. No. 208.)  Absent infringement contentions that aligned with the Court's claim constructions or a similar showing, Plaintiffs failed to provide a sufficient basis as to the relevance of the discovery

sought.[18]  Cf. Phigenix, Inc. v. Genentech, Inc., 783 F. App'x 1014, 1018 (Fed. Cir. 2019) (explaining that Patent Local Rules "confin[e] discovery and trial preparation to information that is pertinent to the theories of the case"); Ameranth, Inc. v. Pizza Hut, Inc., No. 12CV1627 JLS NLS, 2013 WL 3894880, at *2 (S.D. Cal. July 26, 2013) (explaining that infringement contentions "'shape discovery'" (quoting Apple Inc. v. Samsung Elecs. Co., No. 12-CV-0630-LHK PSG, 2013 WL 3246094, at *3 (N.D. Cal. June 26, 2013)); Pelican Int'l, Inc. v. Hobie Cat Co., No. 320CV02390RSHMSB, 2023 WL 2127995, at *2 (S.D. Cal. Feb. 10, 2023) (explaining that the disclosures required by the Court's Patent Local Rules "'provide structure to discovery'" (quoting Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC, 411 F. Supp. 3d 975, 981 (N.D. Cal. 2019))).

Moreover, even if Plaintiffs had provided the Court with infringement contentions that aligned with the Court's claim constructions, Plaintiffs would have still failed to meet their burden to demonstrate that they are entitled to the broad damages-related discovery

---

[18]  Plaintiffs' failure to provide the Court with infringement contentions that align with the Court's claim construction is not insignificant here.  Plaintiffs assert that they are entitled to damages "'reflecting the value to Shoreline of using iPSCs.'"  (Doc. No. 228-1 at 6 (quoting Doc. No. 238, Ex. 2 at 10).)  In this action, Plaintiffs allege that Shoreline's use of iPSCs infringes the asserted method patents under 35 U.S.C. § 271(g).  (Doc. No. 162, Supp. FAC ¶¶ 211-14, 283-86, 356-59, 396-99.)  All of the asserted method patents contain the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming."  '856 Patent col. 20 ll. 38-39; '536 Patent col. 20 ll. 37-38; '744 Patent col. 21 ll. 14-15; '917 Patent col. 21 ll. 16-17, col. 22 ll. 6-7.  The Court has construed the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" as "[primes / priming / prime] the [somatic] cell to improve the cloning efficiency of the subsequent reprogramming."  (Doc. No. 208 at 33.)

Plaintiffs have failed to adequately explain to the Court how Shoreline's alleged use of iPSCs is within the scope of the asserted method claims as construed by the Court. Plaintiffs have explained to the Court that iPSCs are made via direct reprogramming.  (See Doc. No. 162, Supp. FAC ¶¶ 31-32; Doc. No. 218 at 4-6.)  Plaintiffs have also explained to the Court that the "cloning" is "unique to SCNT."  (Doc. No. 218 at 18.)  Plaintiffs have also explained to the Court that SCNT is "different" than direct reprogramming.  (Id. at 4.) Further, the Court notes that Plaintiffs' January 4, 2023 infringement contentions made no reference to any alleged use by Defendants of SCNT.  (See generally Doc. No. 197.)

that they were seeking in the February 16, 2023 joint filing.  To support the relevance of its discovery requests, Plaintiffs cite to the Federal Circuit's decision in Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371 (Fed. Cir. 2001), and Roche Prods. v. Bolar Pharm. Co., 733 F.2d 858, 866 (Fed. Cir. 1984).  (Doc. No. 228-1 at 15-16.)  In Interactive Pictures, the Federal Circuit recognized that a reasonable royalty award of damages may be "premised on a lump sum royalty payment based on an infringer's expected sales."  274 F.3d at 1384.  The Federal Circuit, thus, held that a business plan and projections for future sales from two months before infringement began was relevant to the hypothetical negotiation in the case.  See id. at 1385; see also Enplas, 909 F.3d at 412 ("a jury may award a lump-sum, paid-in-full royalty . . . [b]ut that lump-sum must be based on an estimate of the extent of future sales of accused products" (citing Lucent, 580 F.3d at 1325)); Summit 6, 802 F.3d at 1296 (explaining that a method for estimating a reasonable royalty could utilize "focusing on the infringer's projections of profit for the infringing product" (citing Lucent, 580 F.3d at 1324)); Lucent, 580 F.3d at 1327 ("Parties agreeing to a lump-sum royalty agreement may, during the license negotiation, consider the expected or estimated usage (or, for devices, production) of a given invention, assuming proof is presented to support the expectation, because the more frequently most inventions are used, the more valuable they generally are and therefore the larger the lump-sum payment.  Conversely, a minimally used feature, with all else being equal, will usually command a lower lump-sum payment.").

