1   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2   MORRISON & FOERSTER LLP
    425 Market Street
3   San Francisco, California 94105-2482
    Telephone: (415) 268-7000
4   Facsimile: (415) 268-7522

5   Attorneys for Defendant
    SHORELINE BIOSCIENCES, INC.
6

7   *Appearances of Counsel Continued on Next Page*

8

9

10              **UNITED STATES DISTRICT COURT**

11            **SOUTHERN DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| FATE THERAPEUTICS, INC. and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | Case No. 3:22-cv-00676-H-MSB |
| Plaintiffs, | **SHORELINE BIOSCIENCES, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY FEES** |
| v. | |
| SHORELINE BIOSCIENCES, INC., | Hearing Date: October 16, 2023 Time: 10:30 A.M. (PST) Location: Courtroom 12A |
| Defendant. | Hon. Marilyn L. Huff |
| SHORELINE BIOSCIENCES, INC., | |
| Counterclaimant, | |
| v. | |
| FATE THERAPEUTICS, INC. and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE SUBMITTED UNDER SEAL** |
| Counterdefendants. | |

ERIC M. ACKER (CA SBN 135805)
EAcker@mofo.com
DREW A. HILLIER (CA SBN 337112)
DHillier@mofo.com
WESLEY W. CHEN (CA SBN 329446)
WChen@mofo.com
SARAH J. VANDERVALK (CA SBN 332651)
SVandervalk@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California  92130-2040
Telephone:  (858) 720-5100
Facsimile:  (858) 720-5125

Attorneys for Defendant
SHORELINE BIOSCIENCES, INC.

# <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ...................................................................................... 1

II. BACKGROUND ....................................................................................... 1

    A. Plaintiffs Never Previously Enforced the Asserted Patents ................. 1

    B. Plaintiffs Sued Dr. Kaufman and Shoreline, Claiming to Have
       Invented iPSCs ................................................................................ 2

    C. Plaintiffs Knew That Shoreline Does Not Make iPSCs and the
       Asserted Patents Do Not Cover iPSCs ................................................ 3

    D. The Court Made Clear During Claim Construction That the
       Asserted Claims Do Not Cover iPSCs ................................................ 4

    E. The Court Reaffirmed Its Claim Construction Order and
       Rejected Plaintiffs' Recycled Arguments ............................................ 5

    F. Shoreline Expressly Communicated to Plaintiffs That Their
       Infringement Theories Were Fatally Flawed and That the
       Meritless Litigation Was Accruing Significant Attorney Fees ............ 6

    G. Plaintiffs Pursued Outsized Damages Theories ................................. 8

III. LEGAL STANDARD ............................................................................... 9

IV. ARGUMENT ............................................................................................ 9

    A. This Case Is Exceptional Because It Was Not Brought in Good
       Faith ................................................................................................ 10

    B. This Case Is Exceptional Because Plaintiffs Knew Its Claims
       Were Meritless Yet Continued to Burden Shoreline and the
       Court with Baseless Litigation .......................................................... 11

        1. Plaintiffs Knew That Their Infringement Claims Were
           Baseless ................................................................................ 12

           a. Plaintiffs Knew That Shoreline Did Not Make
              iPSCs ........................................................................ 12

           b. Plaintiffs Knew That Their Induced Infringement
              Theory of the Composition Claims as to the
              ThermoFisher iPSC Lines Was Fatally Deficient .......... 12

        2. Defendants and the Court Repeatedly Told Plaintiffs that
           the Method Claims Do Not Cover Reprogramming iPSCs ...... 14

        3. Plaintiffs Put Forth an Expert Opinion on "Priming" That
           Is Directly Contradicted By Their Expert's Prior Sworn
           Testimony and Their Representations to the Court During
           Claim Construction .............................................................. 16

        4. Plaintiffs' Pursued a Doctrine of Equivalents Theory
           Contrary to Fact and the Court's Claim Construction ............. 17

**TABLE OF CONTENTS**
(continued)

Page

C.  This Case Is Exceptional Because Plaintiffs' Shifting Damages Theory Was Contrary to Law and Fact .................................... 18

   1.  Plaintiffs' Head-Start Theory Used a Lump Sum to Improperly Capture Royalties on Post-Expiration Sales .......... 19

   2.  Dr. Keeley's First Damages Model Disregarded a Comparable License with a Low Running Royalty in Favor of Admittedly Non-Comparable Agreements ............... 20

   3.  Plaintiffs' Second Damages Model Improperly Adopted a Lost-Profits Theory and Ignored Shoreline's Position at the Time of the Hypothetical Negotiation ............................... 21

   4.  Plaintiffs Had No Basis to Refuse to Apportion ..................... 22

V.  CONCLUSION ............................................................. 23

1
2

# <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Cases**

5
6

*AdjustaCam, LLC v. Newegg, Inc.*,
   861 F.3d 1353 (Fed. Cir. 2017) ................................................................... 11, 18

7
8
9

*Amazon Web Servs. v. Personalweb Techs., LLC*,
   No. 18-md-02834-BLF,
   2020 U.S. Dist. LEXIS 186226 (N.D. Cal. Oct. 6, 2020) ........................... 14, 17

10

*Astrazeneca AB v. Apotex Corp.*,
   782 F.3d 1324 (Fed. Cir. 2015) ........................................................................ 8

11
12

*Bayer CropScience AG v. Dow AgroSciences LLC*,
   851 F.3d 1302 (Fed. Cir. 2017) ..................................................................... 9, 10

13
14

*Brulotte v. Thys Co.*,
   379 U.S. 29 (1964) ......................................................................................... 19

15
16
17

*CH2O v. Meras Eng'g*,
   No. LA CV13-08418 JAK (GJSx), 2017 U.S. Dist. LEXIS 235890
   (C.D. Cal. July 13, 2017) ................................................................................ 23

18
19

*Clinicomp Int'l, Inc. v. Cerner Corp.*,
   No. 17CV02479GPCDEB, 2023 WL 1767008 (S.D. Cal. Feb. 3,
   2023) .............................................................................................................. 11

20
21

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013) ...................................................................... 22

22
23

*DSU Med. Corp. v. JMS Co.*,
   296 F. Supp. 2d 1140 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293 (Fed.
   Cir. 2006) ........................................................................................................ 8

24
25
26

*Icon Health & Fitness, Inc. v. Octane Fitness, LLC*,
   112 F. Supp. 3d 888 (D. Minn. 2015), *aff'd*, 706 F. App'x 666 (Fed.
   Cir. 2017) .................................................................................................. 17, 19

27
28

*Innovation Scis., LLC v. Amazon.com, Inc.*,
   842 F. App'x 555 (Fed. Cir. 2021) .................................................................. 11

*Intex Recreation Corp. v. Team Worldwide Corp.*,
   77 F. Supp. 3d 212 (D.D.C. 2015) ...................................................................... 16

