Joseph T. Ergastolo (SBN 137807)
jte@wlelaw.com
Andrew E. Schouten (SBN 263684)
aschouten@wlelaw.com
WRIGHT, L'ESTRANGE & ERGASTOLO
402 West Broadway, Suite 1800
San Diego, California 92101
Tel: (619) 231-4844
Fax: (619) 231-6710

*Attorneys for Plaintiffs Fate Therapeutics, Inc.
and Whitehead Institute for Biomedical Research*

***Appearances of Counsel Continued on the Next Page***

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FATE THERAPEUTICS, INC. and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | Case No.: 3:22-cv-00676-H-MSB |
| Plaintiffs, | **REDACTED PLAINTIFFS' OPPOSITION TO DEFENDANT SHORELINE BIOSCIENCES, INC.'S MOTION FOR ATTORNEY FEES** |
| v. | |
| SHORELINE BIOSCIENCES, INC., | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

Rose Cordero Prey (admitted *pro hac vice*)
preyr@gtlaw.com
Jonathan D. Ball (admitted *pro hac vice*)
ballj@gtlaw.com
Jeffrey R. Colin (admitted *pro hac vice*)
colinj@gtlaw.com
Giancarlo L. Scaccia (admitted *pro hac vice*)
scacciag@gtlaw.com
Wen Xue (admitted *pro hac vice*)
xuew@gtlaw.com
Danielle M. Zapata (admitted *pro hac vice*)
zapatad@gtlaw.com
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
Tel: (212) 801-9200
Fax: (212) 801-6400

Aimee Housinger (admitted *pro hac vice*)
housingera@gtlaw.com
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 6700
Houston, TX 77002
Tel: (713) 374-3570
Fax: (713) 374-3505

Benjamin D. Witte (admitted *pro hac vice*)
Ben.Witte@gtlaw.com
GREENBERG TRAURIG, LLP
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131
Tel: (305) 579-0500
Fax: (305) 579-0717

Andrew S. Ong (SBN 267889)
aong@goodwinlaw.com
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, CA 94063
Tel: (650) 752-3100

Kevin P. Martin (*pro hac vice* pending)
kmartin@goodwinlaw.com
Christopher J.C. Herbert (admitted *pro hac vice*)
cherbert@goodwinlaw.com
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000

*Attorneys for Plaintiffs Fate Therapeutics, Inc.
and Whitehead Institute for Biomedical Research*

# **TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................... 1

II.    FACTUAL BACKGROUND.................................................. 1

     A.    The Parties' Relationship Pre-Suit ................................ 2

     B.    Plaintiffs Filed Suit in Good Faith ............................... 2

     C.    Shoreline's Unsuccessful Early Dispositive Motions ................ 3

     D.    Plaintiffs' Well-Supported Claim Construction Positions .......... 4

     E.    Plaintiffs' Amended Infringement Contentions .................... 5

     F.    The Contentious Summary Judgment Hearing ...................... 6

     G.    Plaintiffs' Well-Supported Damages Theory ..................... 6

III.   LEGAL STANDARD ......................................................... 7

IV.    ARGUMENT....................................................................... 9

     A.    Plaintiffs' Brought This Case in Good Faith..................... 9

     B.    Plaintiffs' Infringement Claims Were Objectively Reasonable, Strongly Supported by Expert Testimony, and Not Baseless .......... 11

         1.    Plaintiffs Reasonably Litigated Their § 271(a) Claims .................. 11

         2.    Plaintiffs Reasonably Litigated Their § 271(b) Claims .................. 12

         3.    Plaintiffs Properly Applied the Court's Claim Construction.......... 14

     C.    Plaintiffs' Reasonable Royalty Damages Theory Was Well-Supported and Does Not Support an Exceptional Case Finding .............. 21

         1.    Dr. Keeley Did Not Rely on Post-Expiration Sales...................... 22

         2.    Dr. Keeley Thoroughly Evaluated All Licenses............................ 22

         3.    Dr. Keeley Did Not Opine on Lost Profits or "Ignore" Shoreline's Position at the Time of the Hypothetical Negotiation .................... 23

         4.    Dr. Keeley Did Not "Refuse to Apportion"................................... 24

     D.    The Court Should Defer Ruling on This Motion Pending Appeal ............ 25

V.    CONCLUSION.................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*AdjustaCam, LLC v. Newegg, Inc.*,
861 F.3d 1353 (Fed. Cir. 2017) ................................................................. 18

*Amazon Web Servs. v. Personalweb Techs., LLC*,
2020 WL 5910080 (N.D. Cal. Oct. 6, 2020) ............................................. 18

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) ................................................... 23, 24, 25

*Auto-Kaps, LLC v. Clorox Co.*,
2017 WL 6210846 (E.D.N.Y. Mar. 27, 2017), *aff'd*, 715 F. App'x 1025
(Fed. Cir. 2018) ......................................................................................... 20

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
157 F.3d 1340 (Fed. Cir. 1998) ................................................................... 9

*Calypso Wireless, Inc. v. T-Mobile USA Inc.*,
2015 WL 1022745 (E.D. Tex. Mar. 5, 2015) ............................................ 17

*Cambrian Sci. Corp. v. Cox Commc'ns, Inc.*,
79 F. Supp. 3d 1111 (C.D. Cal. 2015) ........................................................ 8

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
2022 WL 17968844 (N.D. Cal. Oct. 6, 2022) ..................................... 14, 17

*CH2O v. Meras Eng'g*,
2017 U.S. Dist. LEXIS 235890 (C.D. Cal. July 13, 2017) ........................ 25

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*,
858 F.3d 1371 (Fed. Cir. 2017) ................................................................... 9

*Clinicomp Int'l, Inc. v. Cerner Corp.*,
2023 WL 1767008 (S.D. Cal. Feb. 3, 2023) .............................................. 14

*Curver Luxembourg, SARL v. Home Expressions Inc.*,
2018 WL 10151930 (D.N.J. Dec. 20, 2018) .............................................. 15

*Digit. Reg of Texas LLC v. Adobe Sys., Inc.*,
2015 WL 1026226 (N.D. Cal. Mar. 9, 2015) ............................................ 21

*Doggyphone LLC v. Tomofun, LLC*,
2023 WL 4743708 (W.D. Wash. July 25, 2023) ....................................... 17

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013) ................................................................. 24

*Envosys LLC v. AT&T Mobility LLC*,
2016 WL 3460794 (C.D. Cal. Feb. 16, 2016) ...................................... 8, 18

*EON Corp. IP Holdings LLC v. Cisco Sys. Inc.*,
2014 WL 3726170 (N.D. Cal. July 25, 2014) ..................................... 8, 18

*Fate Therapeutics, Inc. v. Shoreline Biosciences, Inc. et al.*,
No. 37-2022-00018260-CU-BT-CTL (C.A. Super. Ct. May 13, 2022) ..................... 2

*FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*,
2018 WL 6830611 (S.D. Cal. Dec. 21, 2018) ......................................... 25

*Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods.*,
790 F.3d 1369 (Fed. Cir. 2015) .................................................... 1, 8

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ........................................................ 12

*Icon Health & Fitness, Inc. v. Octane Fitness, LLC*,
112 F. Supp. 3d 888 (D. Minn. 2015) ............................................. 20, 21

*Innovation Scis., LLC v. Amazon.com, Inc.*,
842 F. App'x 555 (Fed. Cir. 2021) ................................................... 18

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001) .................................................... 7, 14

*Intex Recreation Corp. v. Team Worldwide Corp.*,
77 F. Supp. 3d 212 (D.D.C. 2015) .................................................... 15

*Kreative Power, LLC v. Monoprice, Inc.*,
2015 WL 1967289 (N.D. Cal. Apr. 30, 2015) ......................................... 17

*LaserDynamics, Inc. v. Quanta Comp., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ......................................................... 23

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
869 F.3d 1372 (Fed. Cir. 2017) ...................................................... 12

*Modine Mfg. Co. v. Allen Grp., Inc.*,
917 F.2d 538 (Fed. Cir. 1990) ......................................................... 8

iii

*Monsanto Co. v. DuPont de Nemours and Co.*,
  2012 WL 5397601, *3 (E.D. Mo. Nov. 2, 2012) ................................................. 23, 24

*Munchkin, Inc. v. Luv N'Care, Ltd.*,
  960 F.3d 1373 (Fed. Cir. 2020) ...................................................................... 21

*Nantkwest, Inc. v. Iancu*,
  898 F.3d 1177 (Fed. Cir. 2018), *aff'd sub nom. Peter v. Nantkwest, Inc.*,
  140 S. Ct. 365 (2019) ....................................................................................... 7

*Neville v. Found. Constructors, Inc.*,
  2019 WL 8195559 (C.D. Cal. Dec. 2, 2019) .................................................. 14

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
  30 F.4th 1339 (Fed. Cir. 2022) ...................................................................... 25

*Noven Pharms., Inc. v. Amneal Pharms. LLC*,
  2021 WL 4033172 (D. Del. Sept. 3, 2021) ..................................................... 17

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014) ................................................................................ 1, 7, 8

*OneSubsea IP UK Ltd. v. FMC Techs., Inc.*,
  68 F.4th 1285 (Fed. Cir. 2023) ......................................................................... 9

*Pac. Coast Bldg. Prod., Inc. v. CertainTeed Gypsum, Inc.*,
  2021 WL 75755 (N.D. Cal. Jan. 7, 2021) ......................................................... 1

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
  2015 WL 4756669 (S.D. Cal. Aug. 10, 2015) ................................................. 16

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
  429 F.3d 1364 (Fed. Cir. 2005) ...................................................................... 10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  2017 WL 130236 (N.D. Cal. Jan. 13, 2017) ..................................................... 8

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965 (Fed. Cir. 2018) ....................................................................... 15

*Prima Tek II, L.L.C. v. A-Roo Co.*,
  222 F.3d 1372 (Fed. Cir. 2000) ...................................................................... 11