But, in the February 16, 2023 joint filing, Plaintiffs were not merely seeking discovery limited to business plans and projections of future sales/profits/usage of the allegedly infringing products.  (See Doc. No. 163.)  Rather, in the filing, Plaintiffs broadly requested "documents concerning [Shoreline's] valuation [and] investors."[19]  (Id.)  Further,

---

[19]   Plaintiffs' reply brief contends that in the discovery requests at issue, they were merely seeking "Shoreline's own documents and communications provided to its investors that concern Shoreline's projected profits, projected market share, business and development plans, consumer demand, and other financial-related analyses in order to

in the February 16, 2023 joint filing, Plaintiffs specifically requested that the Court compel Shoreline to produce documents responsive to Plaintiffs' RFP Nos. 14 and 53, (id.), and Plaintiffs provided those RFPs to the Court.  (Doc. No. 193-1, Ex. 1.)  RFP No. 14 broadly requests: "All documents relating to or constituting communications with actual or prospective investors regarding SHORELINE."  (Id. at 14.)  RFP No. 53 requests: "All documents concerning any potential or actual investment, collaboration, or partnership with SHORELINE since January 1, 2020."  (Id. at 19.)  Those requests broadly seek all documents related to or concerning any investments in Shoreline and any partnership with Shoreline.  The Federal Circuit's decisions in Interactive Pictures, Roche, Enplas, Summit 6, and Lucent do not provide support for such broad requests.[20]  As such, the Court properly denied Plaintiffs' motion to compel as overbroad.

To support its discovery requests, Plaintiffs also cite to the decisions in Grain Processing Corp. v. Am. Maize-Prod. Co., 185 F.3d 1341 (Fed. Cir. 1999), and BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc., 687 F. Supp. 134 (S.D.N.Y. 1988).  (See Doc. No. 228-1 at 16.)  But Grain Processing and BIC are both decisions analyzing a lost profits theory of damages.  See Grain Processing, 185 F.3d at 1349-53; BIC, 687 F. Supp. at 136-38.  Here, Plaintiffs' discovery requests are based on a reasonable royalty theory of damages.  (See Doc. No. 228-1 at 5-7.)  A reasonable royalty theory of damages is not the same as a lost profits theory of damages.  The Federal Circuit's decision in Grain Processing recognizes this.  In Grain Processing, the Federal Circuit explained that § 284

---

procure investments."  (Doc. No. 252 at 2; see id. at 1.)  The Court notes that nothing in the February 16, 2023 joint filing says "projected profits," "projected market share," "business and development plans," "consumer demand," or "other financial-related analyses."  (See Doc. No. 163.)  Instead, the joint filing specifically says "valuation" and "investors."  (Id.)  If Plaintiffs wanted, for example, documents regarding Shoreline's "projected profits," then they should have said so in the February 16, 2023 joint filing.

[20]  The Federal Circuit's decision in Roche simply recognizes that in some circumstances, monetary damages for a relatively brief period of infringement can still be "substantial."  733 F.2d at 866.

"sets the floor for 'damages adequate to compensate for the infringement' as 'a reasonable royalty.'" 185 F.3d at 1352. But in order to be entitled to lost profits damages, a patentee must demonstrate "'but for' causation." Id. at 1353; see Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 875 F.3d 1369, 1380 (Fed. Cir. 2017) ("To recover lost profits, the patentee bears the burden of proof to show a 'reasonable probability that, 'but for' infringement, it would have made the sales that were made by the infringer.'"). Plaintiffs do not represent that they are seeking lost profits in this case or that they are prepared to demonstrate "but for" causation. As such, Plaintiffs' reliance on Grain Processing and BIC is misplaced.[21] See AstraZeneca AB, 782 F.3d at 1334 & n.3 (explaining that an argument that "would have been relevant in [a] lost profits case" was not relevant to the "reasonable royalty theory of damages" in the case).