*Kaneka Corp. v. Zhejiang Med. Co.*,
   No. CV 11-02389 SJO,
   2017 U.S. Dist. LEXIS 230942 (C.D. Cal. Feb. 22, 2017) ................................. 23

*Kimble v. Marvel Ent., LLC*,
   576 U.S. 446 (2015) ............................................................................................ 19

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) .............................................................................. 22

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
   30 F.4th 1339 (Fed. Cir. 2022) ........................................................................... 22

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) .................................................................................... *passim*

*Spineology, Inc. v. Wright Med. Tech., Inc.*,
   910 F.3d 1227 (Fed. Cir. 2018) .......................................................................... 20

*Syneron Med. Ltd. v. Invasix, Inc.*,
   No. 8:16-cv-00143-DOC-KES,
   2018 U.S. Dist. LEXIS 220514 (C.D. Cal. Aug. 27, 2018) ......................... 21, 22

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
   726 F.3d 1306 (Fed. Cir. 2013) .......................................................................... 11

*Yankee Candle Co. v. Bridgewater Candle Co., LLC*,
   140 F. Supp. 2d 111 (D. Mass.) .......................................................................... 11

## I.    INTRODUCTION

Defendant Shoreline Biosciences, Inc. ("Shoreline") requests that the Court find Plaintiffs' case "exceptional" under § 285 of the Patent Act for purposes of an award of attorney fees.  Plaintiffs' litigation "stands out from others"—as the governing standard prescribes—in their refusal to take "no" as the answer to the question of whether their patents covered induced pluripotent stem cells (iPSCs). The patent examiner told them "no" during prosecution, the Court told them "no" during claim construction, and the Court again told them "no" when they sought reconsideration.  At each stage, Plaintiffs not only refused to listen to that direction; they doubled down on their theory.  Plaintiffs also pursued an exorbitant damages theory, seeking hundreds of millions of dollars from a company that is years away from submitting a treatment for FDA approval—again after the Court told them "no" on that issue as well.

Shoreline repeatedly put Plaintiffs on notice that their strategy exposed them to an award of attorney fees in Shoreline's favor.  Shoreline's letters tracked closely what the Court ultimately decided, even highlighting the lack of evidence on induced infringement that the Court cited in granting summary judgment on that claim.  Still, Plaintiffs pressed on, not to vindicate legitimate intellectual property rights but to burden and distract Shoreline from its work on potentially life-saving treatments. Taking all circumstances into account, this case easily satisfies the test for exceptionality.

## II.    BACKGROUND

### A.    Plaintiffs Never Previously Enforced the Asserted Patents

The oldest Asserted Patent issued December 6, 2011.  (ECF No. 1, Ex. A at 41.)  It and all the other Asserted Patents are set to expire November 24, 2024.  (ECF No. 291, Ex. G ¶ 18.)  Plaintiff Whitehead Institute for Biomedical Research ("Whitehead") and Plaintiff Fate Therapeutics, Inc. ("Fate") have, respectively, owned and exclusively licensed the Asserted Patents since they issued.  (*See id.* ¶ 44.)

In that time, hundreds of academic institutions and for-profit enterprises have made, sold, and used iPSCs. Before this action, Plaintiffs never accused any of them of infringing. (*See, e.g.*, Ex. A[1] at 166:22-202:4.) Outside of ███████████ agreements, Plaintiffs never licensed or sublicensed the Asserted Patents. (*See, e.g.*, Ex. B at 148:9-23.) The Whitehead–Fate exclusive license obligated each Plaintiff to notify the other on learning of any infringement of the Asserted Patents. (*See id.* at 63:12-64:5.) No such notices have ever been exchanged in the 14 years since the license was executed in 2009. (*Id.* at 65:2-23.) Plaintiffs had no intention of attempting to enforce the Asserted Patents against entities that either made iPSCs or used them for scientific research or drug development. That is, at least, not until Shoreline presented a competitive threat.

### B.     Plaintiffs Sued Dr. Kaufman and Shoreline, Claiming to Have Invented iPSCs

Plaintiffs sued Dr. Dan Kaufman and Shoreline on May 13, 2022, about 20 months after Dr. Kaufman informed Fate in September 2020 that he had joined Shoreline. (*See* ECF No. 1 ¶ 44.) Dr. Kaufman also told Fate's CEO Scott Wolchko that Shoreline would be developing iPSC-derived therapies. (Ex. A at 262:17-263:20; 265:11-266:2.) True to form, Fate never suggested to him that, in doing so, Shoreline would infringe Plaintiffs' intellectual property. (*Id.* at 267:14-272:1.) Between September 2020 and May 2022, Plaintiffs never contacted Shoreline to notify it of its purported infringement or to seek an out-of-court resolution to such claims. Even after filing suit and learning that Shoreline never made iPSCs, Plaintiffs had no interest in pursuing settlement.

Plaintiffs' pleadings accused Defendants of infringing the Asserted Patents, which Plaintiffs alleged to cover a "groundbreaking iPSC reprogramming platform."

---

[1] The exhibits cited in this Motion are attached to the Declaration of Drew A. Hillier in Support of Defendant Shoreline Biosciences, Inc.'s Motion for Attorney Fees.

SHORELINE'S MOTION FOR
ATTORNEY FEES
CASE NO. 3:22-CV-00676-H-MSB

(ECF No. 1 ¶¶ 2, 60.)   Plaintiffs did not mention that the method for directly reprogramming somatic cells into iPSCs was first invented by a Japanese scientist, Dr. Shinya Yamanaka, in 2006—*three years after the Asserted Patents were filed*—and that Dr. Yamanaka earned the 2012 Nobel Prize in Medicine for doing so.  (ECF No. 121-3.)  Plaintiffs were desperate to portray their claims as covering technology for reprogramming somatic cells to iPSCs despite an intrinsic record that unambiguously refuted that position.  In reality, and as this Court confirmed time and time again, the Asserted Patents were directed to somatic cell nuclear transfer technology, to which Shoreline and its products have no connection.

### C.   Plaintiffs Knew That Shoreline Does Not Make iPSCs and the Asserted Patents Do Not Cover iPSCs

From the outset of this case, Plaintiffs were on notice that their infringement claims were meritless.  After Plaintiffs claimed infringement based on Shoreline's alleged manufacture and use of iPSCs, Shoreline stated in its original answer and counterclaims that the Asserted Patents do not cover iPSCs because (1) the Asserted Composition Claims cover somatic cells and not iPSCs, and (2) the Asserted Method Claims do not cover reprogramming a somatic cell into an iPSC.  (ECF No. 36 ¶¶ 52-56.)  Shoreline noted how the prosecution history confirmed that the Asserted Patents do not cover iPSCs or the reprogramming of somatic cells into iPSCs.  (*Id.* ¶¶ 72-101.)  Shoreline's pleading also explained how Shoreline does not itself reprogram somatic cells into iPSCs, make somatic cells into which exogenous Oct4 was introduced, or practice the claimed methods of making a somatic cell more susceptible to reprogramming.  (*Id.* ¶¶ 102-22, 132-37, 159-64, 201-06, 230-35, 276-81, 304-09.)   These points were reiterated in Shoreline's answer to Plaintiffs' supplemental complaint.  (*See* ECF No. 171 ¶¶ 47-138.)