*Seoul Semiconductor Co., Ltd. v. Bed Bath & Beyond*,
  2023 WL 2629872 (C.D. Cal. Jan. 10, 2023) ................................................. 21

*SFA Sys., LLC v. Newegg Inc.*,
  793 F.3d 1344 (Fed. Cir. 2015) ................................................................. 8

*SkinMedica, Inc. v. Histogen Inc.*,
  869 F. Supp. 2d 1176 (S.D. Cal. 2012) ..................................................... 17

*Spineology, Inc. v. Wright Med. Tech., Inc.*,
  910 F.3d 1227 (Fed. Cir. 2018) ......................................................... 17, 21

*Sportstar Athletics, Inc. v. Wilson Sporting Goods Co.*,
  2018 WL 1970754 (S.D. Tex. Feb. 27, 2018), *report and
  recommendation adopted*, 2018 WL 2948026 (S.D. Tex. June 13, 2018)............... 16

*Steyr Arms, Inc. v. SIG Sauer*,
  2020 WL 1957926 (D.N.H. Apr. 23, 2020) ............................................... 20

*Stopinc Aktiengesellschaft v. J.W. Hicks, Inc.*,
  131 F. Supp. 3d 763 (N.D. Ind. 2015), *aff'd sub nom. Aktiengesellschaft
  v. J.W. Hicks, Inc.*, 655 F. App'x 858 (Fed. Cir. 2016)................................. 20

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015) ................................................................. 7

*Synchronoss Techs., Inc. v. Dropbox Inc.*,
  2020 WL 759528 (N.D. Cal. Feb. 14, 2020) ............................................... 17

*Syneron Med. Ltd. v. Invasix Inc.*,
  2018 U.S. Dist. LEXIS 220514 (C.D. Cal. Aug. 27, 2018) ............................. 23

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
  726 F.3d 1306 (Fed. Cir. 2013) ............................................................... 18

*Universal Stabilization Techs., Inc. v. Advanced Bionutrition Corp.*,
  2018 WL 6181479 (S.D. Cal. Nov. 27, 2018) ............................................. 18

*Vasudevan Software, Inc. v. Microstrategy, Inc.*,
  2015 WL 4940635 (N.D. Cal. Aug. 19, 2015) ............................................... 8

*Virnetx, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ............................................................... 23

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
  824 F.3d 1344 (Fed. Cir. 2016) ............................................................... 13

*Water Techs. Corp. v. Calco, Ltd.*,
  850 F.2d 660 (Fed. Cir. 1988) ............................................................... 13

*Whitewater W. Indus., Ltd. v. Pac. Surf Designs, Inc.*,
    2021 WL 1265210 (S.D. Cal. Apr. 5, 2021) ........................................................ 8, 21

*Winterborne, Inc. v. FUJIFILM N. Am. Corp.*,
    2015 WL 12734079 (C.D. Cal., 2015) ....................................................... 10

*WSOU Invs., LLC v. F5 Networks, Inc.*,
    2023 WL 3723679 (W.D. Wash. May 30, 2023) ............................................. 17, 18

*Zeta Glob. Corp. v. Maropost Mktg. Cloud, Inc.*,
    2023 WL 355655 (S.D.N.Y. Jan. 23, 2023) ....................................................... 10

**Statutes**

35 U.S.C. § 285 ............................................................................................................... 7

# TABLE OF EXHIBITS[1]

| Exhibit | Description |
|---|---|
| 1 | Science article entitled "Landmark Pluripotent Patent Has Stem Cell Researchers Nervous" |
| 2 | Nature Biotechnology article entitled "Up for Grabs," by Michael Eisenstein, dated June 2010 |
| 3 | "Human Stem Cell Manual: A Laboratory Guide," by Jeanne Loring and Suzanne Peterson |
| 4 | Email chain between Kleanthis Xanthopolous, Dan Kaufman, Steven Holtzman, and Kelly Fevrier, dated April 13, 2020 |
| 5 | Email from Kleanthis Xanthopoulos to Dan Kaufman, dated April 18, 2020 |
| 6 | Shoreline Presentation entitled "Differentiation of Shoreline Biosciences" |
| 7 | Expert Report of Michael Richard Verneris, M.D., dated May 2, 2023 |
| 8 | Deposition Testimony of Kleanthis Xanthopoulos, dated April 27, 2023 |
| 9 | Third Supplemental Opening Expert Report of Kathrin Plath, Ph.D., Regarding Infringement |
| 10 | Declaration of Kathrin Plath, Ph.D. in Support of Plaintiffs' Infringement Contentions (Exhibit H to Plaintiffs' Third Supplemental Infringement Contentions) |
| 11 | Deposition Transcript of Evan Y. Snyder, dated January 23, 2023 |
| 12 | Deposition Transcript of Martin F. Pera, dated June 4, 2023 |
| 13 | Declaration of Bahram (Bob) Valamehr, Ph.D., dated July 27, 2023 |
| 14 | Email chain between Scott Wolchko, Dan Kaufman, Dan Shoemaker, and Bob Valamehr, dated February 7, 2015 |
| 15 | Fate Therapeutics presentation entitled "Programmed Cellular Therapeutics for Sever, Life-Threatening Diseases" |
| 16 | Email chain between Scott Wolchko, Dan Kaufman, Dan Shoemaker, and Bob Valamehr, dated February 25, 2015 |
| 17 | Deposition Transcript of Scott Wolchko, May 22, 2023 |
| 18 | Deposition Transcript of Dan S. Kaufman, May 11, 2023 |
| 19 | Email chain between Dan Kaufman, Kleanthis Xanthopoulos, Steven Holtzman, William Sandborn, and Kelly Fevrier, dated July 1, 2020 |

---

[1] Unless otherwise indicated, all Exhibits are attached to the Declaration of Rose Cordero Prey.

| | |
|---|---|
| 20 | Plaintiffs' Third Supplemental Disclosure of Asserted Claims, Infringement Contentions and Document Disclosures, dated March 21, 2023 |
| 21 | Declaration of Rudolf Jaenisch, M.D., dated July 27, 2023 |
| 22 | Declaration of Konrad Hochedlinger, Ph.D., dated July 27, 2023 |
| 23 | Declaration of Kathrin Plath Ph.D. in Opposition to Shoreline's Motion for Summary Judgment, dated July 28, 2023, entered as Dkt. 323 |
| 24 | Plaintiffs' Damages Contentions, dated February 24, 2023 |
| 25 | Expert Report on Damages by Michael C. Keeley, Ph.D., dated May 2, 2023 |
| 26 | Email from Beigene to Eddie Cherok, dated April 21, 2021 |
| 27 | Email chain between David Rodgers, Eddie Cherok, and Scott Forrest, dated November 21, 2021 |
| 28 | Deposition Transcript of Edward Cherok, Jr., Ph.D., dated April 24, 2023 |
| 29 | Email from ███████ to Eddie Cherok, dated July 12, 2021 |
| 30 | Declaration of Edward Patrick Cherok, Jr., dated November 23, 2022 |
| 31 | Email chain between Shoreline and ThermoFisher, dated July 16, 2021 |
| 32 | Third-Party Technical Presentation |
| 33 | Shoreline purchase order to a third-party, dated July 30, 2021 |
| 34 | Deposition Transcript of Megan Rogge |
| 35 | Deposition Transcript of David Rodgers |
| 36 | Email chain between Megan Rogge, Huafeng Wang, David Rodgers, ███████████████████, dated July 30, 2021 |
| 37 | Article entitled "Angiogenic activity mediates bone repair from human pluripotent stem cell-derived osteogenic cells" by Li Zou et al., dated March 16, 2016 |
| 38 | Deposition Excerpts of Huang Zhu , dated April 26, 2023 |
| 39 | Annotated Excerpts from the Deposition Transcript of Evan Y. Snyder, dated June 11, 2023 |
| 40 | Deposition transcript of Michael C. Keeley, Ph.D., dated June 9, 2023 |
| 41 | Article entitled "Detailed Characterization of Human Induced Pluripotent Stem Cells Manufactured for Therapeutic Applications," by Behnam Ahmadian Baghbaderani et al., dated June 10, 2016 |

| | |
|---|---|
| 42 | Transcript of Motion Hearing before the Honorable Marilyn L. Huff, dated August 28, 2023 |
| 43 | U.S. Patent No. 8,071,369 to Jaenisch et al., issued December 6, 2011 |
| 44 | Rebuttal Expert Report of W. Todd Schoettelkotte Relating to Damages, served on May 25, 2023 |

# GLOSSARY OF DEFINED TERMS

| Term | Definition |
|---|---|
| Asserted Patents | U.S. Patent Nos. 8,940,536; 8,932,856; 10,457,917; 10,017,744; 8,071,369; 8,951,797; 9,169,490 |
| Asserted Method Claims | Claims 1-7 of U.S. Patent No. 8,932,856; Claims 1-10, 12-17 of U.S. Patent No. 8,940,536; Claims 1-18 of U.S. Patent No. 10,457,917; and Claims 1-3, 5-9 of U.S. Patent No. 10,017,744 |
| Asserted Composition Claims | Claims 1-6, 8, 9 of U.S. Patent No. 8,071,369; Claims 1-6, 8 of U.S. Patent No. 8,951,797; and Claims 1-6, 8-10 of U.S. Patent No. 9,169,490 |
| CSO | Chief Scientific Officer |
| DOE | Doctrine of Equivalents |
| ██████ | ██████ |
| iPSC | Induced Pluripotent Stem Cell |
| Fate Therapeutics | Fate Therapeutics, Inc. |
| FDA | U.S. Food and Drug Administration |
| MIT | Massachusetts Institute of Technology |
| NIH | National Institute of Health |
| Plaintiffs | Fate Therapeutics, Inc. and Whitehead Institute for Biomedical Research |
| POSA | Person of Ordinary Skill in the Art |
| SCNT | Somatic Cell Nuclear Transfer |
| Shoreline | Shoreline Biosciences, Inc. |
| UMN | University of Minnesota |
| Whitehead Institute | Whitehead Institute for Biomedical Research |
| '369 Patent | U.S. Patent No. 8,071,369 |

# I. INTRODUCTION

While Plaintiffs defeated Shoreline's early dispositive motions and won on almost all claim construction arguments, in the end, Plaintiffs did not prevail at summary judgment. Shoreline now seeks an award of attorney fees based on the Court's determination that (1) the Asserted Patents, as construed by the Court, do not cover any part of the process of directly reprogramming a somatic cell to an iPSC, and (2) Plaintiffs failed to show that Shoreline had the requisite intent to induce ThermoFisher to infringe the composition claims. However, fees are not awarded as a "penalty for failure to win a patent infringement suit." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 548 (2014) (cleaned up); *see also Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015). "The mere fact that the losing party made a losing argument is not a relevant consideration; rather, the focus must be on arguments that were frivolous or made in bad faith." *Pac. Coast Bldg. Prod., Inc. v. CertainTeed Gypsum, Inc.*, 2021 WL 75755, at *3 (N.D. Cal. Jan. 7, 2021) (cleaned up).