Finally, in an effort to support their discovery requests, Plaintiffs provide the Court with their damages contentions, and the Court has reviewed them. In those contentions, Plaintiffs assert that in this case they would be entitled to a reasonable royalty "equal to some or all the financing Shoreline has or will receive as a result of Defendants' unauthorized exploitation of the Asserted Patents. Such damages would be based on how much outside investment Defendants received or will receive . . . ." (Doc. No. 238, Ex. 2 at p. 12; see also Doc. No. 238, Ex. 3 at p. 29 ("[A] potential reasonable royalty to compensate Plaintiffs would be equal to an amount based on the financing Shoreline has or will receive as a result of Defendants' unauthorized exploitation of the Asserted Patents."), p. 31 (asserting that "incremental benefits" "may be in the form of increased valuations [and] funding").) Plaintiffs contend: "Further discovery is necessary to understand how much outside investment Defendants received or will receive and what portion of that investment Fate Therapeutics is entitled to based on Defendants'

---

[21] Indeed, in their motion for reconsideration, Plaintiffs recognize that cases involving lost profits theories of damages are distinguishable from reasonable royalty cases. (See Doc. No. 228-1 at 16 ("DSU is readily distinguishable because that case concerned a lost profits theory of damages, not a reasonable royalty.").)

infringement."  (Doc. No. 238, Ex. 2 at p. 11; <u>see also</u> Doc. No. 238, Ex. 3 at p. 29.)  In their damages contentions and their motion for reconsideration, Plaintiffs provide no legal authority demonstrating that this is a cognizable theory of damages in a patent case. Plaintiffs do not cite to a single case holding that a patentee can be entitled to a portion of an accused infringer's financing/outside investments under a reasonable royalty theory of damages.  And Plaintiffs do not cite to a single case holding that an accused infringer's financing/investments or valuations can be relevant to a reasonable royalty analysis in any way.  As the party seeking the discovery, Plaintiffs bear the burden of demonstrating the relevance of the discovery sought.  <u>Williams</u>, 2019 WL 2330227, at *3.  Plaintiffs have failed to meet that burden.[22]

        In sum, Plaintiffs have failed to identify any error in the Court's February 28, 2023 order denying their motion to compel without prejudice.[23]  As such, the Court denies Plaintiffs' motion for reconsideration of the Court's February 28, 2023 order denying their motion to compel without prejudice.

        Further, the Court notes that the motion to compel was denied without prejudice,

_____

[22]    Plaintiffs assert that they "should not be required to prove their damages theory before they can receive documents" identified as relevant in their damages contentions. (Doc. No. 228-1 at 15.)  The Court agrees that Plaintiffs should not be required to prove their damages theory at the discovery stage of the case.  However, requiring that Plaintiffs provide some legal authority demonstrating that their theory of damages is cognizable and demonstrating the relevance of the discovery sought is not making Plaintiffs "prove their damages theory."  If Plaintiffs want the requested damages-related discovery, then they need to provide the Court with some legal authority demonstrating its relevance.

[23]    Plaintiffs also assert that the Court erred in the February 28, 2023 discovery order by relying on case law related to the admissibility of evidence.  (Doc. No. 228-1 at 4, 12-16.)  Federal Rule of Civil Procedure 26(b)(1) provides: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Nevertheless, Rule 26(b)(1) also expressly provides that in determining the appropriate "scope of discovery," a court may consider "the importance of the discovery in resolving the issues."  <u>Id.</u>  If discovery is ultimately going to be inadmissible, then that has an effect on its "importance" in the case.  Thus, it is still a factor in evaluating proportionality.

meaning that Plaintiffs were free to re-raise the issue with the Court if they narrowed their request or if subsequent developments gave them a basis to renew their motion to compel with the Court.[24]  But the Court also notes that if a party in this case seeks to renew a motion to compel in light of subsequent developments or a narrowed request, then both parties need to follow the procedures for raising discovery issues to this Court set forth in Paragraph 1 of the Court's January 10, 2023 amended scheduling order.  (See Doc. No. 115 at 3.)

## IV.    Plaintiffs' Motion for Reconsideration of the Court's February 28, 2023 Order Denying Plaintiffs' Motion to Strike

Plaintiffs move for reconsideration of the Court's February 28, 2023 order denying Plaintiffs' motion to strike as moot.  (Doc. No. 231-1 at 1, 4.)  In response, Defendants argue that Plaintiffs' motion should be denied because Plaintiffs fail to set forth any basis for reconsideration of the order.  (Doc. No. 242 at 1-2.)

During the claim construction phase of this case, Plaintiffs deposed Defendants' technical expert, Dr. Snyder.  (See Doc. No. 177-2, Prey Decl. Ex. A.)  Following his deposition, Dr. Snyder provided an errata sheet to his deposition.  (See Doc. No. 177-4, Prey Decl. Ex. C.)  On February 17, 2023, Plaintiffs filed a motion to strike certain clarifications identified in the errata to Dr. Snyder's deposition.  (Doc. No. 177.)