Throughout discovery, Plaintiffs were made aware that Shoreline does not make iPSCs and that the Asserted Patents do not cover iPSCs.   Shoreline's interrogatory responses represented those facts unambiguously.  (ECF No. 303, Ex.

SHORELINE'S MOTION FOR
ATTORNEY FEES
CASE NO. 3:22-CV-00676-H-MSB

7 at 3-120.)  For example, a September 2022 interrogatory response represented that Shoreline "does not reprogram somatic cells into iPSCs" and "does not take any steps whatsoever with respect to making somatic cells less differentiated."  (Ex. C at 6-7.) Shoreline witnesses confirmed that Shoreline never manufactured iPSCs from somatic cells.  (ECF No. 290, Ex. 1 at 48:17-49:8; ECF No. 290, Ex. 2 at 80:11-23, 325:16-326:14.)  And, in expert discovery, Plaintiffs' infringement expert did not identify any evidence that Shoreline reprogrammed iPSCs.  (ECF No. 290, Ex. 22 ¶¶ 55-63.)

Shoreline's September 2022 interrogatory responses also reiterated that "[t]he asserted composition claims . . . do not cover iPSCs" and "[t]he asserted method claims . . . do not cover a process for making iPSCs."  (Ex. C at 4-5.)  Shoreline made pains to explain that the third-party manufacture of iPSCs is noninfringing because "the reprogramming of a somatic cell to an iPSC (i.e., the manufacture of iPSCs) is outside the scope of the asserted method claims, which only cover methods of making a somatic cell *more susceptible* to being reprogrammed to a pluripotent or less differentiated state."  (*Id.* at 9; *see also id.* at 14-15.)  Specifically, "[t]he Asserted Claims cover methods for making a somatic cell that is *primed* for reprogramming to a less differentiated or pluripotent state; [third parties such as] Lonza used a method not for making a *primed* somatic cell, but a method for making a reprogrammed iPSC."  (*Id.* at 15.)

### D.   The Court Made Clear During Claim Construction That the Asserted Claims Do Not Cover iPSCs

In its Claim Construction Order, the Court construed the phrase "makes the cell more susceptible to reprogramming," which is recited in every Asserted Method Claim, as "primes the cell to improve the *cloning efficiency* of the subsequent reprogramming."  (ECF No. 208 at 33:1-5 (emphasis added).)  The Court rejected Plaintiffs' argument that the term should be construed to mean "improving the efficiency [of any type] of reprogramming," finding that "cloning efficiency" is

unique to SCNT.  (*Id.* at 21:20-26:9.)  The Court also determined that the "priming" step precedes—and is not part of—reprogramming, based on the patentees' disclaimer of a method of reprogramming a cell by introducing Oct4.  (*Id.* at 30:14-31:9.)  Plaintiffs argued that the "priming" construction was improper because it required a "two-step process in which the Oct4 is introduced as an antecedent step." (*Id.* at 31:10-12.)  The Court rejected this argument, finding that, in view of the prosecution history and the specification's sole working SCNT example, the "priming" limitation indeed requires a two-step process, with Oct4 being added in a step prior to the "subsequent reprogramming." (*Id.* at 31:10-32:6.)

During the February 27, 2023 *Markman* hearing, Plaintiffs acknowledged the substantial differences between the purportedly infringing iPSC reprogramming and the claimed SCNT reprogramming.  For example, Plaintiffs stated that "SCNT is an old technique for reprogramming cells . . . It's an incredibly difficult challenging technical technique that can only be done by a handful of labs in the world," whereas "[d]irect reprogramming is a different technique.  It's got much more commercial appeal and universal applicability." (Ex. L at 3:7-10, 4:22-24.)  Plaintiffs described how the methods of reprogramming are fundamentally different between iPSC reprogramming and SCNT.  (*Id.* at 3:15-4:11, 4:22-6:3.)  Plaintiffs also pointed to the Asserted Patents' disclosure of "blastocyst formation" and "ES cell derivation" as reprogramming results "specific to the particular technique—the words are specific to the technique SCNT." (*Id.* at 17:3-15.)  These admissions show how acutely aware Plaintiffs were that iPSC reprogramming and SCNT are substantially different processes.

**E.    The Court Reaffirmed Its Claim Construction Order and Rejected Plaintiffs' Recycled Arguments**

Without basis, Plaintiffs sought reconsideration of the Court's claim constructions.  The Court recognized Plaintiffs' reconsideration motion for what it was: "an attempt to reargue and relitigate the proper construction of the claims term

'makes the cell more susceptible to reprogramming.'" (ECF No. 255 at 11:12-22.) The motion could have been denied on that ground alone. (*Id.* at 11:19-22.) The Court nevertheless proceeded, for a second time, to take apart Plaintiffs' merits argument.

The Court explained that "narrowing Plaintiffs' proposed construction to only encompass 'cloning efficiency' was necessary to tether the claims to what the intrinsic record indicates the inventors actually invented." (*Id.* at 27:14-19; *see also id.* at 25:16-26:1 ("That the efficiency at issue was consistently described in the intrinsic record within the specific context of SCNT is important because both the specification of the asserted patents and Plaintiffs' own presentation at the [*Markman*] hearing make *clear that SCNT is very different than direct reprogramming*." (emphasis added)).) The Court also rejected Plaintiffs' recycled argument that the "Court erred in importing an order of steps requirement ('subsequent reprogramming') based on disclaimer because the examiner's rejection and comments did not relate in any way to when Oct-4 is introduced to the cell in relation to when reprogramming occurs." (*Id.* at 18:4-7 (quoting Plaintiffs' briefing).) The Court again rejected Plaintiffs' argument that the "priming" and "subsequent reprogramming" limitations do not require a two-step process where Oct4 is introduced in a step antecedent to any reprogramming. (*Id.* at 18:4-23:9.)

**F.     Shoreline Expressly Communicated to Plaintiffs That Their Infringement Theories Were Fatally Flawed and That the Meritless Litigation Was Accruing Significant Attorney Fees**

Shoreline wrote two *Octane* letters to Plaintiffs emphasizing the fatal deficiencies in their infringement claims and their exposure to fee-shifting under § 285. (Exs. D, E.)