Shoreline cannot show that Plaintiffs' litigating positions were objectively weak or that they stand out from others to warrant a finding that this case is "exceptional." Shoreline has no evidence of bad faith and no allegations of litigation misconduct. Plaintiffs brought suit in good faith to enforce their patent rights, their infringement claims were objectively reasonable and consistent with the Court's claim construction, and their damages theory was well-reasoned, based on an established reasonable royalty approach, and supported by Shoreline's expectations at the time of the hypothetical negotiation. Plaintiffs' good-faith belief in the merits—and the objective reasonableness of that belief—are not negated by the Court's summary judgment ruling for Shoreline.

This case was simply a hard-fought patent infringement action between two competitors. It was by no means a frivolous case. Therefore, the Court, in considering the totality of circumstances and exercising its equitable discretion, should decline to find this case "exceptional," and should deny Shoreline's motion in its entirety.

# II. FACTUAL BACKGROUND

### A. The Parties' Relationship Pre-Suit

Fate Therapeutics is a leader in developing iPSC-derived cellular immunotherapies for the treatment of cancer and immune disorders. It was founded in 2007, went public in 2013, and in 2018 became the first company to have an iPSC-derived NK cell immunotherapeutic product cleared for clinical testing by the FDA. Fate Therapeutics is the exclusive licensee of a portfolio of foundational patents from world-renowned biologist, Professor Rudolf Jaenisch of MIT's Whitehead Institute, directed to compositions and methods involved in reprogramming somatic cells.[2] These patents are the basis for Fate Therapeutics' first-in-class iPSC Platform. (*E.g.*, Dkt. 157 ¶¶ 13-16.)

In 2020, Fate Therapeutics' Scientific Advisor, Dr. Dan Kaufman, surreptitiously co-founded Shoreline to directly compete with Fate Therapeutics, in breach of his contract with Fate Therapeutics. (Dkt. 157 ¶¶ 41-51.) Dr. Kaufman and Shoreline's other founders intended to build Shoreline into "Fate 2.0" and develop nearly identical iPSC-derived immunotherapeutic products, targeting the same indications as Fate Therapeutics. (Exs. 4-6; Ex. 7, Verneris Rpt. ¶ 70.) Fate Therapeutics notified Dr. Kaufman of his breach and demanded that he immediately terminate his relationship with Shoreline. (Dkt. 157 ¶ 50.) Dr. Kaufman and Shoreline ignored that communication and continued to build Shoreline on the back of Fate Therapeutics' technologies.[3]

### B. Plaintiffs Filed Suit in Good Faith

iPSCs are the foundation of Shoreline's copycat business. (*See, e.g.*, Ex. 8, Xanthopolous Dep. Tr. at 92:19-93:4.) Knowing that Shoreline was using iPSCs to develop its competing NK cell immunotherapies and having a reasonable belief that the Asserted Patents covered making iPSCs, on May 13, 2022, Plaintiffs filed this lawsuit.

Plaintiffs reasonably believed that Shoreline infringed the Asserted Patents. There

---

[2] While the Court construed the Asserted Method Claims as limited to SCNT, the Asserted Patent family received considerable attention in the industry as the first patents covering so-called direct reprogramming. (*See* Exs. 1-3.)

[3] Fate Therapeutics filed a parallel lawsuit in San Diego County Superior Court alleging various claims arising from Dr. Kaufman's breach of contract. *Fate Therapeutics, Inc. v. Shoreline Biosciences, Inc. et al.*, No. 37-2022-00018260-CU-BT-CTL (C.A. Super. Ct. May 13, 2022).

is no question that Shoreline's iPSCs were made using Oct4—the subject of every claim of the Asserted Patents—as *all* commercially available iPSCs are made using Oct4. (Ex. 9, Plath Rpt. ¶¶ 278, 565, 567-570; Ex. 10, Plath DOE Decl. ¶¶ 126-30; *see also* Ex. 8 at 239:23-240:2; Ex. 11, Snyder CC Dep. Tr. at 87:3-18; Ex. 12, Pera Dep Tr. at 62:24-63:1, 70:4-7.) It was reasonable for Plaintiffs to believe that introducing Oct4 into a somatic cell is a critical step in the overall process of directly reprogramming somatic cells into iPSCs and that it infringes the Asserted Patents. Indeed, up until the claim construction hearing, Shoreline and its expert argued that the Asserted Method Claims covered **only** direct reprogramming. (*See, e.g.*, Dkt. 149 at 12; Dkt. 152 ¶¶ 53-62, 68-83.) Shoreline never raised any non-infringement argument that the somatic cells with Oct4 used to create Shoreline's custom iPSCs did not meet the Asserted Composition Claims.

Plaintiffs also had reasonable belief that Shoreline knew about the Asserted Patents. When Fate Therapeutics' visited Dr. Kaufman at UMN in February 2015, they gave him a presentation about its ground-breaking work involving iPSCs and its "Foundational intellectual property for reprogramming using Oct4," which included a description of the asserted '369 Patent and the full text of its claim 1. (Ex. 13, Valamehr Decl. ¶ 12; Exs. 14-16; Ex. 17, Wolchko Dep. Tr. at 278:11-282:1; Ex. 18, Kaufman Dep. Tr. at 259:6-18.) When starting Shoreline, Dr. Kaufman revealed to his co-founders that Fate Therapeutics has ███████████ in iPSCs. (Ex. 19.) Dr. Kaufman also understood when he co-founded Shoreline and served as a Director and its CSO that Fate Therapeutics had ████████████████████ (Ex. 18 at 259:6-18.)

## C. Shoreline's Unsuccessful Early Dispositive Motions

Shoreline filed two, unsuccessful dispositive motions early in the case. *First*, Shoreline sought partial summary judgment arguing that 1) its use of domestically manufactured iPSCs does not give rise to a § 271(g) infringement claim and 2) Plaintiffs' infringement claims are barred under 28 U.S.C. § 1498(a) because Shoreline's iPSCs were made by Lonza "for the United States" and with authorization from the NIH. (Dkt. 127.) The Court rejected both arguments and denied summary judgment. (Dkt. 226.)

*Second*, Shoreline filed a partial motion to dismiss arguing that Plaintiffs failed to state a claim for (1) direct infringement claim under § 271(g); (2) indirect infringement claim under § 271(b); and (3) willful infringement. (Dkt. 166-1.) The Court denied Shoreline's motion to dismiss in its entirety. (Dkt. 234.)

### D.    Plaintiffs' Well-Supported Claim Construction Positions

Plaintiffs presented reasonable arguments at claim construction that the intrinsic record and expert testimony supported. The Court agreed with Plaintiffs on the construction of four out of the five disputed claim limitations, and rejected Shoreline's indefiniteness argument. (Dkt. 208.) For the last limitation, "makes the cell more susceptible to reprogramming," the Court adopted a construction different from either party's proposed construction. (Dkt. 208 at 20-33.)

Regarding whether "making the cell more susceptible to reprogramming" requires "prim[ing] . . . for subsequent reprogramming," Plaintiffs argued, based on the specification, that the claim language meant "improving the 'efficiency' of reprogramming." (Dkt. 151 at 10-13; Dkt. 179 at 1-3; Dkt. 232-1 at 11-12.) Plaintiffs also argued that there were no statements made by the applicant during prosecution that rose to the level of clear and unmistakable disavowal or lexicography—a very high standard under the law—that would limit the phrase to "priming," as Shoreline urged. (Dkt. 151 at 10-13; Dkt. 179 at 1-3; Dkt. 232-1 at 5-9.) Plaintiffs' expert, Dr. Kathrin Plath, explained that a POSA would understand the claim language to mean that Oct4 improved the yield of pluripotent stem cells when included as an additive factor in reprogramming. (Dkt. 232-3 ¶¶ 8-11.). She also explained that, to a POSA, the important feature of the Asserted Patents' working example is that Oct4 is present *together* with the other reprogramming factors in the oocyte and that the purpose of the DOX induction period in the example was not to "precondition" the somatic cells with Oct4, but simply to ensure that sufficient Oct4 expression had occurred so that it would be present as an additive factor during SCNT. (*Id.*) That the Court disagreed and found that the amendments during prosecution history rose to the level of disclaimer does not mean that Plaintiffs' position

was objectively weak or advanced in bad faith.