On February 22, 2023, the Court issued a tentative claim construction order.  (Doc. No. 192.)  In the tentative claim construction order, the Court acknowledged Plaintiffs' pending motion to strike, and the Court explained to the parties:  "The Court's tentative claim construction order does not cite to or rely on any testimony from Dr. Snyder's deposition. As such, the analysis in this tentative claim construction order is not implicated by the pending motion to strike."  (Id. at 39 n.18.)

---

[24]    Indeed, as shown by the above analysis, for example, the Court would have considered a properly presented request for Shoreline's "projected profits."  But that is not what Plaintiffs requested in the February 16, 2023 joint filing.  (See Doc. No. 163.)

On February 24, 2023, Shoreline filed a response in opposition to Plaintiffs' motion to strike.  (Doc. No. 202.)  In the opposition, Shoreline argued:

> There is also no reason to strike Dr. Snyder's errata because, as the Court recognized in its Tentative Claim Construction Order, the errata does not impact the Court's claim construction analysis.  Dkt. No. 192 at 39 n.18.  Thus, the concern in Hambleton that errata could be used to impact the outcome of a dispute does not justify striking the errata and makes Plaintiffs' motion moot.

(Id. at 8.)

On February 27, 2023, the Court held a claim construction hearing.  (See Doc. No. 218.)  At the February 27, 2023 hearing, the Court asked the parties: "If the Court doesn't rely on his deposition testimony [in the claim construction order], isn't the motion to strike moot?"  (Id. at 29.)  At the time, Defendants were arguing, and Defendants asserted that, in that situation, the motion to strike would be moot.  (Id.)  Shortly thereafter, the Court permitted Plaintiffs to respond to Defendants' arguments, and Plaintiffs did not address or contest Defendants' assertion that the motion to strike would be moot if the Court did not rely on Dr. Snyder's deposition testimony.  (See id. at 29-32.)

Following the claim construction hearing, on February 28, 2023, the Court issued its claim construction order.  (Doc. No. 208.)  In the claim construction order, the Court again acknowledged the pending motion to strike, and the Court explained: "The Court's claim construction order does not cite to or rely on any testimony from Dr. Snyder's deposition.  As such, the analysis in this claim construction order is not implicated by the pending motion to strike."  (Id. at 40 n.19.)  In light of this and Plaintiffs' acquiescence at the claim construction hearing on the mootness issue, the Court denied Plaintiffs' motion to strike as moot.  (Doc. No. 210.)

In their motion for reconsideration, Plaintiffs do not identify any clear error by the Court in denying the motion to strike as moot.  If Plaintiffs thought the motion to strike was not going to be mooted by the Court's claim construction order, then they should have said so at the February 27, 2023 hearing in response to the Court's direct question on that issue – not via a motion for reconsideration filed four weeks later.  As such, the Court

denies Plaintiffs' motion for reconsideration of the Court's February 28, 2023 order denies Plaintiffs' motion to strike as moot.[25, 26]

### Conclusion

For the reasons above, the Court denies Plaintiffs' motions for reconsideration.

**IT IS SO ORDERED.**

DATED: April 19, 2023

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[25]     In their reply brief, Plaintiffs for the first time request that the Court strike the declaration from Dr. Snyder that was attached to Shoreline's opposition to Plaintiffs' motion to strike. (Doc. No. 251 at 2 n.2.) "Issues raised for the first time in [a] reply brief are waived." Bazuaye v. I.N.S., 79 F.3d 118, 120 (9th Cir. 1996); United States v. Gianelli, 543 F.3d 1178, 1184 (9th Cir. 2008) ("arguments raised for the first time in a reply brief are generally considered waived"). As such, Plaintiffs' request to strike Dr. Snyder's declaration is waived, and the Court denies it.

[26]     Plaintiffs attached to one of their motions for reconsideration a declaration from their technical expert, Dr. Plath. (Doc. No. 232-3, Plath Decl.; see also Doc. No. 232-1 at 9.) Defendants argue that Dr. Plath's declaration should be stricken. (Doc. No. 241 at 3, 10-11.) The Court agrees that it was improper for Plaintiffs to attach this declaration to their motion for reconsideration because it is untimely claim construction discovery in violation of the deadline set forth in the Court's January 10, 2023 scheduling order. (See Doc. No. 115 at 3 (citing S.D. Cal. Pat. L.R. 4.3).) See Fed. R. Civ. P. 26(a)(2)(D) (stating that expert disclosures must be made "at the times and in the sequence that the court orders"). Nevertheless, the Court has denied the relevant motion for reconsideration. As such, the Court denies Defendants' motion to strike Dr. Plath's declaration as moot.