Shoreline's first *Octane* letter, dated September 7, 2022, alerted Plaintiffs that they had consistently misinterpreted the scope of the Asserted Patents as covering iPSCs or methods of making iPSCs. (Ex. D at 1-2.) Shoreline highlighted that the Asserted Method Claims do not cover methods of reprogramming somatic cells to

iPSCs because Whitehead disclaimed reprogramming methods when prosecuting the Asserted Patents. (*Id.* at 1-2 & n.1.)  In addition, Shoreline alerted Plaintiffs that it does not make iPSCs, noting that Plaintiffs had no evidence to the contrary. (*Id.* at 2-6.)  Shoreline explained it had not infringed the Asserted Composition Claims because, again, Shoreline does not make iPSCs and the Asserted Composition Claims do not cover iPSCs or their use.  The letter urged "Fate to dismiss this case now to limit the attorney fees award Fate will face," warning Plaintiffs that "[i]f the case continues, the amount of attorney fees will only increase and the likelihood of an exceptional case finding will become more certain." (*Id.* at 9.)

After the Court reaffirmed its constructions on reconsideration, Shoreline sent a second *Octane* letter, dated May 25, 2023, emphasizing Plaintiffs' "ever-increasing exposure to an award of attorney fees under Section 285 given Fate's initiation and litigation of meritless claims of infringement against Shoreline." (Ex. E at 1.)  Shoreline cautioned Plaintiffs that their

> continued litigation in the face of two claim construction orders . . . make clear Fate cannot establish infringement based on any of the five iPSC lines that Shoreline purchased presents serious risks to Fate and its counsel . . . The only question is the size of Fate's exposure to Shoreline's claim for attorney fees.

(*Id.*)

Shoreline detailed how the Court's construction, applied to the facts, rendered Plaintiffs' infringement theories meritless. (*Id.* at 1-4.)  This was "the second time [Shoreline had] urged [Plaintiffs] to dismiss this case to avoid an exceptional case finding and an award of attorneys' fees." (*Id.* at 6.)  "With the benefit now of two claim construction Orders that make it impossible for [Plaintiffs] to establish infringement, . . . if the case continue[d], the amount of attorney fees [would] only increase and the likelihood of an exceptional case finding [would] become more certain." (*Id.*)

### G.     Plaintiffs Pursued Outsized Damages Theories

Plaintiffs served damages contentions offering a "head start" or "accelerated market entry" theory that claimed entitlement to a lump sum reasonable royalty "reflecting the value to Defendants" of purportedly infringing "instead of waiting until expiration of the Asserted Patents." (ECF No. 228-6 at 4:27-5:2.) Plaintiffs estimated that Shoreline's "entire business of developing iPSC-derived therapeutics can only exist based on its infringement," which, in Plaintiffs' eyes, entitled them to some or all the "financing Shoreline has or will receive." (*Id.* at 4:27-5:6.) This included all of Shoreline's equity financing and the value of Shoreline's strategic partnerships. (*Id.* at 5:6-16.) Plaintiffs, in effect, claimed entitlement to Shoreline's entire business.

Shoreline refused to indulge Plaintiffs' application of a head-start theory that had been derided as lacking foundation in "sound economic principle." *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1151 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293, 1309 (Fed. Cir. 2006); *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1344 n.8 (Fed. Cir. 2015) (rejecting plaintiff's attempt to justify a reasonable royalty based on a head-start theory); ECF No. 228-7 at 5:1-20.) Shoreline cabined its document productions accordingly.  In response, Plaintiffs sought an order compelling Shoreline to produce sensitive information relating to Shoreline's valuation, its equity financing, and the terms of its strategic partnerships. (ECF No. 163.) The Court denied that application, finding Plaintiffs' discovery requests overbroad, and specifically that valuation, market capitalization, and investor information is irrelevant to a proper reasonable royalty theory. (ECF No. 209 at 2:22-3:9.)

Plaintiffs requested reconsideration in an 18-page screed. (ECF No. 228-1.) The Court rightly refused.  Plaintiffs' case law ostensibly supporting a head-start theory opined only on lost profits and were thus irrelevant to Plaintiffs' reasonable royalty theory.   (ECF No. 255 at 35:12-36:11.)    Plaintiffs lacked authority demonstrating that they had articulated a "cognizable theory of damages in a patent

case." (*Id.* at 36:12-37:10 ("Plaintiffs do not cite to a single case holding that a patentee can be entitled to a portion of an accused infringer's financing/outside investments under a reasonable royalty theory of damages.").) The Court therefore denied Plaintiffs' request for reconsideration. (*Id.*)

That Order would have compelled a reasonable party to retire its head-start theory. Plaintiffs merely retooled theirs. The theory Plaintiffs ultimately offered was, like their original theory, detached from sound economic principles and the relevant facts. (*See infra* Section IV.C.)

## III.   LEGAL STANDARD

The court in exceptional cases may award reasonable attorney fees to the prevailing party. 35 U.S.C. § 285. An "exceptional" case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to be 'exceptional.'" *Id.* at 554. The *Octane* Court also directed district courts to determine exceptionality "in the case-by-case exercise of their discretion, considering the totality of the circumstances," including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 & n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)). Because § 285 "demands a simple discretionary inquiry" and "imposes no specific evidentiary burden, much less such a high one," litigants need only satisfy "a preponderance of the evidence standard." *Id.* at 557.

## IV.   ARGUMENT

Because the § 285 inquiry involves weighing the totality of the circumstances, multiple factors can "coalesce[]" to make a case exceptional. *Bayer CropScience AG*

*v. Dow AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017).  Plaintiffs' baseless infringement and damages cases, and their motivation to bring them, coalesce to make this case exceptional.  This Court granted Shoreline summary judgment of noninfringement on all of Plaintiffs' claims after issuing claim construction Orders that foreclosed infringement.  The Court also rejected Plaintiffs' original damages theory (*see supra* Section II.G), and had it reached Shoreline's motion to exclude Plaintiffs' damages expert's report, Shoreline is confident the Court would have also rejected Plaintiffs' retooled theory.  The infirmity of Plaintiffs' merits position merely reinforces that Plaintiffs brought this case to harm a former scientific advisor and his new startup.  Shoreline, as the prevailing party, is therefore entitled to attorney fees under § 285.

### A.   This Case Is Exceptional Because It Was Not Brought in Good Faith

Courts should, in considering the totality of the circumstances, evaluate the litigant's motivation and subjective bad faith.  *Bayer CropScience*, 851 F.3d at 1306.  Fate's motivation in bringing and maintaining this action was not relief from purported infringement; it was spite.  Notwithstanding the prevalence of third parties manufacturing, selling, and using iPSCs, Fate had never previously sought to license or enforce the Asserted Patents outside of ██████████ agreements. (*See supra* Section II.A.)  Eleven years after the first Asserted Patent issued, Fate fixated on Defendants as their first and only targets because Dr. Kaufman joined Shoreline to further develop his own breakthrough medical technology—an opportunity Fate rejected.  (*See* Ex. A at 256:15-23 (testimony from Fate's CEO regarding Fate passing on a license from UCSD for Dr. Kaufman's CISH knockout technology used by Shoreline).)