Regarding whether "makes the cell more susceptible to reprogramming" refers *only* to improving "[SCNT] cloning efficiency," Plaintiffs reasonably argued that it refers to *any* reprogramming. (*See* Dkt. 232-1.) Indeed, it was undisputed that the essential thrust of the specification was about using Oct4 (and other reprogramming factors) to achieve direct reprogramming. (*See, e.g.*, Dkt. 149; Dkt. 151 at 10-13; Dkt. 232-3 ¶¶ 8-10.) Again, Shoreline argued during claim construction that the claims do ***not*** embrace SCNT, even offering a penalty of perjury declaration on that issue from its expert, Dr. Snyder. (Dkt. 149 at 12 ("From this claim language, a POSA would understand that the term 'reprogramming' refers to 'directly reprogramming' using transcription factors and not to SCNT or other methods."); *e.g.*, Dkt. 149 ¶¶ 72-76.) Further, the Court's tentative claim construction order did not restrict the claims to SCNT. (Dkt. 192 at 20-34.) While the Court ultimately settled on a construction that limited the literal scope of the Asserted Method Claims to SCNT cloning efficiency, Plaintiffs' arguments that it should not be so limited were not uncommonly weak or objectively unreasonable.

### E. Plaintiffs' Amended Infringement Contentions

Within a month of the Court's claim construction order, Plaintiffs amended their Infringement Contentions. (Ex. 20, Am. Infringement Contentions.) In their amended infringement contentions—and for the rest of the case—Plaintiffs diligently adhered to the Court's construction of "making the cell more susceptible to reprogramming."

Under the Court's construction requiring a two-step process involving "priming" for "subsequent reprogramming," Plaintiffs relied on a declaration from Dr. Plath, detailing how the underlying biology of direct reprogramming aligns with the Court's construction. (Ex. 10.) Dr. Plath explained, with support from peer-reviewed literature on the mechanism of cellular reprogramming, that Oct4 functions as a "pioneer" transcription factor by binding to "closed" chromatin to release sections of DNA containing pluripotency genes for subsequent expression by other factors. (*Id.* ¶¶ 12-19.) Dr. Plath also explained that Oct4 serves the identical role in direct reprogramming as it

does in the Asserted Patents' example, so that if one refers to its role as "priming" in the example, it also "primes" in direct reprogramming. (Ex. 10 ¶ 23.) From a biological perspective, Dr. Plath explained that it is immaterial that other transcription factors are introduced along with Oct4 in direct reprogramming because they are simply along for the ride until Oct4 has completed the priming process.[4] (*E.g.*, *id.* ¶¶ 20-21.)

As to the "improving cloning efficiency" language, Plaintiffs dropped their literal infringement allegations and proceeded only under a DOE theory after claim construction. (*See generally* Ex. 20.) As Dr. Plath explained, the "cloning efficiency" of an SCNT process is essentially the same as the efficiency of iPSC production, as both efficiencies are simply measures of the percentage of somatic cells converted to pluripotent cells. (*E.g.*, Ex. 10 ¶¶ 22-25.)

## F.  The Contentious Summary Judgment Hearing

Almost four months after Plaintiffs' amended their Infringement Contentions, Shoreline filed for summary judgment, challenging almost every infringement issue. (Dkt. 290.) The parties vigorously disputed these issues. The Court initially allocated one hour for the hearing and extended it into the afternoon given the breadth of both sides' arguments. (Dkt. 357.) The Court ultimately granted Shoreline's motion and explained, in a 38-page opinion, why it disagreed with Plaintiffs' infringement theory. (Dkt. 390.)

## G.  Plaintiffs' Well-Supported Damages Theory

Since the start of the case, Plaintiffs consistently asserted that they were entitled to damages in the form of a reasonable royalty to compensate for Shoreline's infringement. (*See, e.g.*, Dkt. 1 ¶¶ 88, 118, 145, Prayer for Relief; Ex. 24, Pls.' Damages Contentions at 13.) Based on Shoreline's failure to timely produce documents, Plaintiffs were forced to have multiple discovery conferences with Magistrate Berg and also file a discovery

---

[4] Dr. Plath also detailed how Lonza used a two-step process to make its iPSCs. (Ex. 23, Plath MSJ Opp. Decl. ¶¶ 61-64.) First, Oct4 was exogenously introduced in a "priming medium" and cultured for two days (i.e., a "priming" step). (*Id.*) Then, the cells were plated on specific feeder cells, and a specific media, growth factors, and other agents necessary for reprogramming were added. (*Id.*) The cells were cultured for *weeks* until iPSC colonies appeared (i.e., a "reprogramming" step). (*Id.*) Dr. Plath explained that without these steps after "priming," reprogramming could not occur. (*Id.*)

dispute. (Dkts. 77, 85, 163.) The Court denied Plaintiffs' request for certain damages related documents and for reconsideration, finding that valuation, market capitalization, and/or investor discovery was overbroad and/or irrelevant. (Dkts. 209, 255.) Accordingly, Plaintiffs' damages theory does ***not*** rely on such documents.

Plaintiffs' damages expert, Dr. Michael Keeley, used the hypothetical negotiation construct and *Georgia-Pacific* factors to determine a reasonable royalty. (Ex. 25, Keeley Rpt. ¶¶ 28-38, 111-67.) Dr. Keeley used two methods to determine the incremental benefits to Shoreline of having made and used iPSCs starting in August 2020, rather than waiting for the Asserted Patents to expire in November 2024. (*Id.*) He relied on Shoreline's own sales projections from the relevant time, royalty rates from comparable licenses, and many other pieces of corroborating evidence from Shoreline as the basis for his opinions (*see generally id.*). *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (explaining that the well-known analytical method focuses on the infringer's projections of profit); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) (finding damages upheld that were premised on a lump sum royalty payment based on an infringer's expected sales).[5]

## III. LEGAL STANDARD

A party is not entitled to attorney's fees under the Patent Act unless the court finds that the case is "exceptional." 35 U.S.C. § 285. An exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane*, 572 U.S. at 554. Courts determine this "in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* at 554. The showing required for an exceptional case, is a "high bar" and extraordinarily difficult to make. *Nantkwest, Inc. v. Iancu,* 898 F.3d 1177, 1182 (Fed. Cir.

---

[5] Both parties filed *Daubert* motions against the other side's damages expert, however, the Court denied both motions as moot based on the Court's summary judgment order. (Dkts. 288, 291; Dkt. 390 at 38 n.15.) Shoreline's disagreement with Plaintiffs' damages expert is not a basis for *Daubert* (Dkt. 311), let alone exceptionality.

2018), *aff'd sub nom. Peter v. Nantkwest, Inc.*, 140 S. Ct. 365 (2019).

Courts do not award fees "as a penalty for failure to win a patent infringement suit.'" *Octane*, 572 U.S. at 548 (cleaned up). "In other words, fees are not awarded solely because one party's position did not prevail." *Gaymar Indus.*, 790 F.3d at 1373. This would conflict with the Supreme Court's mandate that Section 285 requires a case to "stand[] out from others" and "would have negative implications for access to justice." *Cambrian Sci. Corp. v. Cox Commc'ns, Inc.*, 79 F. Supp. 3d 1111, 1115 (C.D. Cal. 2015). "[W]here a party has set forth some good faith argument in favor of its positions it will generally not be found to have advanced exceptionally meritless claims." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2017 WL 130236, at *6 (N.D. Cal. Jan. 13, 2017) (cleaned up). "A party's position on issues of law ultimately need not be correct for them to not stand out, or be found reasonable." *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015) (quotation omitted). "When a losing party has not committed independently sanctionable conduct, such as [conduct that violates Rule 11], it will be a rare case in which that party's unreasonable conduct will nonetheless be so exceptional as to justify an award of fees." *Whitewater W. Indus., Ltd. v. Pac. Surf Designs, Inc.*, 2021 WL 1265210, at *1 (S.D. Cal. Apr. 5, 2021) (cleaned up).

Even if a case is exceptional, the court has discretion to not award fees. *Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990). Courts have found that a party "taking an aggressive stance while positing stretched or unsuccessful infringement theories does not, without more, warrant fee-shifting." *Vasudevan Software, Inc. v. Microstrategy, Inc.*, 2015 WL 4940635, at *5 (N.D. Cal. Aug. 19, 2015). The court's disagreement with a party's application of its claim construction also does not render a case exceptional. *E.g., Enovsys LLC v. AT&T Mobility LLC*, 2016 WL 3460794, at *12 (C.D. Cal. Feb. 16, 2016) ("Even though the Court ultimately disagreed with certain of Enovsys's contentions on summary judgment, it does not necessarily follow that Enovsys's positions were 'objectively baseless'"); *see also EON Corp. IP Holdings LLC v. Cisco Sys. Inc.*, 2014 WL 3726170, at *5 (N.D. Cal. July 25, 2014). The Federal Circuit

has also found "that the ultimate failure to produce admissible evidence to support [an] infringement theory alone [does not] makes [a] case exceptional." *OneSubsea IP UK Ltd. v. FMC Techs., Inc.*, 68 F.4th 1285, 1297 (Fed. Cir. 2023).

## IV.  ARGUMENT

Plaintiffs brought this case in good faith and advanced infringement and damages theories strongly supported by expert testimony and a thorough analysis of the facts and law. Plaintiffs' infringement arguments, although rejected on summary judgment two months before trial, did not lack merit. Shoreline's assertions and characterizations to the contrary are unjustified, and there is no evidence of bad faith or litigation misconduct. Plaintiffs litigated this case reasonably. It is not exceptional and does not warrant fees.

### A.  Plaintiffs' Brought This Case in Good Faith

"The law recognizes a presumption that the assertion of a duly granted patent is made in good faith, . . . [and] this presumption is overcome only by affirmative evidence of bad faith." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998). Since the outset of this case, Plaintiffs have had a reasonable basis to believe that Shoreline infringed the Asserted Patents. (Dkts. 1, 108, 157.) Exogenous expression of Oct4 in somatic cells, as first described in the Asserted Patents, is the cornerstone of all commercially manufactured iPSCs. (*E.g.*, Ex. 9 ¶¶ 278, 565, 567-70; Ex. 23 ¶¶ 126-30; *see* Ex. 8 at 239:23-240:2; Ex. 12 at 62:24-63:1, 70:4-7.)