For Fate, the merits of this suit were ancillary to its purpose: intimidate Dr. Kaufman, cast a cloud over Shoreline's business, and waste Defendants' capital.  This intent is evident from Plaintiffs' failure to make "any meaningful pre-litigation

attempt to resolve" their differences with Shoreline, or indeed any subsequent attempt. *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 140 F. Supp. 2d 111, 116, 118 (D. Mass. 2001). Fate peddled an infringement theory that the intrinsic record foreclosed and that the 2012 Nobel Prize in Medicine to Dr. Yamanaka flatly contradicted. Its hyperbolic and shifting damages theories were contrary to law and intended to cow Defendants into submission. Plaintiffs maintained these theories even after Defendants, and then the Court, alerted Plaintiffs to their manifest flaws. It is clear, then, that Plaintiffs did not file and maintain this suit to vindicate their intellectual property rights.

### B. This Case Is Exceptional Because Plaintiffs Knew Its Claims Were Meritless Yet Continued to Burden Shoreline and the Court with Baseless Litigation

The Court should find this case exceptional because Plaintiffs pursued meritless litigation despite knowing they had no reasonable basis to claim infringement. Plaintiffs' "litigation position was baseless" because, as this Court concluded, "[n]o reasonable factfinder could conclude that [Shoreline's] products infringe." *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1361 (Fed. Cir. 2017). "These are traits of an exceptional case." *Id.* Pre-suit due diligence must have revealed the glaring flaws in Plaintiffs' infringement position and Shoreline highlighted them for Plaintiffs at several points throughout this case. But the Court's claim construction left no doubt. Because Plaintiffs persisted despite that construction, this case is exceptional. *See Innovation Scis., LLC v. Amazon.com, Inc.*, 842 F. App'x 555, 557 (Fed. Cir. 2021) ("We have also frequently held that a case is exceptional when a party continues to litigate claims that have become baseless in view of a district court's claim construction opinion."); *Clinicomp Int'l, Inc. v. Cerner Corp.*, No. 17-CV-02479-GPC-DEB, 2023 WL 1767008, at *6-11 (S.D. Cal. Feb. 3, 2023) (finding an exceptional case and award attorney's fees where plaintiffs pursued "objectively baseless" infringement arguments following the Court's adverse claim construction order); *see also Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d

11

1306, 1326-29 (Fed. Cir. 2013) ("[A] party cannot assert baseless infringement claims and must continually assess the soundness of pending infringement claims, especially after an adverse claim construction.").

### 1. Plaintiffs Knew That Their Infringement Claims Were Baseless

Shoreline and the Court put Plaintiffs on notice of the baselessness of their case at several points in this action.

### a. Plaintiffs Knew That Shoreline Did Not Make iPSCs

As previously discussed, Plaintiffs learned from Shoreline's answers, counterclaims, discovery responses, and witnesses that Shoreline never made and does not reprogram somatic cells to iPSCs. (*See supra* Section II.C.) Yet Plaintiffs persisted in claiming that Shoreline infringes the Asserted Patents by making iPSCs.[2] Plaintiffs persisted in asserting § 271(a) claims into expert discovery and only dropped them in their opposition to Shoreline's motion for summary judgment. (ECF No. 312 at 32:22-33:5.)

### b. Plaintiffs Knew That Their Induced Infringement Theory of the Composition Claims as to the ThermoFisher iPSC Lines Was Fatally Deficient

By the expert discovery stage, Plaintiffs asserted composition claims but only against the ThermoFisher iPSC lines and only under an induced infringement theory. (ECF No. 290, Ex. 22 [Plath Report], ¶¶ 60-63.)  Shoreline's second *Octane* letter

---

[2] ECF No. 290, Ex. 17 at 7-8 ("Defendants infringe the Asserted Method Claims and Asserted Composition Claims under 35 U.S.C. § 271(a) because they have made, continue to make, and/or will make iPSCs."); ECF No. 108 ¶¶ 140 ("On information and belief, Defendants, individually and acting in concert, make . . . induced pluripotent stem cells."), 154 ("On information and belief, such development has included the development of in-house manufacturing capabilities for making . . . iPSCs from somatic cells using exogenously introduced nucleic acid encoding transcription factors, including the OCT4 transcription factor."); ECF No. 157 ¶¶ 140, 154; Ex. F at 2-3 ("Defendants infringe the Asserted Method Claims and Asserted Composition Claims under 35 U.S.C. § 271(a) because they have made, continue to make, and/or will make iPSCs.").

1    stated that that theory was meritless because "witness testimony is clear that no one
2    at Shoreline knew how ThermoFisher intended to produce its iPSC lines or directed
3    ThermoFisher how to do so." (Ex. E at 4.)  Plaintiffs did not respond with contrary
4    evidence; they merely noted "Shoreline solicited ThermoFisher to manufacture
5    iPSCs on its behalf." (Ex. F at 5.)

6          But as the Court's Summary Judgment Order recognized, that is insufficient
7    to establish inducement.  (ECF No. 390 at 35:10-19 (stating that even if it was
8    assumed that Shoreline solicited and purchased iPSCs from ThermoFisher, such
9    evidence "cannot be utilized to demonstrate that Shoreline induced Thermo Fisher to
10   infringe the asserted composition patents").)  That Order noted a complete absence
11   of evidence supporting induced infringement as to the ThermoFisher iPSCs lines
12   even though all the available evidence was viewed in Plaintiffs' favor.  (*Id.* at 34:14-
13   16 ("Indeed, the unrebutted evidence in the record demonstrates that the relevant
14   actors at Shoreline did not know what the CytoTune 2.0 kit is or how it works."),
15   34:20-35:2 ("[T]he unrebutted evidence demonstrates that Shoreline did not know
16   what reprogramming factors Thermo Fisher was going to use to manufacture the
17   iPSC line at issue, and Shoreline did not give Thermo Fisher any direction of how to
18   perform the reprogramming.").)

19         Even if Plaintiffs' § 271(b) claim against the ThermoFisher line had merit,
20   which it did not, its marginal damages proposition did not justify maintaining a suit
21   claiming more than $1 billion in damages.  ThermoFisher charged Shoreline ████
22   to produce iPSC lines via reprogramming.  (Ex. G.)  ThermoFisher purportedly
23   produced the claimed composition as part of that reprogramming process.  The final
24   product of that process, the iPSC line, is not the claimed composition and there is no
25   dispute that Shoreline never directly infringed the claimed composition.  (*See* ECF
26   No. 290, Ex. 2 at 80:11-23.)  The ThermoFisher line's significance to Shoreline was
27   minimal; Dr. Plath argued that "Shoreline's entire company was built on the use of
28   the Lonza [line]" and acknowledged that Shoreline does not use ThermoFisher's

13

iPSCs to manufacture iPSC-derived therapies. (ECF No. 290, Ex. 22 ¶ 56; *id.* at 33 n.29.) Yet Dr. Keeley did not isolate a reasonable royalty just for ThermoFisher's single act of purported infringement. Indeed, Plaintiffs did not apportion damages on an iPSC line-by-iPSC line basis. (*See* Ex. H at 85:6-87:5.) Shoreline's single alleged act of inducing ThermoFisher to produce, for ███████ lines that Shoreline *does not use* to develop therapies did not justify Plaintiffs maintaining a suit claiming entitlement of up to $1.07 billion in damages. (ECF No. 291, Ex. G ¶ 37.)