Now, for the first time, Shoreline alleges that Plaintiffs' filing of this lawsuit was in "bad faith" and for improper "motivation." Shoreline never raised allegations of bad faith before, nor could it because there is nothing from Plaintiffs' officers, employees, or witnesses that evidence an improper motive such as to "intimidate" or to "cast a cloud over" Shoreline's business. "A patentee's assertion of reasonable claims of infringement is the mechanism whereby patent systems provide an innovation incentive." *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1375 (Fed. Cir. 2017). The "motivation to implement the statutory patent right by bringing suit based on a reasonable belief in infringement is not an improper motive." *Id.*

9

*First*, Plaintiffs did not file this case out of spite. That Fate Therapeutics filed a separate contractual and tort cause of action against Shoreline and its founders is not "persuasive evidence of an ulterior motive." *Zeta Glob. Corp. v. Maropost Mktg. Cloud, Inc.*, 2023 WL 355655, at *6 (S.D.N.Y. Jan. 23, 2023). It is common for competitors to pursue patent claims concurrently with other non-patent claims when there have been violations of numerous rights and agreements. *See id.*

*Second*, it is untrue that Plaintiffs did not make any pre-litigation attempt to "resolve their difference with Shoreline." (Mot. at 10-11.) It was Shoreline's co-founder, Dr. Kaufman, who ignored Fate Therapeutics' letter notifying him of his breach and requesting him to immediately terminate his relationship with Shoreline. (Dkt. 157 ¶ 50.) There is no reason to believe that sending another notice letter specifically directed to Shoreline's patent infringement would have resulted differently, especially when discovery revealed that Shoreline's founders knew of the Asserted Patents and Fate Therapeutics' ███████████ in iPSCs and specifically chose to ignore them. (Exs. 26-27; *see* Ex. 28, Cherok Dep. Tr. at 106:18-23, 256:5-11; 259:12-16; Ex. 29.)

*Third*, Shoreline faults Plaintiffs for not enforcing their patent rights against others. (Mot. at 10.) But that is not evidence of an improper motive either, particularly given that no entity except Shoreline has intended to become a copycat "Fate 2.0." Moreover, Plaintiffs are not precluded from enforcing their patent rights against others in the future and are neither required, nor can they be expected, to litigate against all infringers simultaneously. *See, e.g.*, *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005) ("A patentee does not have to sue all infringers at once."); *Winterborne, Inc. v. FUJIFILM N. Am. Corp.*, 2015 WL 12734079, at *3 (C.D. Cal., 2015).

*Fourth*, Shoreline argues that Plaintiffs should have known that the Asserted Patents do not cover Shoreline's iPSCs because they are made under the later-disclosed "Yamanaka" method of direct reprogramming. (Mot. at 3-4.) Shoreline asserts this as the basis for Plaintiffs' outsized damages theory. That is logically unsound because, up until the claim construction hearing, Shoreline and its expert believed that the Asserted Patents

covered direct reprogramming (*e.g.*, Dkt. 149 at 12.), and an earlier invention can be a "blocking patent" for a later invention. *See Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1379 n.2 (Fed. Cir. 2000). Plaintiffs' expert, Dr. Plath, testified that one could not practice the Yamanaka method without utilizing the inventions of the Asserted Patents, which Plaintiffs reasonably believed cover intermediate compositions and critical steps in the process of making iPSCs using Oct4. (Ex. 9 ¶¶ 739-50.) That Shoreline's iPSCs were made using the later Yamanaka method does not preclude a finding that Shoreline also infringes an earlier "blocking patent," such as the Asserted Patents.

**B.  Plaintiffs' Infringement Claims Were Objectively Reasonable, Strongly Supported by Expert Testimony, and Not Baseless**

**1.  Plaintiffs Reasonably Litigated Their § 271(a) Claims**

Plaintiffs reasonably litigated their claims under § 271(a) based on Shoreline's alleged acts of making iPSCs. While Shoreline may not have made iPSCs in its lab, it had ThermoFisher generate iPSCs from somatic cells Shoreline provided using a reprogramming kit Shoreline brought to ThermoFisher's attention. (Ex. 30, Cherok Decl. ¶ 7; Ex. 28 at 90:12-91:4; 229:17-230:21; Exs. 31-33; Ex. 34, Rogge Dep. Tr. at 37:9-21; Ex. 35, Rodgers Dep. Tr. at 132:19-133:7, 134:2-11.) Plaintiffs were entitled to take discovery from Shoreline and ThermoFisher, who despite Plaintiffs' diligent efforts was not deposed until the last day of discovery, to determine whether Shoreline possessed agency over ThermoFisher such that Shoreline was acting through ThermoFisher.[6]

At summary judgment after discovery closed, Plaintiffs confirmed, based on the evidence and "Shoreline's representations" that "there is no activity to accuse of direct infringement," that there is nothing to adjudicate under § 271(a). (Dkt. 312 at 32-33.) Thus, the Court denied Shoreline's motion on § 271(a) as moot. (Dkt. 390 at 36.) Shoreline faults Plaintiffs for maintaining these claims, even though the *later* discovered testimony of Dr. Kaufman and Dr. Edward Cherok confirmed that Shoreline "does not itself reprogram somatic cells." (Mot. at 3-4, 12.) Plaintiffs took reasonable discovery

---

[6] Shoreline admits Plaintiffs' allegations were narrowly tailored to ThermoFisher. (Mot. at 12:18-19.)

and decided not to pursue § 271(a) based on Shoreline's collaboration with ThermoFisher. There is nothing exceptional in Plaintiffs' positions or course of conduct.

## 2. Plaintiffs Reasonably Litigated Their § 271(b) Claims

While the Court rejected Plaintiffs' § 271(b) claims for lack of evidence that "Shoreline specifically instructed or directed ThermoFisher to use Oct4" to make Shoreline's iPSCs, Plaintiffs reasonably litigated their claims. (Dkt. 390 at 34 n.13.)

*First*, Plaintiffs met their burden to plead inducement under § 271(b), as the Court found in denying Shoreline's motion to dismiss. (Dkt. 234 at 8-11.)

*Second*, Plaintiffs reasonably believed that the evidence supported their inducement claim based on Shoreline's acts of soliciting customized iPSCs from ThermoFisher. Testimony from a Shoreline employee established that ThermoFisher did not know that Shoreline's monocytes (a particular type of somatic cell) could be reprogrammed. (Ex. 35 at 134:2-11.) It also established that another Shoreline employee, Huafeng Wang, provided ThermoFisher with a scientific article showing that monocyte somatic cells could be reprogrammed using the CytoTune 2.0 kit, to be "helpful." (*Id.*; Ex. 31; Ex. 36.) In fact, Shoreline's founder and then-CSO, Dr. Kaufman, had reprogrammed monocytes using the CytoTune kit. (Ex. 18 at 84:21-85:3; Ex. 37.) It is a matter of public record, and readily verified on Google, that the CytoTune 2.0 kit—like all commercial reprogramming methods—includes Oct4. (Ex. 28 at 93:10-18; Ex. 23 ¶¶ 126-29; Ex. 8 at 239:23-240:2.) Moreover, it is reasonable to infer that Dr. Kaufman knew[7] that the CytoTune 2.0 kit contained Oct4 because he only ever reprogrammed somatic cells using Oct4 (along with the other Yamanaka factors). (Ex. 38 at 28:5-7; 29:14-30:14; 32:4-14.) Indeed, Shoreline's CEO and 30(b)(6) witness, Dr. Xanthopolous, testified that *Shoreline* was unaware of any commercial iPSCs made without Oct4.[8] (Ex.

---

[7] As Shoreline's CSO, Dr. Kaufman's knowledge can be imputed to Shoreline. This is particularly so where the company consisted of only a handful of individuals at the time (Ex. 38, Zhu Dep. Tr. at 28:5-7). *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010); *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372 (Fed. Cir. 2017).

[8] Shoreline's technical experts also testified they only ever made iPSCs using Oct4. (Ex. 12 at 62:24-63:1, 70:4-7; Ex. 11 at 53:2-17; Ex. 39, Snyder Dep. Tr. at 87:6-19; Dkt 151-3.)

8 at 239:23-240:2.) While circumstantial, Plaintiffs reasonably believed that the evidence was sufficient for a jury to conclude that Shoreline knew and intended for ThermoFisher to use the CytoTune 2.0 kit for the custom reprogramming project and knew it contained Oct4. *See Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice."); *see also Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1347 (Fed. Cir. 2016) (reaffirming Supreme Court precedent that circumstantial evidence can support indirect infringement).

*Third*, Shoreline blames Plaintiffs for not identifying evidence of how "Shoreline knew how ThermoFisher intended to produce its iPSC lines or directed ThermoFisher how to do so" in response to its May 25, 2023 letter. (Mot. at 12-13.) But at the time of Shoreline's letter, discovery was ongoing and both David Rodgers and ThermoFisher's witness had not yet been deposed. As explained above, Dr. Rodgers testified that the ThermoFisher team had never reprogrammed monocytes and were unsure if it could be done, which is why Dr. Wang was being "helpful" in providing the Hiramatsu article that discussed the CytoTune 2.0 kit to help ThermoFisher plan how they would make Shoreline's iPSCs. (Ex. 35 at 132:19-133:7, 134:2-11.) While the Court ultimately found that Plaintiffs' evidence could not establish inducement, that does not make Plaintiffs' position objectively unreasonable or stand out from others in terms of its weakness.

*Lastly*, Shoreline argues that Plaintiffs assume an unreasonable damages position by failing to "apportion damages on an iPSC line-by-iPSC line basis." (Mot. at 13-14.) Shoreline never previously raised this issue, and it is incorrect. Dr. Keeley considered a hypothetical negotiation "in August 2020 (when Shoreline first purchased Lonza iPSCs) *or September/October 2021 (when Shoreline made or had made iPSCs by ThermoFisher)*" and provided different calculations for each scenario. (Ex. 25 ¶¶ 20, 22, nn.34-35, 54, Ex. 1; Ex. 40, Keeley Dep. Tr. at 21:2-24.) Shoreline's assertion that Plaintiffs' reasonable royalty was unreasonable based on its "minimal" use of the ThermoFisher iPSCs is an improper hindsight argument that "is irrelevant to

[Shoreline's] state of mind at the time of the hypothetical negotiation." *Interactive Pictures*, 274 F.3d at 1385.