### 2. Defendants and the Court Repeatedly Told Plaintiffs that the Method Claims Do Not Cover Reprogramming iPSCs

Plaintiffs' litigation strategy required that the Court reject their arguments against the method claims' two-step sequence three separate times. Plaintiffs' failure to instruct its expert to accord weight to the Court's construction requiring that sequence was "unreasonable litigation conduct." *See Amazon Web Servs. v. Personalweb Techs., LLC*, No. 18-md-02834-BLF, 2020 U.S. Dist. LEXIS 186226, at *55 (N.D. Cal. Oct. 6, 2020) (holding that plaintiff instructing its expert to apply plaintiff's own "interpretation" of the court's claim construction was "unreasonable litigation conduct").

The Court first rejected Plaintiffs' arguments against the two-step sequence at claim construction. Plaintiffs asserted that the claims do not encompass a two-step sequence where a first priming step precedes and is separate from a second, subsequent reprogramming step. The Court construed the claims against Plaintiffs. (ECF No. 208, 31:10-18 ("Plaintiffs argue that Defendants' proposed construction is improper because it construes the word 'priming' used by the examiner as a two-step process in which the Oct4 is introduced as an antecedent step . . . The Court rejects this argument as Plaintiffs again fail to read the examiner's statements within their proper context.").) The Court's Claim Construction Order "specifically require[d] that the induction of Oct4 expression occur prior to and be separate from the reprogramming process." (ECF No. 390 at 12:10-12 (first citing ECF No. 208 at 31-

32; and then citing ECF No. 255 at 18-23)); *see also* ECF No. 209 at 2:1-21 (denying Plaintiffs' motion to compel production of documents concerning the manufacture and use of iPSCs).)

Plaintiffs recycled the same argument in their Motion for Reconsideration. They posited that the Court erred in "importing an order of steps requirement" into the method claims.  (ECF No. 232-1 at 8.)   The Court reaffirmed that "priming" refers to the first step of a two-step SCNT experiment.  (ECF No. 255 at 18:4-23:9 & nn.6-8.)  And it specifically noted that "Plaintiffs' motion is an attempt to reargue and relitigate the proper construction of the [claims] . . . Plaintiffs simply disagree with the Court's construction." (*Id.* at 11:12-19.)

After the Court denied reconsideration, Plaintiffs received Shoreline's second *Octane* letter reminding Plaintiffs how none of the accused iPSC lines were made by such a "two-step process in which the first 'priming' step involved the introduction of Oct4 alone." (Ex. E at 3.) Plaintiffs' response did not grapple with this issue.  As discussed, Shoreline notified Plaintiffs from the outset and throughout this case that the Asserted Patents did not cover iPSCs or methods for reprogramming somatic cells to iPSCs.  (*See supra* Section II.C.)

On summary judgment, the Court rejected Plaintiffs' infringement theory for a *third time*.  Plaintiffs attempted to dismiss the construction that distinguished between priming and reprogramming as "trivial" and "merely semantic."  (ECF No. 390 at 12:23-13:14 (first citing ECF No. 354 at 10; and then citing ECF No. 354-7 ¶ 45); *see also* Ex. M at 29:19-25, 32:17-24 (Plaintiffs' counsel describing whether priming is part of reprogramming as "semantic"); Ex. I at 254:4-259:14 (Plaintiffs' expert testifying that, in her opinion, methods of reprogramming somatic cells encompasses the claimed method of make a somatic cell more susceptible to reprogramming); ECF No. 151-14 ¶ 87 ("[I]t is unclear what Defendants mean by 'priming,' as that is not a term that is used in the field of reprogramming somatic cells").)  Plaintiffs' strategy of attempting to repeatedly relitigate claim construction

renders this case exceptional.  *See Intex Recreation Corp. v. Team Worldwide Corp.*, 77 F. Supp. 3d 212, 217 (D.D.C. 2015) (awarding fees where the court's "claim construction foreclosed any reasonable argument [of infringement]" but plaintiff refused to stipulate to noninfringement and instead "filed a conclusory expert report and advanced flawed, nonsensical, and baseless arguments, . . . seeking only to re-litigate [the court's claim] construction").

### 3.   Plaintiffs Put Forth an Expert Opinion on "Priming" That Is Directly Contradicted By Their Expert's Prior Sworn Testimony and Their Representations to the Court During Claim Construction

In their claim construction briefing, Plaintiffs told the Court that "[a]nother problem with Defendants' construction is that 'priming' has no meaning in the stem cell field."  (ECF No. 179 at 2:21-22.)   In support, Plaintiffs cited the sworn declaration of their expert Dr. Plath's, who attested: "Further, it is unclear what Defendants mean by 'priming,' as that is not a term that is used in the field of reprogramming somatic cells, and would only inject ambiguity into the claims." (ECF No. 151-14 ¶ 87.)

Plaintiffs and Dr. Plath changed their tune quickly after the Court determined that the asserted method claims only covered "priming a cell to improve cloning efficiency for subsequent reprogramming."  (ECF No. 208 at 33.)   In her declaration in support of Plaintiffs' opposition to summary judgment, Dr. Plath opined: "Each of the Lonza, ThermoFisher, FCDI, and ASC manufacturing processes introduce exogenous Oct-4 in a 'priming' stage which is followed by 'subsequent reprogramming to a pluripotent state' weeks later." (ECF No. 323 ¶ 320.)  Dr. Plath went further and explained that each of the third-party manufacturers maintained the somatic cells in a "priming medium" before transferring the cells to a "reprogramming medium."  (*Id*.)  But neither Plaintiffs nor Dr. Plath explained why they told the Court that the term "priming" has no meaning in the stem cell field or the field of reprogramming somatic cells when it suited their purposes during claim

construction, but then suddenly decided that it did when they had to scramble to come up with a new infringement theory after claim construction.  Plaintiffs' willingness to have their expert to swear to any opinion that suited their purposes, and to flip-flop in sworn testimony, also makes this case exceptional.  *See, e.g.*, *Amazon Web*, 2020 U.S. Dist. LEXIS 186226, at \*51, 52, 75 (awarding fees where plaintiff "instructed its expert to apply [an] improper 'interpretation'" of the court's claim construction, "frequently changed its infringement positions to overcome the hurdle of the day," and "unnecessarily prolonged [the] litigation after claim construction foreclosed its infringement theories").