### 3. Plaintiffs Properly Applied the Court's Claim Construction

Within a month of the Court's claim construction, Plaintiffs amended their Infringement Contentions to adapt and apply the Court's construction. (Ex. 20.) Plaintiffs dropped their allegations of literal infringement under the Asserted Method Claims and provided a detailed description and explanation of their DOE argument under the Court's construction. (*Id.*) Plaintiffs' contentions are supported by multiple declarations and hundreds of pages of expert reports from one of the world's leading experts on the mechanism of cellular reprogramming, Dr. Plath, who explained in painstaking detail the scientific basis underlying Plaintiffs' "priming … for subsequent reprogramming" and DOE arguments. (*E.g.*, Ex. 9 ¶¶ 237-305; Ex. 10; Ex. 23 ¶¶ 88-125.) Dr. Plath's consistent and detailed, 286-page expert report alone distinguishes this case from the exceptional cases based on mere "attorney argument." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 2022 WL 17968844, at *3-5 (N.D. Cal. Oct. 6, 2022).

Shoreline did not move for summary judgment after claim construction or after receiving Plaintiffs' amended Infringement Contentions. Nor did Shoreline request that the parties "stipulate to noninfringement," as it now claims Plaintiffs should have done (Mot. at 15-16.) Instead, Shoreline continued to litigate the case on all fronts. That Shoreline decided not to "challenge Plaintiffs' final infringement contentions," but "continued litigating the matter, including with highly substantive summary judgment motions on the merits of almost all issues in the case" shows that it did not view Plaintiffs' infringement theory as baseless. *Neville v. Found. Constructors, Inc.*, 2019 WL 8195559, at *1 (C.D. Cal. Dec. 2, 2019).[9]

### a. Abundant Evidence of Two-Step Direct Reprograming

---

[9] This case is distinguishable from *Clinicomp Int'l, Inc. v. Cerner Corp.*, where the accused infringer moved for summary judgment of non-infringement less than a month after receiving amended contentions, and the court found that the plaintiff "repeatedly shifted its theory of infringement" even during the summary judgment briefing. 2023 WL 1767008, at *9-10 (S.D. Cal. Feb. 3, 2023).

Dr. Plath faithfully applied the Court's construction of "making the cell more susceptible to reprogramming" as requiring a two-step process. In opposing Shoreline's summary judgment motion, Dr. Plath submitted a declaration explaining her opinions on how and why all commercially available direct reprogramming kits involve a two-step process, relying on over a hundred pages of evidence and scientific articles. (Ex. 23 ¶¶ 54-87.) Dr. Plath explained that the Lonza iPSCs are made in a two-step process: first, "Lonza transfected the cells with the episomal plasmids [which include Oct4] and cultured them in a priming medium for ~2 days"; and second, "[t]he cells were then transferred to a reprogramming medium which was changed every other day and the somatic cells were subsequently successfully reprogrammed to a pluripotent state between day 15 to day 25." (*Id.* ¶¶ 61-64.). Lonza itself referred to the media in which Oct4 was added and the somatic cells were cultured for two days as the "priming" media. (*Id.*; Ex. 41.) Lonza also referred to the subsequent step, after the cells were removed from the "priming media," as the "***reprogramming step***." (Ex. 23 ¶¶ 61-64.) As discussed above, Dr. Plath explained in her reports and declarations, how the Court's construction aligns with the actual cell biology underlying direct reprogramming, including the role of Oct4 as a "pioneer" factor that must bind to closed chromatin to free DNA before other transcription factors can operate. (*E.g.*, Ex. 9 ¶¶ 59, 68, 239, 242-63; Ex. 10 ¶¶ 12-21; Ex. 23 ¶¶ 38-45.) Though the Court rejected this, (Dkt. 390 at 12), Dr. Plath's analysis is anything but "conclusory, nonsensical, and baseless." (Mot. at 16; *contra Intex Recreation Corp. v. Team Worldwide Corp.*, 77 F. Supp. 3d 212, 217 (D.D.C. 2015).)

*First*, Shoreline incorrectly characterizes Plaintiffs' litigation positions as attempting to relitigate claim construction. (Mot. at 15-16.) To the contrary, Plaintiffs believed that they were required to file the motion for reconsideration to preserve the claim construction issues for appeal because the Court adopted a claim construction that neither party proposed. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 973 (Fed. Cir. 2018). Asking the court to reconsider "points [a litigant] had already made" is "common, not exceptional." *See Curver Luxembourg, SARL v. Home*

*Expressions Inc.*, 2018 WL 10151930, at *1 (D.N.J. Dec. 20, 2018). After the Court issued its claim construction, Plaintiffs promptly "adapted to the Court's construction of the term" by revising its infringement contentions as any reasonable and competent litigant would do. *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 2015 WL 4756669, at *2 (S.D. Cal. Aug. 10, 2015). While Shoreline faults Plaintiffs for not stipulating to non-infringement after the claim construction order, a reasonable litigant would not have done so because that "could have foreclosed its ability to pursue its doctrine of equivalents theory." *Sportstar Athletics, Inc. v. Wilson Sporting Goods Co.*, 2018 WL 1970754, at *3 (S.D. Tex. Feb. 27, 2018), *report and recommendation adopted*, 2018 WL 2948026 (S.D. Tex. June 13, 2018) (denying a fees motion where claim construction foreclosed literal infringement and the court rejected a DOE argument on summary judgment).

*Second*, Shoreline accused Dr. Plath of "flip-flopping" in sworn testimony. This is also untrue. (Mot. at 17.) During claim construction, Dr. Plath disagreed that a POSA would understand the Asserted Claims to require "priming" a cell. (Dkt. 151-14 ¶¶ 83-87.) This disagreement was based on several reasons, including because Shoreline's expert did not explain what he meant by "priming" and because scientists in the relevant art rarely use the term "priming." (*Id.*) The Court disagreed with Dr. Plath and expressly construed the claims to require "priming." (*See* Dkt. 255 at 18-19.) With this clarification, Dr. Plath was appropriately instructed to apply the Court's construction, despite her disagreement, and did so in her infringement and validity analysis.[10]

*Finally*, Shoreline's last-ditch effort to mischaracterize Plaintiffs' statements as referring to the Court's construction as "trivial" and "merely semantic" is meritless. (Mot. at 15-16.) Plaintiffs argued that **Shoreline's misrepresentation** of Dr. Plath's deposition testimony was "trivial" and "merely semantic," not the Court's construction.[11] (Dkt. 312

---

[10] Shoreline unfairly characterizes Dr. Plath's opinions as a "flip-flop" because if she had not conformed her opinions to the Court's construction, Shoreline would have attacked her for that too.

[11] Shoreline misrepresented Dr. Plath's testimony that Oct4 "initiates" reprogramming. (Dkt. 335 at 12.) It merely reflects the fact that—like in the Asserted Patents' example—the "priming" step is part of the overall process of making iPSCs, which can be referred to as a "reprogramming process," even though the step of reprogramming the cell occurs after priming. Dr. Plath used the phrase "initiated" in her deposition in the same sense that any "priming" step "initiates" an overall process, whether painting or

at 9-10.) In reality, Plaintiffs and Dr. Plath respected the Court's claim construction and consistently applied it. While the Court rejected Plaintiffs' arguments, its 38-page analysis shows that Plaintiffs' arguments were not "exceptional." *See, e.g.*, *Doggyphone LLC v. Tomofun, LLC*, 2023 WL 4743708, at *2 (W.D. Wash. July 25, 2023) (denying a fees motion where in granting summary judgment, the court "devoted at least a ***dozen pages*** to analyzing Plaintiff's arguments") (emphasis added); *Kreative Power, LLC v. Monoprice, Inc*., 2015 WL 1967289, at *6 (N.D. Cal. Apr. 30, 2015) (denying a fees motion where "[t]he Court devoted nearly ***five pages*** of the summary judgment order to analyze Kreative's infringement claim under the doctrine of equivalents and the materiality of prosecution history estoppel" showing the arguments "were plausible and not objectively baseless.") (emphasis added).[12]

At its core, Shoreline asks the Court to find this case "exceptional" because Plaintiffs' claims failed on summary judgment. But courts routinely decide infringement claims on summary judgment, including based on claim construction, without rising to the level of "exceptional" to warrant an award of attorney fees. *See Synchronoss Techs., Inc. v. Dropbox Inc*., 2020 WL 759528, at *3 (N.D. Cal. Feb. 14, 2020) (denying a fees motion after granting summary judgment where plaintiff did not disregard but "[i]nstead, it interpreted the construction (erroneously, in the Court's view) as supporting an infringement claim"); *see also Spineology, Inc. v. Wright Med. Tech., Inc*., 910 F.3d 1227, 1229 (Fed. Cir. 2018); *SkinMedica, Inc. v. Histogen Inc*., 869 F. Supp. 2d 1176, 1202 (S.D. Cal. 2012). Indeed, "claims that are not sufficiently strong to survive summary judgment do not necessitate a finding of an exceptional case." *Cellspin Soft*, 2022 WL 17968844, at *3; *see also WSOU Invs., LLC v. F5 Networks, Inc*., 2023 WL 3723679, at *3 (W.D. Wash. May 30, 2023).

---

reprogramming. (*See* Ex. 42, Hearing Tr. at 10:15-11:9; 29:23-24; 32:17-24.) Plaintiffs believe Dr. Plath's deposition testimony aligns with her expert report and the Court's construction.