### 4.   Plaintiffs' Pursued a Doctrine of Equivalents Theory Contrary to Fact and the Court's Claim Construction

Plaintiffs blithely pursued a doctrine of equivalents ("DOE") theory, ignoring its fatal defects.  A case may be exceptional where the plaintiff's "doctrine of equivalents argument was conspicuously flawed" in that it "contradicted the testimony of its own expert, the patent's prosecution history, and the clear text of the patent itself."  *Icon Health & Fitness, Inc. v. Octane Fitness, LLC*, 112 F. Supp. 3d 888, 894 (D. Minn. 2015), *aff'd*, 706 F. App'x. 666 (Fed. Cir. 2017).

The Court's Orders construing the claims expressly stated, in part based on Plaintiffs' own admissions, that SCNT and iPSC reprogramming were very different processes.[3]  Despite the Court's express finding that SCNT and iPSC reprogramming

---

[3] *See* ECF No. 255 at 25:9-10 ("At the claim construction hearing, Plaintiffs conceded that the words 'blastocyst' and 'cloning' 'are unique to SCNT'" (citing ECF No. 218 at 17, 18)), 25 n.13 ("Consistent with Plaintiffs' representation at the hearing that 'cloning' is unique to SCNT . . . ."), 25:19-26:1 ("Plaintiffs' own presentation at the February 27, 2023 hearing make clear that *SCNT is very different than direct reprogramming*." (emphasis added)), 26 n.15 (discussing Plaintiffs admissions that SCNT and iPSC reprogramming are substantially different), 27:14-16 ("[T]he intrinsic record only supported the inclusion of an 'efficiency' limitation related to 'blastocyst formation and ES cell derivation' efficiency, 'nuclear transfer cloning efficiency,' and 'cloning efficiency,' which are all specific to SCNT."), 33 n.18

SHORELINE'S MOTION FOR
ATTORNEY FEES
CASE NO. 3:22-CV-00676-H-MSB

are fundamentally different, Plaintiffs pursued a DOE theory that SCNT and iPSC reprogramming are fundamentally the same.  (ECF No. 290, Ex. 17 at 12-15.)

Shoreline's second *Octane* letter notified Plaintiffs that "Fate's attempt to rely on [DOE] to expand 'cloning efficiency' beyond SCNT is directly contrary to the Court's prior two Orders on claim construction finding that the intrinsic record makes clear that cloning efficiency and direct reprogramming efficiency are very different." (Ex. E at 3.)  Shoreline pointed Plaintiffs to the Court's explanation in its reconsideration Order for how Plaintiffs' statements contradicted their DOE theory. (*Id.* (quoting ECF No. 255 at 33 n.18).)  Plaintiffs' response claimed that Shoreline "mischaracterize[ed]" the Court's opinions yet quoted the Court as acknowledging that "Plaintiffs' own presentation at the February 27, 2023 hearing make clear that SCNT is very different than direct reprogramming." (Ex. F at 4 & n.4.)  Moreover, the Court found, consistent with Shoreline's letter, that the Claim Construction Order foreclosed Plaintiffs' DOE arguments.  (ECF No. 390 at 15:12-19.)  Thus, as Shoreline's letter warned, Plaintiffs' assertion of a DOE theory contravening the Court's claim construction warrants an exceptional case finding.

### C.   This Case Is Exceptional Because Plaintiffs' Shifting Damages Theory Was Contrary to Law and Fact

The totality-of-the-circumstances evaluation should include consideration of irregularities in a plaintiff's damages model.  *AdjustaCam*, 861 F.3d at 1362 (attributing clear error for failing to consider plaintiff's damages methodology "[i]n light of [plaintiff's] frivolous infringement argument and unreasonable manner of litigation").  After the Court rejected Plaintiffs' original head-start theory that claimed entitlement to the value of Shoreline's entire business (*see supra* Section II.G), Plaintiffs pivoted—but only slightly.  Their damages expert, Dr. Keeley, offered two models, both of which applied a head-start theory to circumvent the bar

---

("Plaintiffs have also explained to the Court that SCNT is 'different' than direct reprogramming.").

against post-expiration royalties.  Dr. Keeley's first model also ignored the most comparable license of record in favor of admittedly non-comparable agreements with higher royalty rates.  In addition, his second model theorized that Shoreline, a *two-month-old startup*, would have agreed to a one-time, paid-up license fee between $535 million and $1.07 billion.  And, in each, he refused to apportion out the value of noninfringing elements.

Plaintiffs intended for their damages model to generate eye-popping damages; they sacrificed sound economic principles and fidelity to the facts to do so.  The Court should award fees to deter future plaintiffs from so abusing the hypothetical negotiation framework to "extract royalties to which [they are] not entitled from a competitor."  *Icon Health*, 112 F. Supp. 3d at 899.  This deterrent principle is particularly acute where Plaintiffs sought up to $1.07 billion for a license to patents covering SCNT technology that is, in Plaintiffs' own estimation, worthless.  (Ex. L at 8:15-18 (Plaintiffs' attorney arguing that here's "no commercial value" in developing "a better SCNT process").)

### 1.    Plaintiffs' Head-Start Theory Used a Lump Sum to Improperly Capture Royalties on Post-Expiration Sales

Dr. Keeley's head-start theory provided for a one-time, paid-up license fee meant to circumvent the bar against royalties accruing on sales made after a patent expires.  Black-letter law bars using post-expiration sales as a royalty base.  *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 449 (2015); *Brulotte v. Thys Co.*, 379 U.S. 29, 32-33 (1964).  Yet, it is undisputed that Dr. Keeley derived his one-time, paid-up license from Shoreline's first four years of projected post-expiration sales.[4]  (Ex. H at 75:23-76:8.)  His report did not describe why the parties to the hypothetical negotiation would have eschewed a running royalty framework, prevalent in the

---

[4] As Shoreline's Motion to Exclude Dr. Keeley's Expert Report describes, these projections were too speculative and unreliable to be probative.  (ECF No. 291 at 10:20-11:20.)

licenses of record, in favor of his fully paid-up arrangement, not evinced in any of such agreement.  Dr. Keeley testified, however, that he rolled the value of these post-expiration sales into a lump sum because the law would not permit a running royalty on them.  (*Id.* at 88:8-89:8 ("I'm not even sure the law would allow . . . a royalty, at least in a . . . hypothetical negotiation, to be paid on sales that were made after the patents expired.")  That is, Plaintiffs adopted their lump sum, head-start theory as an end-run around the bar on post-expiration royalties.  The hypothetical negotiation framework cannot be used to launder such offenses against well-established law.  Plaintiffs have certainly not "marshaled case law to make a colorable argument in support of" this tactic.  *Spineology, Inc. v. Wright Med. Tech., Inc.*, 910 F.3d 1227, 1230 (Fed. Cir. 2018).