[12] *See also Noven Pharms., Inc. v. Amneal Pharms. LLC*, 2021 WL 4033172, at *4 (D. Del. Sept. 3, 2021); *Calypso Wireless, Inc. v. T-Mobile USA Inc*., 2015 WL 1022745, at *4 (E.D. Tex. Mar. 5, 2015) (denying a fees motion where the court rejected claim construction arguments but "only did so after ***fifteen pages*** of analysis") (emphasis added).

17

The few cases Shoreline relies on are easily distinguishable. In *Amazon Web Servs. v. Personalweb Techs., LLC*, the court issued a claim construction that necessitated a conclusion of non-infringement. 2020 WL 5910080, at *11 (N.D. Cal. Oct. 6, 2020). After a stipulation did not materialize, PersonalWeb directed its expert "to base his infringement opinions on a substitute claim construction preferred by PersonalWeb." *Id.* at *12. This intentional disregard for the Court's construction warranted an award of fees. *Id.* at *13. Here, the Court's claim construction did not require a conclusion of non-infringement, and Plaintiffs promptly amended their Infringement Contentions to apply the Court's construction and supported their DOE infringement theory with a detailed declaration from Dr. Plath. (Ex. 20; Ex. 10.)[13]

Ultimately, even if the Court believes Plaintiffs' arguments were weak, Plaintiffs' conduct during this litigation did not "constitute repetitive egregious conduct that amounts to an 'exceptional' case," and Shoreline has failed to point to any such conduct. *Universal Stabilization Techs., Inc. v. Advanced Bionutrition Corp.*, 2018 WL 6181479, at *5-6 (S.D. Cal. Nov. 27, 2018); *see also EON Corp.*, 2014 WL 3726170, at *5 (denying a fees motion even where the court agreed plaintiff's "post-claim construction infringement argument" was "quite stretched"). Plaintiffs faithfully applied the Court's construction and were "entitled to raise those arguments on summary judgment to test the application of the Court's construction." *Enovsys*, 2016 WL 3460794, at *12.

### b. Plaintiffs Properly Applied DOE

After the Court construed "mak[ing] the cell more susceptible to reprogramming" to mean "priming the cell to improve the *cloning efficiency* of the subsequent reprogramming," Dr. Plath provided 36 pages of thorough expert analysis explaining how

---

[13] Shoreline's other cases are distinguishable where a party continued to "rely on infringement theories . . . that were plainly inconsistent with the []claim constructions," or simply "failed to articulate an infringement theory" after the court's claim construction. *Innovation Scis., LLC v. Amazon.com, Inc.*, 842 F. App'x 555, 557 (Fed. Cir. 2021); *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1326-27 (Fed. Cir. 2013); *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1360-61 (Fed. Cir. 2017). Here, Plaintiffs' infringement theory was never plainly inconsistent with the Court's construction, and Plaintiffs' expert diligently applied the Court's construction to the evidence. Nowhere in Shoreline's 35-page motion for summary judgment, Dr. Snyder's 320-page expert report, or the Court's 38-page summary judgment decision has Dr. Plath's testimony been accused of being conclusory.

Oct4 improves reprogramming efficiency in direct reprogramming just as Oct4 "improve[s] the cloning efficiency" in SCNT. (Ex. 9 ¶¶ 237-305.) Dr. Plath explained that cloning efficiency in SCNT and the efficiency of making iPSCs in direct reprogramming are both simply measures of the number of somatic cells converted to a pluripotent stem cell state, and thus "cloning efficiency" is insubstantially different from the improved efficiency of making iPSCs using Oct4 in direct reprogramming. (*Id.*) Shoreline never challenged the scientific correctness of Dr. Plath's analysis.

The Court disagreed with Dr. Plath's application of DOE, finding that she should have applied it to the entire disputed claim term "priming the cell to improve the cloning efficiency of the subsequent reprogramming," rather than "to improve the cloning efficiency of the subsequent reprogramming." (Dkt. 390 at 13.) But that does not render Plaintiffs' litigation position unreasonable because Plaintiffs applied DOE only to the portion of the claim that they believed was not ***literally*** met. (*See, e.g.*, Ex. 9 ¶¶ 237-305.) Dr. Plath and both inventors explained that "priming" with Oct4 is the ***same*** in direct reprogramming as is in the Asserted Patents' example, and that priming improves the efficiency of both direct reprogramming and SCNT. (Ex. 9 ¶¶ 237-305; Ex. 10 ¶¶ 19, 23-26; Ex. 23 ¶¶ 39-44; Exs. 21-22.) Plaintiffs reasonably believe that the analysis is the same whether one focuses on just the language "improve[s] the cloning efficiency of the subsequent reprogramming" or the complete phrase because in either case the cell is primed in the same way (exogenous expression of Oct4), and in either case the efficiency of the subsequent reprogramming is improved. (Ex. 42 at 34:21-36:18.)

Shoreline takes a strawman tactic, mischaracterizing Plaintiffs' DOE theory as arguing that "SCNT and [direct] reprogramming are fundamentally the same." (Mot. at 18.) That is not and has never been Plaintiffs' position, and Shoreline knows it. Plaintiffs have explained to the Court that "SCNT is very different than direct reprogramming." (Mot. 18:11-12.) Plaintiffs' position is and has always been that Oct4 has the same effect of improving the reprogramming efficiency in SCNT and in direct reprogramming, not that the two processes themselves are the same. (*See, e.g.*, Ex. 20.)

In this regard, *Icon Health*, the only case Shoreline cited for the proposition that Plaintiffs' DOE argument renders this case "exceptional," is distinguishable. (Mot. at 17.) There the claims were directed to an elliptical machine having a linkage system for "linear" motion. *Icon Health & Fitness, Inc. v. Octane Fitness, LLC*, 112 F. Supp. 3d 888, 893-95 (D. Minn. 2015). The patentee argued that the claims covered a non-linear (arcuate) motion under DOE, but Icon's own expert testified that the "linear" element was the reason the system was patentable, and the patent examiner relied on the "linear" element in the reasons for allowance. *Id.* at 894. Here, Dr. Plath's explanation of the "priming" function of Oct4 is consistent with the intrinsic record and not unreasonable or contradictory. For example, the Asserted Patents' example and prosecution history support Dr. Plath's opinion that if Oct4 primed the somatic cells in the example, Oct4 would have the same function as direct reprogramming because it serves the same purpose and carries out the same processes in the somatic cell's genome. (Ex. 10 ¶ 19; Ex. 43.) As another example, Plaintiffs' DOE argument was not unreasonable because Shoreline never rebutted Plaintiffs' scientific explanation. (*E.g.*, Ex. 9 ¶¶ 237-305; Ex. 10 ¶¶ 19, 23-26; Ex. 23 ¶¶ 39-44; Exs. 21-22.)

Based on Dr. Plath's expert opinions and analysis, Plaintiffs advanced a reasonable DOE theory of infringement that the Court's construction did not preclude. While the Court ultimately rejected Plaintiffs' DOE argument on summary judgment, court's routinely find that this does not rise to the level of an "exceptional" case warranting attorneys' fees under § 285. *See, e.g.*, *Stopinc Aktiengesellschaft v. J.W. Hicks, Inc*., 131 F. Supp. 3d 763, 773 (N.D. Ind. 2015), *aff'd sub nom. Aktiengesellschaft v. J.W. Hicks, Inc*., 655 F. App'x 858 (Fed. Cir. 2016) (denying a fees motion where the court found on summary judgment that prosecution-history estoppel barred a DOE theory because the patentee presented "thoughtful, reasonable arguments for why it should be allowed to proceed under the doctrine of equivalents"); *Steyr Arms, Inc. v. SIG Sauer*, 2020 WL 1957926, at *3-4 (D.N.H. Apr. 23, 2020); *Auto-Kaps, LLC v. Clorox Co*., 2017 WL 6210846, at *2-3 (E.D.N.Y. Mar. 27, 2017), *aff'd*, 715 F. App'x 1025 (Fed. Cir. 2018).

### C. Plaintiffs' Reasonable Royalty Damages Theory Was Well-Supported and Does Not Support an Exceptional Case Finding

Shoreline's disagreement with Plaintiffs' damages report is not a basis to find this case exceptional and award fees. Indeed, Shoreline's motion largely repeats its Keeley *Daubert* Motion (Dkt. 291), which the Court denied as moot. (Dkt. 390 at 38 n.15).[14] For the same reasons Plaintiffs explained in their Keeley *Daubert* Opposition, which Shoreline did not address, Shoreline's arguments do not support exclusion of his testimony, let alone support an exceptional case finding. (*See* Dkt. 311.)

Even if the Court were inclined to exclude certain of Dr. Keeley's opinions, such exclusion would not render this case exceptional. *Spineology*, 910 F.3d at 1230 (finding no abuse of discretion in declining to award fees where "even if [the court] had excluded [the plaintiff's] damages expert, [its] damages theories are not so meritless as to render the case exceptional"); *Whitewater*, 2021 WL 1265210, at *4; *Digit. Reg of Texas LLC v. Adobe Sys., Inc.*, 2015 WL 1026226, at *2 (N.D. Cal. Mar. 9, 2015).

Furthermore, as the Court already mooted Shoreline's Keeley *Daubert* Motion, it should reject Shoreline's request to reconsider those same arguments. The Court "need not . . . litigate to resolution every issue mooted by summary judgment to rule on a motion for attorney's fees," particularly when, as here, Dr. Keeley's methodology was supported by the facts and relies on well-known Federal Circuit precedent for calculating reasonable royalty damages.[15] (*See* Dkt. 311; *Spineology*, 910 F.3d at 1230; *Munchkin, Inc. v. Luv N'Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020) (reversing a fee award and indicating that the Federal Circuit has "made abundantly clear that district courts have wide latitude

---

[14] Shoreline also asserts that "the Court rejected Plaintiffs' original head-start theory," (Mot. at 18), but it simply denied a motion to compel discovery, which is not exceptional. *See, e.g.*, *Seoul Semiconductor Co., Ltd. v. Bed Bath & Beyond*, 2023 WL 2629872, at *3 (C.D. Cal. Jan. 10, 2023) ("the Court is not persuaded that the parties' evidentiary dispute amounted to litigation misconduct").