### 2. Dr. Keeley's First Damages Model Disregarded a Comparable License with a Low Running Royalty in Favor of Admittedly Non-Comparable Agreements

Dr. Keeley's first damages model proposed a royalty rate that ignored the most comparable license from ███████████ in favor of admittedly non-comparable agreements that spoke to higher royalty rates.  Plaintiffs claimed that Shoreline's ███ license—███████████—was not technologically comparable. ███████████

███████████

███████████

███████████

███████████

███████████

Dr. Keeley instead relied on Fate's collaboration agreements with ███████, which provided for ███████████.  (ECF No. 291, Ex. G ¶¶ 117-19.)  Dr. Keeley never opined that the complex ███████ agreements are economically comparable to the hypothetical negotiation's bare,

1  non-exclusive license.  In fact, he freely admitted that the ███████ agreement is not

2  economically comparable, suggesting the same for the ███ agreement.  (Ex. H at

3  65:22-66:21, 92:19-93:18.)  Through this baseless selectivity, Dr. Keeley applied a

4  royalty rate ██████████████ that of the facially comparable ████████.

5  (*Compare* ECF No. 291, Ex. G at Ex. 1 (hypothetical royalty of ████████), *with*

6  *id.* at Ex. 4A (████████████████████████).)

### 3.   Plaintiffs' Second Damages Model Improperly Adopted a Lost-Profits Theory and Ignored Shoreline's Position at the Time of the Hypothetical Negotiation

9       Plaintiffs' second damages model supposed that, in August 2020, Shoreline

10  would have agreed to pay Fate an up-front, fully paid-up royalty of between $535

11  million and $1.07 billion—that is, ████████████████████████████

12  ██████████████████████.  (ECF No. 291, Ex. G ¶ 37.)  Plaintiffs supposed

13  that Shoreline would agree to pay $1.07 billion if it was assumed that "Fate's

14  incremental losses were to equal Shoreline's gain." (*Id.* ¶ 130.)  This presented two

15  obvious issues that should have led Plaintiffs away from advancing such a theory.

16  First, in Plaintiffs' view, the hypothetical negotiation would see Shoreline potentially

17  agreeing to a royalty that conveniently equaled Fate's supposed lost profits.  Plaintiffs

18  cannot relieve themselves of the burden of satisfying the *Panduit* factors by simply

19  branding their lost-profits theory as the inevitable consequence of the hypothetical

20  negotiation.  *See Syneron Med. Ltd. v. Invasix, Inc.*, No. 8:16-cv-00143-DOC-KES,

21  2018 U.S. Dist. LEXIS 220514, at *10-13 (C.D. Cal. Aug. 27, 2018) (holding that

22  *Georgia-Pacific* "does not authorize the direct setting of the reasonable royalty in the

23  amount of the licensor's lost profits . . . . Otherwise, a patent owner could always

24  sidestep the heightened requirements of proving lost profits").

25       Second, Plaintiffs ignored that, in August 2020, Shoreline was two-months old

26  and had ████████████.  (*See* ECF No. 291, Ex. G at 15 n.36.)  Shoreline

27  could not have, as Dr. Keeley proposed, raised exponentially more money just to pay

28

a license fee.[5]  (Ex. H at 58:20-59:8.)  Dr. Keeley also suggested that maybe Shoreline could have borrowed against its collaboration agreements with Kite and Beigene. (*Id.* at 57:24-58:19, 59:9-18.)  Those agreements would not exist until ███████, almost ████ after the hypothetical negotiation.  (*See* ECF No. 291, Ex. G at 27 n.52.) In short, Shoreline did not have the capital to accommodate Plaintiffs' outrageous up-front sum in the hopes of recouping it through sales in the far-flung future.  *Cf. Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013) ("The infringer's selling price can be raised if necessary to accommodate a higher royalty rate.").  In light of Shoreline's position as of August 2020, Plaintiffs' paid-up royalty framework was farcical.

### 4.    Plaintiffs Had No Basis to Refuse to Apportion

Plaintiffs' damages case was also objectively baseless in its attributing the entire value of iPSCs and iPSC-derived therapies to the Asserted Patents.  "[T]he patentee must *in every case* give evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features . . . ." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (cleaned up) (emphasis added).  Dr. Keeley opined that "[a]ll of Shoreline's incremental profit should be credited to the invention because without practicing the patents-in-suit, it would not be possible to make any of" Shoreline's immunotherapy treatments.  (ECF No. 291, Ex. G ¶ 165.)  Plaintiffs thereby attribute no value to Dr. Yamanaka's Nobel-Prize-worthy contributions, without which the methods and compositions of the Asserted Patents (even under Plaintiffs' rejected infringement theory) have *no* commercial value.  Dr. Keeley also ignored Shoreline's contributions in transforming iPSCs, which have no therapeutic effect, into therapies that have considerable potential market value.

---

[5] The record is bereft of any suggestion that securing a license to the Asserted Patents would have attracted any more investment to Shoreline, let alone an amount comparable with Plaintiffs' proposed paid-up license fee.

1       Plaintiffs have cited no authority suggesting a "blocking patent" exception to

2   apportionment.  Nor is there any authority recognizing an exception to apportionment

3   for method patents.  *See, e.g.*, *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30

4   F.4th 1339, 1357 (Fed. Cir. 2022) ("[W]e disagree with [plaintiff's] carefully worded

5   assertion on appeal that apportionment does not apply to method claims."); *CH2O v.*

6   *Meras Eng'g,* No. LA CV13-08418 JAK (GJSx), 2017 U.S. Dist. LEXIS 235890, at

7   *10 (C.D. Cal. July 13, 2017) ("Although this action does not involve multi-

8   component products, the rationale for apportionment still applies."); *Kaneka Corp.*

9   *v. Zhejiang Med. Co.*, No. CV 11-02389 SJO (SSx), 2017 U.S. Dist. LEXIS 230942,

10   at *15 (C.D. Cal. Feb. 22, 2017) ("[Plaintiff] cites no authority in support of its

11   argument that apportionment of the royalty base is inappropriate where process

12   claims, rather than multi-component product claims, are concerned.").  Plaintiffs

13   cannot excuse their failure to apportion.

14   **V.      CONCLUSION**

15       For the foregoing reasons, the Court should grant Shoreline's Motion and find

16   that this case is exceptional.  If the Court deems this case exceptional, Shoreline will

17   provide the Court and Plaintiffs a detailed account of the attorney fees being sought.

18   Pursuant to Federal Rule of Civil Procedure 54(d)(2)(B)(iii), Shoreline fairly

19   estimates that the attorney fees to date for Shoreline are approximately ████,

20   and the attorney fees since the February 28, 2023 Claim Construction Order (ECF

21   No. 208) are approximately ████.

22

23

24

25

26

27

28

SHORELINE'S MOTION FOR
ATTORNEY FEES
CASE NO. 3:22-cv-00676-H-MSB

1

2      Dated:  September 14, 2023              MORRISON & FOERSTER LLP

3

4                                             By:  */s Eric M. Acker*
                                                   Eric M. Acker
5                                                  EAcker@mofo.com

6                                                  Attorney for Defendant and
                                                   Counterclaimant Shoreline
7                                                  Biosciences, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHORELINE'S MOTION FOR
ATTORNEY FEES
CASE NO. 3:22-CV-00676-H-MSB