[15] Shoreline's reliance on *Icon Health* is irrelevant because that case concerned "an old patent 'sitting on the shelf' and had never been commercialized," while here, the Asserted Patents form the basis for Fate Therapeutics' valuable iPSC platform. (*Icon Health*, 112 F. Supp. 3d at 898; Ex. 25 ¶¶ 8, 10, 102-09.) While calling Plaintiffs' damages "eye-popping," Shoreline ignores that it entered into collaboration agreements valued at $3.7 billion before it even had a single product. (*Id.*)

to refuse to add to the burdens of litigation by opening up issues that have not been litigated but are asserted as bases for a fee award.") (cleaned up).)

### 1. Dr. Keeley Did Not Rely on Post-Expiration Sales

Shoreline asserts that Dr. Keeley tried to "end run around the bar on post-expiration royalties," and committed an "offense[] against well-established law" because he allegedly testified "that he rolled the value of these post-expiration sales into a lump sum because the law would not permit a running royalty on them." (Mot. at 19-20.) But, Shoreline cites a snippet of deposition testimony taken out of context and misrepresents Dr. Keeley's opinions and testimony. Dr. Keeley uses the hypothetical negotiation outlined in *Georgia-Pacific* to determine a reasonable royalty for Shoreline's infringement. (Ex. 25 ¶¶ 28-38, 111-67.) He made clear that his hypothetical negotiation opinions were not based on post-expiration sales but on "the incremental benefits [Shoreline] would receive by practicing the patents-in-suit starting in 2020 instead of starting in 2024." (Ex. 25 ¶¶ 21-23, 29-30, 33-34, 111-15; Ex. 40 at 61:12-63:17, 75:13-77:7, 143:12-22.) Despite being aware of this testimony, Shoreline fails to address it.[16] (Dkt. 311 at 3-5.)

Shoreline also argues that Dr. Keeley improperly "eschewed a running royalty framework . . . in favor of his fully-paid up arrangement," (Mot. at 19-20), even when Shoreline's own expert agreed that a lump-sum payment "would be appropriate" here. (Ex. 44, Schottelkotte Rpt. ¶ 201; Ex. 40 at 89:9-12.)

### 2. Dr. Keeley Thoroughly Evaluated All Licenses

Shoreline asserts that Dr. Keeley "ignored the most comparable license . . . in favor of admittedly non-comparable agreements." (Mot. at 20.) But Shoreline is well-aware that Dr. Keeley explained in detail why he does not believe that the ▮▮▮▮ license is technically comparable—relying on Dr. Plath—nor economically comparable. (*See* Dkt. 311 at 8-9; Ex. 40 at 94:2-110:11.) Shoreline also asserts that "Dr. Keeley never opined that the complex ▮▮▮▮▮▮▮▮ agreements are economically comparable to the

---

[16] Shoreline's assertion that Plaintiffs have "not 'marshalled case law to make a colorable argument'" also ignores the case law cited through Plaintiffs' Keeley *Daubert* Opposition. (Dkt. 311.)

hypothetical negotiation's bare, non-exclusive license." (Mot. at 20-21.) But, again, Shoreline's assertion is misleading and wrong because Dr. Keeley analyzed both agreements and explained that ████████████ are the most comparable licenses to the hypothetical license to Shoreline because ████████████

████████████ (Dkt. 311 at 8-9); *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights"). Regardless, Shoreline's disagreements on comparability are not a basis for exclusion, let alone finding a case exceptional. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330-31 (Fed. Cir. 2014) ("[T]he 'degree of comparability' . . . was '[a] factual issue[] best addressed by cross examination and not by exclusion.'") (cleaned up).

### 3. Dr. Keeley Did Not Opine on Lost Profits or "Ignore" Shoreline's Position at the Time of the Hypothetical Negotiation

Shoreline asserts—without any evidence—that Dr. Keeley's damages amount "conveniently equaled Fate's supposed lost profits." (Mot. at 21.) Dr. Keeley's Method 2 is not a lost profits analysis, but is simply another way to look at the incremental benefit to Shoreline of beginning to use the Asserted Patents in 2020. Dr. Keeley never analyzed actual sales Fate Therapeutics may have lost. (Ex. 25 ¶¶ 32, 35-38, 122-31.) Dr. Keeley considered what Fate Therapeutics "could have insisted on as compensation for licensing its patents to [the defendant] as of the beginning of [the defendant's] infringement." *See AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334, n.3 (Fed. Cir. 2015). For this reason, Shoreline's citation to *Syneron Med. Ltd. v. Invasix Inc.* is irrelevant, as that case concerned an expert who "unmistakably, [used] the profits [the plaintiff] would have earned had it made [the defendant's] sales (*i.e.*, [the plaintiff's] lost profit but for [the defendant's] infringement), assuming that there are no other competitors." 2018 U.S. Dist. LEXIS 220514, at *9-10 (C.D. Cal. Aug. 27, 2018). Dr. Keeley did no such thing here. He applied the same methodology as in *Monsanto Co. v. DuPont de Nemours and Co.*, a case in which the jury awarded damages to the plaintiff for one billion dollars

based on facts similar to those here. (2012 WL 5397601, *3 (E.D. Mo. Nov. 2, 2012); Keeley Dep. Tr., 75:23-77:7.)

Shoreline also asserts that "Plaintiffs ignored that, in August 2020, Shoreline was two-months old and had only raised ███████" and "did not have the capital" to pay Dr. Keeley's "outrageous up-front sum." (Mot. at 21-22.) But Shoreline ignores that it argued, and the Court found, that Shoreline's capitalization, valuation, and investors are *irrelevant* to the reasonable royalty. (*Id.* at 8.) Thus, Dr. Keeley could not have relied on such information. Shoreline's own cited case indicates that "an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013). While Shoreline criticizes the size of the damages amount, Dr. Keeley's calculations were based on Shoreline's own expectations at the time of the hypothetical negotiation, including forecasts from "an independent third party consultant with specialized knowledge," as well as other Shoreline documents from the relevant time, which provide objective evidence of its expectations and are consistent with its sales projections. (Ex. 25 ¶¶ 31, 33-34, 103-09; Ex. 40 at 148:7-149:7, 151:14-153:1, 168:10-171:18.)

### 4. Dr. Keeley Did Not "Refuse to Apportion"

Shoreline asserts that "Plaintiffs' damages case was also objectively baseless in attributing the entire value of iPSCs and iPSC-derived therapies to the Asserted Patents." (Mot. at 22). But, relying on Dr. Plath, Dr. Keeley assumes that the Asserted Patents are necessarily infringed by the manufacture and/or use of iPSCs, which is the foundation for everything Shoreline does. (Ex. 25 ¶¶ 8-10, 14-16, 20-23, 53-54, 63, 102-09.)[17] iPSCs are not multi-component products and because there was no previously existing way to make iPSCs, Dr. Keeley's analysis is properly supported. *See AstraZeneca*, 782 F.3d at 1337-40 (the entire market value does not apply because "[the plaintiff's] patents cover

---

[17] Shoreline asserts that "Dr. Keeley also ignored Shoreline's contributions in transforming iPSCs" (Mot. at 22), but Shoreline's use of iPSCs—not "iPSC-derived therapies"—is accused of infringement. Shoreline asserts that "Dr. Yamanaka's Nobel-Prize-worthy contributions" should be considered, but Dr. Keeley relies on Dr. Plath's testimony that the Asserted Patents are foundational to the manufacture iPSCs, whereas Dr. Yamanaka's patents "can be designed around." (Ex. 25 ¶¶ 96, 139, 144.)

the infringing product as a whole, not a single component of a multi-component product," and no apportionment was necessary because the "product was previously unknown in the art and was novel in its own right.").

Shoreline asserts that there is no "authority recognizing an exception to apportionment for method patents," but Shoreline fails to address *AstraZeneca*. (Mot. at 23; Dkt. 311 at 2.) Shoreline's cases on method patents are distinguishable because each concerned a method where there were non-infringing alternatives. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022); *CH2O v. Meras Eng'g*, 2017 U.S. Dist. LEXIS 235890, at *18 (C.D. Cal. July 13, 2017). Here, Dr. Keeley assumed that there were no non-infringing alternatives, based on the testimony from Dr. Plath and Shoreline's CEO, because there is no commercially viable way to make iPSCs without infringing the Asserted Patents. (Ex. 25 ¶ 15.)

### D. The Court Should Defer Ruling on This Motion Pending Appeal

Shoreline's Motion relies on the Court's claim construction order and summary judgment opinion, which are on appeal. (Dkt. 405.) While Plaintiffs believe that it is appropriate for the Court to deny Shoreline's Motion, if the Court is not so inclined, it should exercise its discretion to defer consideration of this Motion until after the pending appeal in the interest of judicial efficiency. *See, e.g.*, *FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*, 2018 WL 6830611, at *3 (S.D. Cal. Dec. 21, 2018) (denying a fees motion because "it would be most efficient to consider a motion for attorneys' fees after the appeal has been resolved"). If the judgment is reversed on appeal, Shoreline will not be entitled to any fees and the Court's work on the present Motion would be wasted effort. A decision from the Federal Circuit overturning any adverse rulings will also be instructive for the Court's consideration of the totality of the circumstances.

## V. CONCLUSION

For at least the foregoing reasons, the Court should deny Shoreline's Motion.

DATED: October 2, 2023

WRIGHT, L'ESTRANGE & ERGASTOLO
and
GREENBERG TRAURIG, LLP

*Attorneys for Plaintiffs Fate Therapeutics, Inc.*
*and Whitehead Institute for Biomedical Research*

By: _/s/Joseph T. Ergastolo_
    Joseph T. Ergastolo
    jte@wlelaw.com